**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Fairway Group Holdings Corp. Securities Litigation | Case No. 1:14-cv-0950-LAK (AJP) |
| | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| | **ECF CASE** |

# TABLE OF CONTENTS

I.  NATURE OF THE ACTION ............................................................................... 1

II.  THE CLAIMS ASSERTED IN THE COMPLAINT ...................................... 7

III.  JURISDICTION AND VENUE ...................................................................... 8

IV.  THE EXCHANGE ACT PARTIES ............................................................... 9

    A.  Lead Plaintiff ................................................................................... 9

    B.  Exchange Act Defendants ............................................................... 9

        1.  The Company ........................................................................ 9

        2.  Individual Defendants ......................................................... 10

        3.  Sterling Defendants ............................................................. 11

V.  BACKGROUND AND NATURE OF THE FRAUD ....................................... 13

    A.  Background On Fairway And Its Acquisition By Sterling ................... 13

    B.  Sterling Positions Fairway For An IPO By Causing Fairway To Implement
        An Aggressive (And Expensive) Store Expansion Plan ....................... 15

    C.  The Expansion Plan Fails To Increase Sales As Expected And Saddles
        Fairway With More Than $260 Million In Debt .................................... 16

    D.  Facing The Possibility That Its Investment In Fairway Could Lose
        Significant Value, Sterling Accelerates Its Plans To Conduct An IPO ......... 17

    E.  The April 17, 2013 IPO: Fairway Sells $180 Million In Stock To Public
        Investors Based On Representations Regarding The Company's
        "Growth Potential" ................................................................................ 18

        1.  New Store Growth ............................................................... 18

        2.  Same Store Sales Growth .................................................... 20

        3.  Deferred Tax Assets And EBITDA ..................................... 22

    F.  In The Next Two Quarters After The IPO, Defendants Continue To Assure
        Investors That The Company's "Growth Story" Was On Track ............. 23

    G.  As Defendants Knew, Their Statements To Investors Were Materially
        False And Misleading ............................................................................ 27

1.      The Company Lacked The Infrastructure Or Ability To Execute Its New Store Expansion Plan, And Its Growth Projections Were Pure Fiction ................................................................. 27

2.      The Company's Reported Deferred Tax Asset And Adjusted EBITDA Were Materially False And Lacked Any Objective Basis ........ 33

H.      The Truth Is Revealed ............................................................................ 40

1.      The November 7, 2013 Partial Disclosure ................................. 40

2.      The February 6, 2014 Disclosure ............................................... 42

VI.     ADDITIONAL ALLEGATIONS OF SCIENTER ............................................. 43

VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............................................................................................. 48

A.      The April 17, 2013 IPO Offering Materials ........................................ 48

B.      Fourth Quarter And Fiscal Year 2013 (Ended March 31, 2013) .......... 52

C.      First Quarter 2014 (Ended June 30, 2013) ........................................... 58

D.      Second Quarter 2014 (Ended September 29, 2013) .............................. 62

VIII.   THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET AND AFFILIATED UTE ..................................................................................... 66

IX.     LOSS CAUSATION/ECONOMIC LOSS ........................................................ 67

X.      THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ...................... 69

XI.     CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT .................................... 70

THE SECURITIES ACT CLAIMS .................................................................... 72

XII.    THE SECURITIES ACT PARTIES .................................................................. 73

A.      Lead Plaintiff ....................................................................................... 73

B.      Securities Act Defendants ..................................................................... 74

1.      The Company ............................................................................. 74

2.      Officer Defendants ..................................................................... 74

3.      Director Defendants ................................................................... 74

4. Underwriter Defendants ........................................................................... 76

5. Sterling Defendants .................................................................................. 77

XIII. BACKGROUND TO THE SECURITIES ACT CLAIMS ................................. 78

XIV. THE IPO REGISTRATION STATEMENT CONTAINED UNTRUE STATEMENTS OF FACT AND OMITTED MATERIAL FACTS  NECESSARY TO MAKE THE OFFERING MATERIALS NOT MISLEADING ............................................... 85

XV. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ........................................... 89

XVI. CLASS ACTION ALLEGATIONS ................................................................. 93

XVII. PRAYER FOR RELIEF ............................................................................... 95

XVIII. JURY TRIAL DEMAND ................................................................................ 96

Court-appointed Lead Plaintiff Jacksonville Police and Fire Pension Fund ("Jacksonville P&F" or "Plaintiff"), by its undersigned counsel, hereby brings this action on behalf of itself and all other persons or entities, as specified below, who purchased or otherwise acquired the common stock of Fairway Group Holdings Corp. ("Fairway" or the "Company") between April 17, 2013 and February 7, 2014 (the "Class Period"), and were damaged thereby.  This Second Amended Class Action Complaint is submitted pursuant to the Court's March 25, 2015 Order.  ECF No. 82.

I.      **NATURE OF THE ACTION**

1.      This securities class action arises from a series of material misrepresentations and omissions made by Fairway and the private equity firm that controlled it (Sterling Investment Partners L.P., defined below as "Sterling") regarding Fairway's financial statements and supposedly strong growth prospects.  The misrepresentations set forth below enabled Sterling to "cash out" a large portion of its ownership interest in Fairway through an initial public offering ("IPO") that enriched Sterling by hundreds of millions of dollars while causing public investors, rather than Sterling, to suffer enormous losses when the truth about the Company was revealed.

2.      Indeed, as discussed in more detail below, less than ten months after Fairway's April 17, 2013 IPO, the Company announced that it was completely unable to achieve the "growth plan" that was the IPO's key selling point.  The Company also announced that its same store sales were declining (as opposed to increasing as Defendants had projected), it was writing off its entire deferred tax asset of $26 million – which, under relevant accounting standards, meant that the Company had determined it was "unlikely" to make a profit at any point in the next five years – and the CEO was unexpectedly resigning after fifteen years with Fairway.  In response, the Company's stock price declined 29 percent in a single trading day, dropping from $11.43 to $8.12 – a stunning decline from its Class Period high of over $28 just a few months earlier.

3.      **Background of the Fraud**:  Fairway is a specialty food retailer that was founded in 1933.  Over the next seventy years, the Company gradually expanded from a single store operating on the Upper West Side of Manhattan to four grocery stores located in the greater New York City area.  Since 1975, Fairway was owned and controlled by Howard Glickberg ("Glickberg"), the grandson of the Company's founder.  By focusing on deliberate and careful growth, the Company achieved substantial success: eventually generating more than $300 million dollars in annual net sales while building a strong reputation as a high-end grocery store.

4.      In 2007, Glickberg sold a majority 80 percent stake in Fairway to Sterling, a private equity firm located in Westport, Connecticut.  Sterling immediately assumed full operational control of Fairway by, among other things, placing its representatives on Fairway's Board of Directors (the "Board"), installing Defendant Charles W. Santoro (Sterling's co-founder and managing partner) as the Executive Chairman of the Board, and placing Sterling-affiliated individuals in key executive positions throughout the Company.  In November 2009, Santoro stated publicly that Sterling was going to take Fairway public, telling a major business publication that "an IPO is something that is important to the management team and to us."  Press reports stated that "Sterling plans to stick with the grocer for another five years, and then cash out in an initial public offering."

5.      In order to maximize the size of the IPO (and its own profit), Sterling had to convince the market that Fairway was a "growth company" with the potential to develop into a regional and national competitor to large food retailers such as Trader Joe's and Whole Foods.  To do this, Sterling embarked on an ambitious plan to open multiple new Fairway stores on a short time schedule.  Between 2009 and 2012, Sterling caused Fairway to triple its number of stores

from four to twelve, opening stores in new locations in New York City as well as in suburban areas of Westchester, Connecticut, and Long Island.

6.      These expansion efforts were expensive.  In order to fund its new store growth, Fairway was forced to take on more than $260 million in debt.  In addition, between 2010 and 2012, Sterling extracted more than $20 million in fees from the Company in return for so-called "management services" related to the expansion.  Defendant Santoro predicted that the expansion efforts would be worth the cost, stating in a July 2011 *Wall Street Journal* article that he expected Fairway to triple its net sales to more than $1 billion by the end of 2012.

7.      In reality, Fairway's rapid growth was placing an unsustainable strain on the business.  According to Fairway's former Manager of Financial Planning, who was employed at the Company from April 2008 through August 2013 ("CW 1"), Fairway "struggled every quarter prior to the IPO."  Indeed, in fiscal year 2012, Fairway's twelve stores generated $555 million in net sales, only a relatively small increase over the $343 million that *four* stores had generated in 2009 – and nearly 50 percent less than the $1 billion that Santoro had predicted.  By the fall of 2012 Fairway had incurred $37 million in net losses for the fiscal year, suffered $110 million in losses since 2008, and was saddled with over $260 million in debt.

8.      Faced with the prospect that its large investment in Fairway could become worthless (or at least lose significant value), Sterling accelerated its plans for an IPO.  In August 2012 – more than two years ahead of schedule – Fairway filed for a "confidential" IPO pursuant to the Jumpstart Our Business Startups Act ("JOBS Act"), which had been enacted on April 5, 2012.  The JOBS Act applies only to "emerging growth" companies with gross revenues less than $1 billion, and is designed to allow those companies to go public on a faster time schedule and with less disclosure of financial information than larger companies.

3

9.      On April 17, 2013, Fairway completed its IPO, offering and selling 15,697,500 shares of Fairway common stock to public investors at a price of $13 per share, for total net proceeds of nearly $180 million.  Astonishingly, Sterling itself personally pocketed more than $95 million of those proceeds through $23 million in stock sales, nearly $63 million in "dividend payments," and a $9.2 million "termination fee" paid pursuant to a management agreement between Fairway and Sterling.  The IPO also increased the value of Sterling's remaining stake in the Company to nearly $280 million based on the closing price of Fairway shares on the day of the IPO.  That day, Fairway's common stock rose nearly 30%, jumping from the $13 offering price to trade at $17.35 per share at the day's close.

10.      The favorable market reaction to the IPO was fueled by an intense pre-IPO marketing campaign orchestrated by Sterling, Santoro, and the other Defendants.  In IPO offering documents filed with the Securities Exchange Commission ("SEC") and in written presentation materials distributed to potential investors during multiple IPO roadshows, Defendants painted an overwhelmingly positive picture of the Company's business and prospects.  In particular, they touted the Company's growth potential, stating that the Company was "in the early innings of growth" and telling investors that Fairway had a "highly scalable store format" that would allow it to open three new stores in the coming year and "3-4 stores annually thereafter," ultimately growing to 90 stores in the northeast region and 300 stores nationwide.

11.      Defendants also represented that the Company would see increasing same store sales and "20% top line growth" in the coming years.  Indeed, Fairway recorded a nearly $26 million "deferred tax asset" on its balance sheet. This greatly eased investor concerns about historical losses because, as discussed below, a deferred tax asset could be recorded only if it was "more likely than not" that the Company would generate at least that much profit over the next

five years.  Finally, in historical financial results included in the IPO marketing documents and filings made with the SEC, Fairway claimed that Hurricane Sandy (which hit the Northeast on October 29, 2012) had disrupted business and depressed the Company's earnings in the third quarter and fiscal year 2013 (the quarter immediately prior to the IPO).  This fact led investors to believe that Fairway's pre-IPO results would have been much stronger without the impact of Hurricane Sandy.

12.     After the IPO, Defendants continued to make positive statements about planned new store growth, increases in same store sales, and the Company's financial performance.  For example, on June 6, 2013, in the Company's first public conference call after the IPO, Defendant Ruetsch stated that he was even "more confident" that new store growth was on track.  On August 8, 2013, Defendant Ruetsch stated that Fairway had just completed "the best Q1 in Company history" and that Fairway had "very significant, very meaningful upside" potential.  Analysts reacted positively to these disclosures, with an analyst from Credit Suisse writing that "today's update suggests Fairway's attractive story is very much on track."  In response to Defendants' statements, Fairway's stock price rose more than 100% in just four months, climbing from the $13 IPO price to nearly $28 per share by the middle of August 2013.

13.     Unfortunately for investors, Defendants' statements were false.  As discussed in more detail below, Fairway lacked the infrastructure and ability to open three to four stores annually, let alone eventually expand to 90 stores in the Northeast and 300 stores nationally.  As multiple former high-level employees of the Company have stated, Fairway's public statements regarding its growth and future financial performance were "pie in the sky targets" that insiders knew were completely unrealistic. Moreover, contrary to the Company's representations and as the Company subsequently admitted, Hurricane Sandy was actually a "net positive" for Fairway,

resulting in some of the most profitable days in the Company's history.  Defendants knew that Hurricane Sandy had a positive impact on Company's earnings, based on (among other things) weekly sales reports that were generated automatically for each store, which information was reported to Fairway's upper management.

14.     **The Truth Is Revealed**: On November 7, 2013, investors began to learn the truth when the Company announced that:  (i) it would open only two stores, rather than three to four, during fiscal year 2015; (ii) net sales growth for the second quarter 2014 was 14.1%, rather than the 20% set forth in the Company's guidance; and (iii) Hurricane Sandy had actually had a "net positive" impact on the Company's historical financial results.  While Defendants rushed to prop up Fairway's stock price by continuing to make materially false statements about the Company, Fairway's stock immediately plummeted 21.6% from the prior day's price of $25.46 to close at $19.95 per share, on the then-highest trading volume in the Company's history.

15.     On February 6, 2014, the full truth was finally revealed when the Company announced that it had missed all major financial metrics in third quarter 2014 and had not achieved its projections for new store growth or same store sales.  Among other things, Fairway announced that its Adjusted EBITDA (*i.e.,* Earnings Before Interest, Taxes, and Depreciation Allowance) for the quarter was $12.8 million – just three percent growth – far below both analysts' consensus estimates of $15.1 million and the Company's prior guidance of 20% - 25% growth.  The Company also wrote off its entire deferred tax asset of nearly $26 million, revealing for the first time that Fairway was not likely to be profitable at any point during the next five years – *i.e.,* it would not make any profit before January 1, 2019 at the earliest.  Finally, the Company announced on February 6, 2014 that Defendant Ruetsch had unexpectedly resigned after fifteen years with Fairway and two years as CEO, and that Bill Sanford, a partner of Defendant Sterling, and

6

Fairway's President since April 2012, was assuming the role of interim CEO immediately. Ruetsch's resignation was a complete surprise, coming less than one year following the IPO – where Ruetsch was described as a "key" member of management – and without a replacement or a succession plan in place.

16.     On February 7, 2014, the first trading day after Defendants' revelations, Fairway's stock price immediately declined, falling 29% in a single trading session, from a close of $11.43 on February 6, 2014 to a close of $8.12 on February 7, 2014. Trading volume was the largest it had been on any day since the Company went public in April 2013. Analysts reacted immediately, uniformly downgrading the stock and lowering price targets.

17.     On March 13, 2014, the Securities and Exchange Commission ("SEC") Division of Corporate Finance sent Defendants a comment letter raising numerous questions regarding Fairway's Adjusted EBITDA and deferred tax assets, including how Fairway determined for the IPO Documents that no additional valuation allowance was required for the remaining $26 million of deferred tax assets the Company recorded at March 31, 2013. As of July 17, Fairway's stock price had declined even further, closing at $6.07.

## II.     THE CLAIMS ASSERTED IN THE COMPLAINT

18.     In this Complaint, Plaintiff asserts two different sets of claims on behalf of purchasers of Fairway's common stock during the Class Period. Counts One and Two assert fraud claims under Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") against Fairway, Sterling and three of Fairway's current and former officers and directors (defined below as the "Individual Defendants"). Counts Three, Four and Five assert strict-liability and negligence causes of action under the Securities Act of 1933 ("Securities Act") against those Defendants who are statutorily responsible under Sections 11 and 12(a)(2) of the Securities Act for materially untrue statements and misleading omissions made in connection with Fairway's IPO,

and control person claims related to the IPO under Section 15 of the Securities Act.  Plaintiff

specifically disclaims any allegations of fraud in the non-fraud claims brought under the Securities

Act, which are pleaded separately in this Complaint from Plaintiff's Exchange Act claims, except

that any challenged statements of opinion or belief made in connection with the IPO are alleged to

have been materially misstated statements of opinion or belief when made and at the time of the

IPO.

## III.    JURISDICTION AND VENUE

19.    This Court has jurisdiction over the subject matter of this action under Section 22

of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and

28 U.S.C. §§ 1331 and 1337.  The claims alleged herein arise under Sections 11, 12(a)(2) and 15

of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, and Sections 10(b) and 20(a) of the

Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations of the SEC

promulgated thereunder, including Rule 10b-5, 17 C.F.R. § 240.10b-5.  In connection with the acts

and conduct alleged in the Complaint, Defendants, directly or indirectly, used the means and

instrumentalities of interstate commerce, including but not limited to the mails, interstate wires,

interstate telephone communications, and facilities of the national securities markets.

20.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331,

because this is a civil action arising under the laws of the United States.

21.    Venue is proper in this District pursuant to Section 22 of the Securities Act, Section

27 of the Exchange Act, and 28 U.S.C. § 1391(b), (c), and (d).  Many of the acts and transactions

that give rise to the violations of law alleged herein, including the dissemination to the public of

materially untrue and misleading press releases and filings with the SEC, occurred in this District,

where the Company's securities actively traded on the NASDAQ Stock Market. During the Class

Period, Fairway maintained its principal executive offices at 2284 12th Avenue, New York, New York.

22.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

## IV.     THE EXCHANGE ACT PARTIES

### A.     Lead Plaintiff

23.     Jacksonville Police and Fire Pension Fund ("Jacksonville P&F" or "Lead Plaintiff") is a public pension plan established for the benefit of the full-time police officers and fire fighters of the City of Jacksonville, Florida.   Jacksonville P&F has over $1 billion in assets under management.   As reflected in the certification already on file with the Court (Dkt. 28-1), Jacksonville P&F purchased shares of Fairway securities during the Class Period and was injured as a result of the violations of the federal securities laws alleged herein.

### B.     Exchange Act Defendants

#### 1.     The Company

24.     Defendant Fairway Group Holdings Corp. is a Delaware corporation that maintains its principal executive offices and conducts business in this District at 2284 12th Avenue, New York, New York.   Fairway is a food retailer in the greater New York City area, widely known for offering fresh, natural, and organic products, among other items, in its 14 stores.   Fairway became a publicly traded company through an IPO conducted in April 2013.   The IPO was conducted pursuant to a Registration Statement (No. 333-184063) that was filed with the SEC on April 16, 2013 (as amended) and an incorporated Prospectus dated April 16, 2013 (collectively, the "IPO Documents"), through which Fairway registered 13,407,632 shares of Class A common stock and

certain identified insiders registered 242,368 shares of Class A common stock.  In the IPO, Fairway ultimately sold 15,697,500 of the outstanding shares, for net proceeds of $180 million.  Fairway common stock trades on the NASDAQ Stock Market under the ticker symbol "FWM."

### 2.     Individual Defendants

25.     Defendant Charles W. Santoro ("Santoro") was at all relevant times Fairway's Executive Chairman of the Board.  Santoro is a co-founder and managing partner of Sterling Investment Partners L.P., and is a member of the general partner of each of the Sterling Funds discussed below.  In his capacity as a member of the Sterling Funds, Santoro has shared voting and investment power with respect to, and therefore is deemed to be the beneficial owner of, the shares beneficially owned by the Sterling Funds.  During the Class Period, Santoro reviewed and approved Fairway's filings with the SEC that contained false and misleading statements, as detailed herein, and participated in conference calls and industry conferences with securities analysts during which Santoro made false and misleading statements.

26.     Defendant Herbert Ruetsch ("Ruetsch") was at all relevant times Fairway's Chief Executive Officer, until he suddenly resigned immediately after the truth about Fairway's poor performance was disclosed to the public on February 6, 2014.  Ruetsch also served as the Company's President from June 2010 to March 2012, Chief Operating Officer from January 2007 to December 2011, and Chief Financial Officer from September 1998 to September 2007.  During the Class Period, Ruetsch reviewed, approved, and signed Fairway's filings with the SEC that contained false and misleading statements, as detailed herein.  Ruetsch also participated in conference calls and industry conferences with securities analysts during which Ruetsch made additional false and misleading statements.

27.     Defendant Edward C. Arditte ("Arditte") was at all relevant times Fairway's Executive Vice President and Chief Financial Officer, and served as a consultant to the Company

in October and November 2012.  During the Class Period, Arditte reviewed, approved, and signed Fairway's filings with the SEC that contained false and misleading statements, as detailed herein. Arditte also participated in conference calls and industry conferences with securities analysts during which Arditte made additional false and misleading statements.

28.     Collectively, Santoro, Ruetsch, and Arditte are referred to herein as the "Individual Defendants."  According to Fairway's SEC filings, the Individual Defendants, and specifically Santoro and Ruetsch, were "key personnel" during the Class Period and were "primarily responsible for determining the strategic direction of [Fairway's] business and for executing our growth strategy."

### 3.     Sterling Defendants

29.     Defendant Sterling Investment Partners L.P. ("Fund I" and, together with Fund II, SBS I, and SBS II discussed below, the "Sterling Funds", and collectively together with the Sterling Funds and Sterling Advisers, "Sterling") is a private equity firm located in Westport, Connecticut, which invests primarily in middle-market companies.  Sterling manages over $1 billion of equity capital.  On January 24, 2007, Sterling acquired an 80.1% stake of Fairway pursuant to an original equity investment of approximately $150 million, with the plan to launch Fairway as a publicly traded national supermarket brand.  In connection with the IPO, Fund I sold 553,448 shares of Class A common stock for proceeds of $6,691,186.  Defendant Sterling's principal place of business is located at 285 Riverside Avenue, Suite 300, Westport, Connecticut 06880.

30.     Defendant Sterling Investment Partners Side-By-Side, L.P. ("SBS I") is an investment fund managed by Sterling.  In connection with the IPO, SBS I sold 7,721 shares of Class A common stock for proceeds of $93,347.  Defendant SBS I's principal place of business is located at 285 Riverside Avenue, Suite 300, Westport, Connecticut 06880.

31.     Defendant Sterling Investment Partners II, L.P. ("Fund II") is an investment fund managed by Sterling.  In connection with the IPO, Fund II sold 1,313,482 shares of Class A common stock for proceeds of $15,879,997.  Defendant Fund II's principal place of business is located at 285 Riverside Avenue, Suite 300, Westport, Connecticut 06880.

32.     Defendant Sterling Investment Partners Side-By-Side II, L.P. ("SBS II") is an investment fund managed by Sterling.  In connection with the IPO, SBS II sold 24,258 shares of Class A common stock for proceeds of $293,279.  Defendant SBS II's principal place of business is located at 285 Riverside Avenue, Suite 300, Westport, Connecticut 06880.

33.     Collectively, the Sterling Funds sold 1,898,909 shares of Fairway stock for proceeds of nearly $23 million.  After the IPO, Sterling retained approximately 72.5% of the voting power of Fairway's outstanding capital stock through its ownership of super-voting Class B common stock, and approximately 77.1% of the voting power of Fairway's outstanding common stock through its ownership of Class A common stock and Class B common stock.

34.     Defendant Sterling Advisers, an affiliate of Sterling, entered into a management agreement with Fairway in 2010.  Pursuant to the agreement, Sterling Advisers consulted with Fairway's Board of Directors and management on business and financial matters, including Fairway's corporate strategy and the IPO.  Sterling, Fairway and Sterling Advisers share several key executives:  Securities Act Defendant Barr is a Principal of Sterling Advisers, and Defendant Santoro and Securities Act Defendant Selden are Managing Members of Sterling Advisers.  Pursuant to the management agreement with Fairway, the Company paid Sterling Advisers over $20 million in monitoring and management fees between 2010 and the April 17, 2013 IPO.  Moreover, Sterling Advisers received $9.2 million, paid directly from the IPO proceeds, as a fee

to terminate the management agreement – netting nearly $30 million in an approximately four-year span.

35.     At all times throughout the Class Period, Sterling exercised control over Fairway through its equity stake, its voting power, and pursuant to various contractual arrangements with the Company.  For example, pursuant to a stockholder agreement (the "Stockholder Agreement") between Sterling and Fairway, Sterling had the right to designate four of the six directors to Fairway's board of directors, including its Chairman.  At the time of the IPO, Sterling in fact had named five of the six directors to Fairway's Board, including Executive Chairman Santoro and additional Sterling Directors Barr, Selden, Key, and Suleman.

36.     Throughout the Class Period, Fairway disclosed in all relevant public filings that it is "controlled by investment funds managed by affiliates of Sterling Investment Partners."

## V.     BACKGROUND AND NATURE OF THE FRAUD

### A.     Background On Fairway And Its Acquisition By Sterling

37.     Fairway was founded in 1933 as a fruit and vegetable market on the Upper West Side of Manhattan.  In 1975, the Company was acquired by Glickberg, the grandson of Fairway's founder.  In 1995 the Company opened its second store, in Harlem, New York.  Six years later the Company opened a third store, on Long Island, and five years after that, the fourth Fairway market opened, in Red Hook, Brooklyn.  These stores performed well, and expanded on Fairway's reputation as a family-run, New York-based food retailer.  By the end of 2006, Fairway's four stores were generating approximately $300 million in annual revenue.

38.     On January 24, 2007, Fairway announced that it had sold a majority, controlling interest in the Company to Sterling, a private equity firm with approximately $1 billion in equity capital under management.  Pursuant to the acquisition, Sterling acquired a majority 80.1% stake of Fairway for an original equity investment of approximately $150 million.

39.     Sterling acted quickly to assume total control of Fairway.  Sterling placed is own founders and partners – all of whom had personal stakes in Sterling's investment fund – into leadership positions at the Company.  For example:

    a.     Santoro was appointed Executive Chairman of the Board of Fairway, where he assumed *de facto* control over day-to-day operations;

    b.     Another Co-Founder and Managing Partner of Sterling, William L. Selden, was appointed Director;

    c.     In 2008, Sterling operating partner William Sanford joined as Fairway's Chief Administrative Officer.  Sanford served as interim CFO and then CFO from September 2011 to December 2012 until he was replaced by Defendant Arditte.  Following Defendant Ruetsch's abrupt resignation on February 6, 2014, Sanford was appointed interim CEO of the Company.  Sanford has also served as President of Fairway since April 2012; and

    d.     Three of the remaining four Board seats were filled by Sterling appointees: Michael Barr (Sterling principal), Stephen L. Key (member of Sterling's Senior Executive Advisory Board), and Farid Suleman (member of Sterling's Senior Executive Advisory Board).

40.     From 2007 forward, Sterling assumed control of the Company's strategic planning and expansion and day-to-day operations.  Glickberg retained the title of CEO until early 2012, but he lacked control over the company he had grown since 1975.  CW 1, who, as referenced above, was Fairway's former Manager of Financial Planning from April 2008 through August 2013, worked closely with the Individual Defendants and stated that during CW 1's tenure, "Charles [Santoro] ran Fairway."

**B.     Sterling Positions Fairway For An IPO By Causing Fairway To Implement An Aggressive (And Expensive) Store Expansion Plan**

41.     As soon as Sterling established its control of Fairway, it began a plan to take Fairway public in order to profit from its investment in the Company.  On November 8, 2009, *Crain's* reported that it had spoken with Santoro, who told them that "Sterling plans to stick with [Fairway] for another five years or so . . . and then cash out in an initial public offering."  Santoro was quoted in the article as stating that that an IPO "is something that is important to the management team and to us . . . We expect it to be a very strong investment for us."  Glickberg was also quoted in the article as stating that Santoro's "expectations are enormous" with respect to the money Sterling hoped to make on the IPO.

42.     Sterling knew that a local grocery store chain that operated just four grocery stores was not a particularly strong candidate for an IPO.  In order to generate sufficient investor interest so that Sterling could conduct a large and lucrative IPO, Sterling had to position Fairway as a "growth" company that had the ability to expand sufficiently to compete with well-known regional and national specialty food retailers such as Whole Foods, Trader Joe's and others.

43.     Accordingly, between 2009 and 2012, under Sterling's and Santoro's control, Fairway expanded at a breakneck speed, tripling from four to twelve stores and opening additional stores in Manhattan as well as the suburban areas of Westchester, Connecticut, and Long Island.

44.     Santoro was publicly bullish about the expansion plans.  On July 11, 2011, the *Wall Street Journal* published an article where Santoro was quoted as saying that "we believe that the New York metro area can satisfy a Fairway food store count that would be well in excess of 30 to 35 stores."  The article also stated:

> The owners brush aside questions about competitors, such as Whole Foods and Trader Joe's, citing growing sales.  Mr. Santoro says the stores currently do about $550 million in sales, which they project

15

will grow to $700 million with the opening of the city stores this
year <u>and to more than $1 billion by the end of 2012</u>.

### C. The Expansion Plan Fails To Increase Sales As Expected And Saddles Fairway With More Than $260 Million In Debt

45.     Sterling's expansion plans placed an enormous strain on Fairway's capital and infrastructure.

46.     By mid-2012, it was becoming clear to Sterling that Fairway's aggressive expansion plans were not going well.  In fiscal 2012 (which ended on April 1, 2012), the twelve Fairway stores generated just $555 million in net sales.  This was only 62 percent greater than the $343 million of net sales that a mere four stores had generated in 2009.  Tellingly, it was also nearly <u>50 percent less than what Santoro had predicted in mid-2011</u>.  As CW 1 confirmed, "[w]e struggled every quarter prior to the IPO."

47.     Moreover, in order to fund this new store growth, Fairway incurred more than $260 million in debt.  In total, by the fall of 2012, Fairway had experienced a $37 million net loss in fiscal 2012, and had piled up a total of $110 million in losses, and extensive debt, between 2008 and 2012.  The situation was so bad that, months before Fairway went public, a partner of New York City-based investment bank the Carl Marks Advisory Group was quoted in the press as stating, "This sounds to me like a company that's going bankrupt, not one that should be going public."

48.     Despite the crippling costs that Fairway was incurring in order to execute on Sterling's expansion plan, between 2010 and 2012, Sterling also insisted on extracting $20 million from the Company in return for "management services."

**D.      Facing The Possibility That Its Investment In Fairway Could Lose Significant Value, Sterling Accelerates Its Plans To Conduct An IPO**

49.      With its expansion plan facing serious setbacks, Sterling knew that its investment in Fairway was at risk of becoming worthless, or at least losing significant value.  Rather than investing more of its own capital and attempting to return the Company to a solid footing, Sterling accelerated its plans for the IPO.

50.      In August 2012, two years ahead of the schedule that Santoro had stated in 2009, Fairway filed for a "confidential" IPO pursuant to the JOBS Act.  With the JOBS Act, Congress created a new initial public offering process that reduces regulatory and reporting requirements under the Securities Act and the Exchange Act for "emerging growth" companies, defined as firms with annual gross revenues of less than $1 billion.  Specifically, emerging growth companies going public are allowed to file confidential submissions of IPO registration statements until 21 days before a roadshow for prospective investors before disclosing *any* financial information.  The JOBS Act also allows emerging growth companies (like Fairway) to (a) disclose only two years of audited financial statements (instead of three), (b) forego an independent auditor's certification of the company's internal controls otherwise required by the Sarbanes-Oxley Act; and (c) allow for investment bankers to arrange communications between analysts and investors earlier than 40 days after the date of the initial public offering.  The passage of the JOBS Act attracted much media scrutiny, with certain private market watchdogs, such as *Rolling Stone* journalist Matt Taibbi, reporting just days following its passage that the law is "a sweeping piece of deregulation that will have an increase in securities fraud" and could be manipulated to "encourage fraud in the stock markets."

E.     **The April 17, 2013 IPO: Fairway Sells $180 Million In Stock To Public Investors Based On Representations Regarding The Company's "Growth Potential"**

51.     Sterling's efforts to conduct an IPO in the fall of 2012 were delayed as a result of Hurricane Sandy, which struck the Northeastern United States on October 29, 2012 and caused the temporary closure of the Company's store in Red Hook, Brooklyn.  The Red Hook store reopened in March 2013.

52.     On April 4, 2013, Fairway filed an amendment to an earlier S-1 Registration Statement, which allowed the Company to begin its "roadshow" to market the IPO.  The roadshow consisted of a series of meetings, primarily with groups of institutional investors, held across the country.  During these meetings, Fairway's most senior executives – including Defendants Santoro, Ruetsch and Arditte – made presentations and answered investor questions.  The roadshow was one of the most important parts of the IPO process because it was a principal way that Defendants and the lead underwriters marketed the IPO directly to institutional investors.  Based on the orders received from investors during the roadshow, Fairway and the lead underwriters determined how many shares to sell in the IPO and the price per share.  These determinations not only set the value of the IPO, but they also set Fairway's market value as a company.

1.     **New Store Growth**

53.     Defendants knew that the only chance that Fairway had to complete an IPO of any size was to convince the market that the Company had enormous growth potential.  For example, as part of their roadshow presentation, Defendants presented a series of "slides" that outlined the Company's projections and guidance.  In these slides, Defendants touted that "Fairway is in the early innings of growth," and projected a 20% "top-line growth story."  Defendants told investors that Fairway would open a multitude of new stores, increase its same store sales, and experience significant revenue growth in the months and years after the IPO.

18

54.     Fairway's ability to open new stores was the key to its "growth story."  Defendants told investors that new stores would increase Fairway's sales and turn the formerly small chain of grocery stores into a regional, and eventually national, competitor of Whole Foods, Trader Joe's, and other well-known and highly successful specialty food retailers.

55.     Defendants represented that Fairway would open two new stores in 2014, three stores in fiscal year 2015 (ending March 29, 2015), and three to four stores annually thereafter. Moreover, in presentations made during the IPO roadshow, Defendants told investors that Fairway had the capability to conduct a "Northeast expansion" by opening more than 90 new store locations, and that there was a "national opportunity" to expand to 300 stores.

56.     During the IPO roadshow, Defendants told the market that there was a "significant upside as store count grows" and that these new stores would "be the primary drivers of [Fairway's] sales, operating profit and market share gains."

57.     Defendants told investors that Fairway already had the experience, business model and infrastructure in place that would allow it to follow through on its aggressive growth plans. For example, the Company's IPO prospectus stated that it had a "proven ability to replicate [its] store model," and roadshow presentations stated that the company had a "highly portable concept" that could drive expansion outside of the New York City metro area.

58.     Further, in its SEC filings and in documents distributed during the IPO roadshow, Defendants repeatedly assured investors that Fairway had the necessary infrastructure to support such enormous growth plans.  Documents distributed during the roadshow stated that the Company had a strong "Platform for Growth" due to "infrastructure investments made to support growth." Similarly, in its IPO prospectus, Fairway stated that "we have made significant investments in management, information technology systems, infrastructure, compliance and marketing to enable

us to pursue our growth plans without a significant increase in infrastructure spending." The IPO roadshow documents also stated that Fairway's "balance sheet [was] well positioned to support growth."

### 2.    Same Store Sales Growth

59.    In addition to growth from new stores, Defendants told investors that they expected sales from their existing stores to continue to grow as well. This was of particular interest to investors because there was a concern that, as Fairway opened more and more stores, the new stores would simply "cannibalize" sales from the older stores rather than increase the Company's revenue on an aggregate basis. Indeed, this had already occurred in connection with Fairway's pre-IPO expansion from 4 stores to 12, and investors were concerned that this trend of decreasing same store sales would continue.

60.    Defendants alleviated this concern in the run-up to the IPO by assuring the market that the Company had experienced "positive SSS [same store sales] growth in most recent period." These statements were repeated in the IPO prospectus filed with the SEC, which stated that Fairway "track[ed] sales on a daily basis" and "expect[ed] to report . . . comparable store sales growth of between 2.0% and 2.3% for the fourth quarter of fiscal 2013."

61.    Moreover, Defendants led investors to believe that its same store sales growth was likely understated because of the impact from Hurricane Sandy, which caused a shutdown of the Company's Red Hook store from November 2012 through February 2013 and purportedly caused other "disruptions" to the Company's business. For example, the IPO prospectus stated that the 2.0% to 2.3% increase in same store sales they expected for the quarter immediately following the IPO "exclude[d] the Red Hook store" (which Defendants stated contributed approximately $12.7 million in sales for the same period the prior year). It further stated that "we were forced to temporarily close our Red Hook, Brooklyn, New York store as a result of damages sustained during

Hurricane Sandy, which has impacted our results of operations" and "the closure of this store impacted our results of operations in our third fiscal quarter ended December 30, 2012."

62.     The IPO prospectus also stated that the Company "temporarily closed <u>all of our stores</u> as a result of Hurricane Sandy . . . [w]hile all but one of our stores was able to reopen within a day or two following the storm, we <u>experienced business disruptions due to inventory delays</u>" and other issues related to the storm.  Similarly, the presentation that Defendants used at the roadshow represented that the "20% top-line growth story" assumed that the Company would realize sales in 2013 from the Red Hook store, which were not realized in 2012 due to Hurricane Sandy.

63.     Defendants knew that investors understood that Hurricane Sandy was a one-time event and that the "business disruptions" and temporary closure of all the Company's stores were not likely to occur again.  Accordingly, it was reasonable for investors to believe that the Company's same store sales would be higher in subsequent years, all other events being equal, absent the highly unusual disruptions caused by Hurricane Sandy.  Defendants knew, however, that Hurricane Sandy was a "net positive" for the Company's earnings.

64.     According to CW 1, weekly sales reports were generated automatically from each store's registers, and would go the Company's management, who would pass that information along to Fairway's upper management.  CW 2 reported that daily sales reports were generated for each store each night through a system called the "Stock Ledger."  According to CW 2, information on daily sales was automatically updated and everyone in senior management, including CEO Defendant Ruetsch and CFO Defendant Arditte had access to that system and its reports.  CW 2 reported that the Stock Ledger system was internally developed and took information from each point-of-sale terminal, and combined that information with costs and margins to generate daily

21

totals.  Further, CW 2 reported that senior management, including Defendants Ruetsch and Arditte, held weekly meetings where they would discuss that week's Stock Ledger results.

### 3.    Deferred Tax Assets And EBITDA

65.    Defendants also told investors that the Company's future revenue would grow exponentially in the wake of the IPO as Fairway increased its store count.  In addition to assuring investors that the Company had a "20% top-line growth story," Fairway recorded a $26 million "deferred tax asset," or "DTA" on its financial statements included with the IPO prospectus.

66.    A deferred tax asset is an asset on a Company's balance sheet that may be used in subsequent periods to offset income tax expenses.  As discussed in more detail below, this deferred tax asset was highly significant to potential investors in the IPO because Generally Accepted Accounting Principles ("GAAP") permit a company to record a deferred tax asset only if the company believes that it is "more likely than not" that the company will be able to use the deferred tax asset to offset taxable income in future years.  Thus, in order for Fairway to claim a $26 million deferred tax asset, it had to have concluded that it was more likely than not that it would have at least $26 million in taxable income within the five-year period that the Company projected.

67.    Defendants also continually stressed the Company's supposedly strong performance in a metric called "Adjusted EBITDA."  In the IPO prospectus, Fairway stated that "Adjusted EBITDA is a useful performance measure and is used by us to facilitate a comparison of our operating performance on a consistent basis from period-to-period and to provide for a more complete understanding of factors and trends affecting our business."  The IPO prospectus emphasized Adjusted EBITDA, stating that "We have increased our . . . Adjusted EBITDA from $23.9 million in fiscal 2010 to $35.8 million in fiscal 2012, or 49.8%, while significantly investing in corporate infrastructure to support our growth, including new store expansion."

68.     Defendants' pre-IPO marketing efforts were successful.   On April 17, 2013, Fairway priced its IPO at $13 per share, well above the initially forecasted range of $10 to $12 per share.  The IPO raised $178 million (excluding fees paid to underwriters) by selling 13.65 million shares (of the roughly 41.2 million shares of outstanding common stock).  Moreover, Fairway's stock price closed at $17.35 on the day of the IPO, climbing 34% in one day.  At the close of trading on April 17, 2013, Fairway had a market capitalization of approximately $700 million (based on the total outstanding shares of common stock), <u>more than quadrupling the value of Sterling's investment in less than two years</u>.

69.     Following the IPO, Defendant Sterling retained 52% of Fairway common stock and more than 70% of the voting power of outstanding shares, a stake that was alone worth approximately $279.1 million, far exceeding its initial investment.  In addition, as set forth above, Sterling recouped approximately <u>$95 million</u> in cash directly from the IPO.  In other words, and astonishingly, <u>approximately half of the IPO proceeds went directly into Sterling's pockets.</u>

70.     Notably, as a beneficial owner of each of the Sterling Funds that sold these shares, Defendant Santoro personally benefited from this sale through his limited and general partnership interests in the Sterling Funds.  Defendant Ruetsch also reaped over $1 million from the offering, nearly double his annual salary, after selling 23,077 shares of Fairway stock in the IPO for $279,000, and receiving a $738,198 IPO bonus, paid directly from the IPO proceeds.

**F.     In The Next Two Quarters After The IPO, Defendants Continue To Assure Investors That The Company's "Growth Story" Was On Track**

71.     On May 13, 2013, the thirty day "quiet period" following the IPO expired and analysts were allowed to initiate coverage on Fairway.  Numerous analysts issued immediately issued positive reports based on the Company's representation of significant growth potential and its projected 20% growth in net sales.  For example, on May 13, 2013, BB&T Capital Markets

("BB&T") initiated coverage of Fairway with a $21 price target and a "Buy" rating, stating that Fairway's "aggressive new store growth strategy will create shareholder value over time."  BB&T focused on "[t]he company's strategies to accelerate fundamental growth [that] focus on building out the store base," and noted that "Fairway's high-return new store economics have been the main driver of its solid fundamentals."

72.     Similarly, on May 13, 2013, William Blair initiated coverage of Fairway with an "Outperform" rating and "Aggressive Growth" company profile, reporting that "the company has potential to surpass our store development estimates" and that "Fairway is one of the most compelling unit growth stories in our coverage universe."

73.     Between the time of the IPO in April 2013 and the end of the Class Period, Fairway communicated annual and quarterly results that met analysts' consensus expectations, and continued to perpetuate Defendants' "growth story."

74.     For example, on June 6, 2013, Fairway announced its fiscal year 2013 fourth quarter results.  In connection with those results, Defendants filed a Form 10-K with the SEC, as well as a Form 8-K and accompanying press release.  The press release quoted Defendant Santoro as stating, "Fairway's Board of Directors, management and employees are excited about our growth outlook and the opportunities ahead," including as a result of the Company's "highly scalable infrastructure."  The press release also highlighted the Company's Adjusted EBITDA, stating, "Adjusted EBITDA Increased 24% for the Fourth Quarter and 32% for the Full Fiscal Year."

75.     On June 6, 2013, Defendants also held a conference call with investors to discuss its fourth quarter and full year 2013 results.  On that conference call Defendants reiterated that Adjusted EBITDA increased 24% in the fourth quarter and 32% in the fiscal year 2013.  Santoro

also reiterated that "[w]e believe we can successfully operate at least 90 stores in this Northeast corridor alone." Indeed, Santoro told investors that Fairway "ha[s] the capacity in the context of our infrastructure to open more stores than this plan provides for." Defendant Ruetsch added that Defendants were "very confident," and, indeed, "more confident" than before the IPO that new store growth was on track and that Fairway's "real estate pipeline is very strong."

76.     Analysts reacted favorably to these statements and to Fairway's results of operations. Indeed, Credit Suisse issued a report titled "Solid Start to Public Life; Already High Management Optimism Continues to Grow," which raised its target price from $22 per share to $23 per share, and stated: "Mgmt. stated that its new store pipeline is developing nicely and highlighted capacity to open more stores than initially planned if the opportunity arises." Similarly, on June 6, 2013, Jefferies issued a report with a "Buy" rating and $24 price target, noting that management "sound[s] particularly bullish on new real estate opportunities" such that the analyst "would not be surprised if new growth unit showed upside in the coming years."

77.     The purported good news continued for the Company in the following quarter. On August 8, 2013, before the market opened, Fairway reported favorable results for the fiscal quarter ended June 30, 2013. In a Form 8-K and press release issued that day, Fairway announced net sales of $186.8 million, which exceeded net sales in same quarter the prior year by more than $32 million, with more than 93% of that growth attributable to the Company's new stores opened in the prior fiscal year. The press release also stated that "Adjusted EBITDA increased 12% to $12.7 million." The Company reiterated its plan to open three to four new stores annually.

78.     On a conference call that day, Defendant Santoro reaffirmed that the Company would "have the capacity to support approximately 30 stores in the greater New York metropolitan area." Santoro also stated that the Company expected "continued positive same store sales in the

25

second quarter." Santoro also highlighted supposedly strong performance in Adjusted EBITDA, stating "our adjusted EBITDA for the quarter was $12.7 million and ahead of our expectations."

79.     Defendant Ruetsch continued with the bullish tone, stating that Fairway had just had "the best Q1 in Company history," which was part of "a continuing trend of positive same store sales and growth" contributing to a "very significant, very meaningful upside for us over the coming two to three years." Ruetsch also stated "we focus very heavily on our adjusted EBITDA margins as a percent of sales.  And, on an annual basis, we've given guidance before that we do expect there is a very significant, very meaningful upside" and "over the next three years on a run rate basis we will drive 200 basis points to our EBITDA margins as a percentage of sales.  That's on an adjusted basis, within the next three years we continue to believe that is very doable.  We see a variety of ways to get there."

80.     Analysts again reacted positively to these disclosures.  For example, on August 8, 2013, Credit Suisse raised its price target to $29 (from $23), and stated that "today's update suggests Fairway's attractive story is very much on track."  Similarly, Jefferies raised its price target to $30 (from $24), stating that management "raised confidence in the growth story" such that "the base case for nine stores over the next three years is intact and could even be 20-30% higher."

81.     Defendants' statements caused Fairway's stock price to rise swiftly and sharply in the months following its IPO.  Specifically, Fairway's stock price rose from the $13 IPO price to nearly $28 per share on August 8, 2013 – an increase of well over 100% in three months.

### G.     As Defendants Knew, Their Statements To Investors Were Materially False And Misleading

82.     Throughout the Class Period, Fairway, the Individual Defendants, and Sterling knew that their representations about Fairway's growth potential and financial performance were materially false and misleading.

### 1.     The Company Lacked The Infrastructure Or Ability To Execute Its New Store Expansion Plan, And Its Growth Projections Were Pure Fiction

83.     It was an open secret within the Company that the "growth plan" Defendants marketed to investors in connection with the IPO and throughout the Class Period was utterly unrealistic.  Numerous former employees of Fairway have confirmed that Defendants lacked any objective basis to believe and/or represent that Fairway had the capital, infrastructure, or means to successfully open three to four stores every year in the greater New York City metropolitan area, let alone build the Company's store base to 90 in the greater Northeast market and 300 nationwide.[1] To the contrary, the supposedly "highly scalable format" and "infrastructure investments made to support growth" were pure fiction.

84.     Defendants knew or should have known from Fairway's ill-fated 2009-2012 expansion from 4 to 12 stores that there were serious deficiencies in the Company's ability to maintain such growth as a result of poor performance, "chaotic" corporate management, and completely deficient infrastructure.

---

[1] In connection with Lead Plaintiff's investigation into the allegations of this Complaint, numerous former employees of Fairway have indicated that, although they would like to discuss matters that occurred at the Company during the Class Period, in their view they are prohibited from doing so because they are subject to severance agreements that contain strict confidentiality provisions. This was a consistent comment from numerous individuals, which suggests that Fairway has been requiring confidentiality agreements so that recent former employees cannot candidly discuss matters occurring during the Class Period.

85.     Indeed, as confirmed by high-level former employees, Fairway simply lacked the capital, infrastructure and internal management capacity to support its aggressive growth targets, a fact known to all Defendants when they communicated these projections to investors.  According to CW 2, the former Assistant Controller at Fairway who worked at the Company from June 2008 through April 2013, at the time of the IPO, Fairway lacked the basic infrastructure needed to facilitate the growth of three to four stores per year.   In fact, CW 2 stated that Fairway's infrastructure – including its IT and warehouse facility for storing and distributing product to the Fairway store – was not fully developed and could not support the kind of growth touted by Defendants.  CW 2 stated that Fairway had one distribution center in Harlem, and it was not nearly large or efficient enough to support any type of significant store expansion.  Among other things, CW 2 explained that the Company's inadequate infrastructure forced it to rely on individual store kitchens to supply multiple stores with certain prepared items, making it impossible for the Company to accurately account for each store's profits and losses.

86.     Fairway not only lacked the current infrastructure to expand, it also lacked the capital required to invest in and improve this infrastructure.  CW 2 stated that "[e]xisting stores could not generate enough to fund the expansion" and there was no way that the Company had sufficient capital for planned future expansion.  CW 2's account was corroborated by CW 3, an employee in Fairway's corporate accounts payable department from September 2011 through March 2013, who stated that Fairway lacked the infrastructure to support the touted growth Fairway marketed in the IPO, as well as CW 1, who reported that the Company suffered from clear infrastructure inefficiencies that constrained its ability to expand.

87.     CW 3 reported that Fairway was opening new stores but not hiring the personnel in the accounts payable department necessary to handle the influx of new employees.  Moreover, CW

28

3 reported that, in direct contrast to Defendant's Class Period statements, Fairway's IT department was not capable of supporting further growth because it could not even sustain the Company's current size, noting that computers were often going down and servers were unable to handle increased capacity. CW 8, a former General Manager in Fairway's Woodlawn Park, New Jersey store from May 2012 to September 2014, likewise stated that in order to open three to four stores annually in the coming years, Fairway would need to steal qualified employees from other stores and pay competitive wages, which the Company was not likely to do.

88.    CW 9, the former bakery manager for multiple Fairway locations from December 2012 through November 2013, regularly received and viewed financial data for the Fairway bakery, including weekly sales figures. CW 9 similarly stated that, following the IPO, he observed in his department declines in production, offerings to customers, and outside purchases. For those reasons, CW 9 "never saw" that Fairway would be able to open three to four stores annually.

89.    These observations were similar to CW 2's observation that the Company was not hiring enough new personnel to staff new stores or to staff corporate headquarters sufficient to support the Company's projected new store growth, and that opening three to four stores a year was "too aggressive, based on the staffing and the systems that we had." Indeed, CW 1, who observed portions of Defendants' five-year growth plan, stated that he never saw increases in administrative expense to cover new infrastructure costs.

90.    CW 4, a former Supervisor for several Fairway stores between October 2010 and January 2013, stated that Fairway's corporate infrastructure was an "unbelievable mess" and a "corporate nightmare." CW 4 stated that, in the lead up to the IPO, Sterling "made life difficult for management and workers" in order to inflate numbers for the IPO. For example, payroll was cut in existing stores where it should not have been cut so that the "bean counters" could

"manipulate[e] stores in a very harsh way in order to make the numbers look right." CW 4 believed that these practices were "chaotic" and were instituted for the purpose of "mak[ing] the numbers look good for the IPO" while "painting over [the] problem" of high debt and poor performance.

91.     CW 4 reported that, according to a high-level Fairway manager, the pre-IPO store openings and post-IPO growth plans were "a Ponzi scheme" through which the Company would stay afloat by opening store after store, using the last store's "bloom money" from the spurt of initial sales that normally resulted after a new store opened. This manager relayed to CW 4 that Fairway was focused primarily on new store openings – that was "the activity of the corporation" – but sales numbers from the new stores "weren't real numbers for the long term." In short, according to CW 5, a Store Controller for Fairway between May 2010 and June 2013, Fairway's management while under the control of Sterling "didn't know what they were doing" and Fairway was not ready to go public.

92.     In addition to lacking infrastructure, former high-level employees have reported that Fairway's projections for sales and new store growth were without a legitimate basis and were devised as a means to drum up investment in Fairway following years of racking up over $110 million of net losses and over $200 million in debt.

93.     CW 1, whose direct access to the Company's financials and business strategies prior to the IPO gave him a unique insight into the weaknesses facing Fairway, opined that the IPO was "overpriced," and that CW 1 "would never have invested." CW 1 said that Fairway's financial forecasts were driven not by objective performance figures, but by Defendant Santoro and the rest of Sterling's management who created bold projections in order to create interest in the Company. According to CW 1, "Charlie [Santoro] is a great salesman but that is all he is."

94.     CW 1 noted that "the IPO financials were based off of [Defendant Santoro's] desires" because Santoro, as the principal and founder of Sterling, "ran Fairway," and that Fairway's highly unrealistic expansion and growth goals came directly from Santoro.  According to CW 1, prior to the IPO, Fairway set a target that they thought would be attractive to the public – *i.e.*, three to four stores a year and 20%-25% growth – and they figured out "how do we get to that" in order to "justify a price, a valuation."  Defendant Arditte then manipulated the Company's growth model to reach "pie in the sky targets" that were not realistic.  CW 1 also reported that Defendant Ruetsch was directly involved in the Company's forecasts, and that Fairway could not submit a forecast for growth without Ruetsch's involvement, input and approval.  Similarly, CW 8 reported that Fairway management kept the Company's financial forecasting "very close to the vest," and that management was "in over their heads, selling their hopes and not their business plan."  CW 10, Fairway's Director of Training and Recruitment from July 2010 to December 2014, confirmed that senior management kept a tight hold on information, as the Company "had a few people that hoarded the information."

95.     CW 1 also stated that the Individual Defendants had a "good sales pitch," but that the Company's past performance simply did not support Defendants' positive financial projections, and that the Company wanted to open three to four stores annually, but had no actual plan in place to do so.

96.     CW 2, Assistant Controller at Fairway from 2008 to April 2013, reported that the Company always said it would do better than its current results, even though the Company had no basis for those projections.  Indeed, as confirmed by CW 1, Fairway consistently saw sales within its existing stores drop each quarter leading up to the IPO.  CW 1 had direct access to the Company's financials and business strategies prior to the IPO, and this gave him a unique insight

into the weaknesses facing Fairway – all of which were known to Defendants.  While CW 1 did not participate in setting the five-year plan used by Defendants to market the Company in the IPO – this was tightly confined to the Individual and Sterling Defendants – he did see portions of that plan in order to create a budget for the stores.  He "thought it was a great stretch" and "didn't see how they were going to make it."  In fact, he did <u>not believe anyone thought they were going to get there</u> because the corporate financial divisions, including his, "struggled every quarter prior to the IPO."  He also noted that he saw "no evidence" that the plan even attempted to account for growth outside the New York City area.

97.     Further, according to CW 1, Fairway's aggressive growth strategy was "unreasonable" and "the number of stores they said they would open was unrealistic."  CW 1 does not believe that Fairway even had a plan to execute that much growth because employees within the Company "thought it was a joke to say they could operate 90 stores."  CW 1 stated that Fairway did not adequately account for the "cannibalization of same store sales when [Fairway] opened new stores."  Every time Fairway opened a new store in the New York City area, sales in another, existing store would decline because the new store "cannibalized," or poached, its customers.  Likewise, CW 2 stated that the Company knew that new stores would result in lost sales from existing stores, and that "[i]f it's just too close, it doesn't make much sense."  CW 5, a store controller who worked as the controller for various Fairway locations between May 2010 and June 2013, confirmed that declines in store sales appeared to be due to "sabotage" among Fairway's stores.

98.     In short, numerous former employees observed first hand that Fairway's highly touted growth plans lacked any objective basis in reality and were used simply as a marketing tool to sell Fairway to public investors and to shift potential losses from Sterling to investors.  For

instance, former employee CW 5 believed that Fairway's Sterling-run management "didn't know what they were doing" and, by 2013, Fairway was not ready to go public.  CW 5 opined that Fairway made the mistake of getting "into bed with an equity firm [Sterling] and they had one goal in mind and it didn't matter how they got there."

> ### 2.    The Company's Reported Deferred Tax Asset And Adjusted EBITDA Were Materially False And Lacked Any Objective Basis

99.    As set forth above, during the Class Period Defendants reported that the Company had a deferred tax asset of nearly $26 million and that it was experiencing steady quarterly and year-over-year increases in its Adjusted EBITDA.  These metrics were very important to investors – indeed, the Company's Form 10-K for the fiscal year 2013 stated, "we also believe that investors, analysts and other interested parties view our ability to generate Adjusted EBITDA as an important measure of our operating performance and that of other companies in our industry."  Among other things, these financial metrics were important to investors because they indicated that the Company expected to be able to make sufficient profits over the next five years to utilize its entire deferred tax asset of $26 million.

100.    In reality, the numbers the Company reported for its Adjusted EBITDA and deferred tax assets were materially false and lacked any reasonable, objective basis.

101.    Financial Accounting Standards No. 109 ("FAS 109"), as set forth by the Financial Accounting Standards Board, is the GAAP principle governing the use and reporting of deferred tax assets.  The principles described in FAS 109 "establish[] financial accounting and reporting standards for the effects of income taxes that result from an enterprise's activities for financial accounting and reporting for income taxes."  Crucially, under FAS 109, a company may claim a deferred tax asset on its balance sheet only if it is more likely than not that it will be able to use the deferred tax asset to offset taxable income in future years.  For example, a company claiming

a $100 million deferred tax asset represents to investors that it is more likely than not that the company will have taxable income of at least $100 million dollars within the time horizon for which the Company can reasonably generate its projections and guidance.

102.    Under Paragraph 17(e) of FAS 109, if, based on the weight of available evidence, it is more likely than not that some portion or all of a company's deferred tax assets will not be realized, the company must take a valuation allowance sufficient to reduce the deferred tax asset to the amount that is more likely than not to be realized.  As set forth in Appendix A to FAS 109, these demanding standards were designed to require companies to value their deferred tax assets in a way that considers current expectations and comes closest to the expected future outcome:

> The Board believes that the criterion required for measurement of a deferred tax asset should be one that produces accounting results that come closest to the expected outcome, that is, realization or non-realization of the deferred tax asset in future years.  For that reason, the Board selected <u>more likely than not</u> as the criterion for measurement of a deferred tax asset.  Based on that criterion, (a) recognition of a deferred tax asset that is expected to be realized is required, and (b) recognition of a deferred tax asset that is not expected to be realized is prohibited.  [Emphasis in original.]

103.    FAS 109 makes clear when and whether recognizing a deferred tax asset on a Company's balance sheet is appropriate, and when, instead, the company should take a valuation allowance, meaning that there is not enough evidence of future profitability to support carrying the deferred tax asset.  Specifically, under Paragraph 20 of FAS 109,

> [a]ll available evidence, both positive and negative, should be considered to determine whether, based on the weight of that evidence, a valuation allowance is needed.  Information about an enterprise's current financial position and its results of operations for the current and preceding years . . . is supplemented by all currently available information about future years.

104.    Defendants recognized and acknowledged these standards in their own SEC filings during the Class Period.  For example, in the IPO prospectus, Fairway reported that, in the third

quarter of fiscal 2013 the Company determined that while it was not more likely than not that it would have sufficient profits in the ensuing five years[2] to use all of its $65 million deferred tax asset as was projected just a few months earlier, it was still more likely than not that the Company would use approximately $26 million of that deferred tax asset by March 30, 2018. As a result, the Company claimed a $26 million deferred tax asset in the IPO Documents, meaning that Fairway sold itself to investors as a company that in the five years following the IPO would earn taxable income (net of all liabilities) of at least $26 million.

105.    As Defendants knew, however, there was no objective basis to conclude that the Company would generate enough income in the next five years to justify maintaining $26 million of deferred tax assets on its books in light of the Company's year-after-year losses. Paragraph 23 of FAS 109 provides that recent-year cumulative losses (like those at Fairway), or "unsettled circumstances" (such as poor infrastructure and disappointing sales), dictate against claiming the full benefit of deferred tax assets:

> Forming a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years. Other examples of negative evidence include (but are not limited to) the following: . . . Losses expected in early future years [and] . . . [u]nsettled circumstances that, if unfavorably resolved, would adversely affect future operations and profit levels on a continuing basis in future years.

106.    Further, under Paragraph 25 of FAS 109:

> An enterprise must use judgment in considering the relative impact of negative and positive evidence. The weight given to the potential effect of negative and positive evidence should be commensurate with the extent to which it can be objectively verified. The more negative evidence that exists (a) the more positive evidence is necessary and (b) the more difficult it is to support a conclusion that

---

[2] Because Fairway's earnings projections extend five years out from the time they are made, when Fairway claims a deferred tax asset in its financial statements, it represents that the Company generate at least that amount of taxable income in the ensuing five years.

> a valuation allowance is not needed for some portion or all of the
> deferred tax asset.

107.    Accordingly, absent objectively verifiable evidence that Fairway would be profitable over the coming five years – and there was none – it should have taken a complete valuation allowance and reduced its deferred tax asset to zero.  Defendants knew, however, that doing so would have crippled the Company's chance of success because investors would immediately have understood that the Company's purported "growth plans" were unsupportable and lacked any basis.  Indeed, CW 1 decisively stated that there was no reasonable basis to believe that the Company could generate $26 million in profits.

108.    The Individual Defendants were directly responsible for the Company's IPO modeling and financial forecasting of significant taxable income within five years of the IPO.  CW 1 stated that Defendant Santoro set forth what the financial forecasts needed to be to sell the Company in the IPO, and Defendant Arditte made sure that the models resulted in those figures. CW 1 stated that Defendants Arditte, Santoro and Ruetsch ensured that this process was tightly confined to the inner circle of Individual and Sterling Defendants (who all stood to benefit personally from the IPO), and that otherwise included only a recent hire who was just out of graduate school, had no experience with the Company or the industry, and was the boyfriend of Defendant Santoro's daughter.

109.    CW 1 also confirmed that the Individual Defendants made the "conscious decision" to separate the Company's daily operating plans from its long-term planning process, in order to control the long-term plan.  Specifically, CW 1 stated that in his capacity as Manager of Financial Planning, he was responsible for the Company's budgets (initially, both long-term budgets and daily operating plans).  Indeed, CW 1 wrote the program that generated the Company's pre-IPO five-year plan.  Around the time of the IPO, however, the Individual Defendants took over

exclusive control of the Company's long-range planning.   Moreover, according to CW 1, Defendant Sanford presented the Company's pre-IPO five-year plan to the Fairway Board, and Arditte presented the Company's five-year plan to the Board after the IPO.   As CW 1 confirmed, there were no specific details on how to achieve what was in the plan, only projected results.   CW 1 further believed that by the time of the IPO, the Company already knew that its aggressive growth plan was untenable, as evidenced by the Company's historical losses.   CW 8 confirmed that management kept the Company's financial forecasting "very close to the vest."

110.   Fairway's reported Adjusted EBITDA was also materially false during the Class period.   In each of its Class Period filings, the Company explained that:

> present[ed] Adjusted EBITDA, a non-GAAP measure, . . . to provide investors with a supplemental measure of our operating performance.   We believe that Adjusted EBITDA is a useful performance measure and is used by us to facilitate a comparison of our operating performance on a consistent basis from period-to-period and to provide for a more complete understanding of factors and trends affecting our business than GAAP measures can provide alone.   Our board of directors and management also use Adjusted EBITDA as one of the primary methods for planning and forecasting overall expected performance and for evaluating on a quarterly and annual basis actual results against such expectations . . . .

> We also believe that investors, analysts and other interested parties view our ability to generate Adjusted EBITDA as an important measure of our operating performance and that of other companies in our industry. . . .

> In the case of the non-cash items [such as deferred tax assets], management believes that investors may find it useful to assess our comparative operating performance because the measures without such items are less susceptible to variances in actual performance . . . and more reflective of other factors that affect operating performance.

111.   In other words, the Company told investors that "Adjusted EBITDA is . . . more reflective of our on-going operating performance" than GAAP metrics alone.

112.    A key item contributing to Fairway's Adjusted EBITDA calculation, as reported in the IPO prospectus and in the 2013 10-K, was the Company's deferred tax asset.  Specifically, the Company either added in the amount of each quarter's income tax provision, or subtracted the amount of each quarter's income tax benefit, in calculating its Adjusted EBITDA.

113.    Although the Company did not report the extent to which deferred tax assets contributed to each quarter's income tax provisions in its Class Period Form 10-Qs, it did report that information in its Prospectus and 10-K, and for certain prior periods.  For the fiscal year ended April 1, 2011, deferred tax assets were responsible for 98.1% of the Company's income tax benefit. For the thirty-nine weeks ended January 1, 2012 and the fiscal year ended April 1, 2012, deferred tax assets were responsible for 99.99% of the Company's income tax benefit.  For the thirty-nine weeks ended December 30, 2012, deferred tax assets (and the valuation allowance the Company took at the time) were responsible for 99.81% of the Company's income tax provision, and for the fiscal year ended March 31, 2013, deferred tax assets were responsible for 99.96% of the Company's income tax provision.  In other words, through the inclusion of the income tax provision or benefit, the Company's deferred tax assets contributed, essentially dollar-for-dollar, to its reported Adjusted EBITDA.

114.    For the thirty-nine weeks ended December 30, 2012, the Company reported Adjusted EBITDA of nearly $34 million, approximately $26.5 million of which was due to the $26.5 million in deferred tax assets that the Company recognized.  That Adjusted EBITDA figure indicated strong operational results, despite the Company's cumulative net losses of over $100 million as of December 30, 2012.  If the Company had not included its deferred tax asset, Adjusted EBITDA for the nine-month period ended December 30, 2012 would have been approximately $7.4 million, the worst such period presented in the Company's financial statements.

115.    Likewise, Adjusted EBITDA for the fiscal year ended March 31, 2013 would have been approximately $21.6 million, rather than the $47.3 million reported.  In comparison, for fiscal year 2012 (ended April 1, 2012), the Company reported Adjusted EBITDA of $35.8 million.  Without an income tax benefit resulting from the Company's deferred tax asset, Adjusted EBITDA for fiscal year 2012 would have been approximately $44.1 million:

| **Fiscal Year Ended** | **April 1, 2012** | **March 31, 2013** |
|---|---|---|
| Adjusted EBITDA | $35.8 million | $47.4 million |
| Income Tax Provision (Benefit) | ($8.3 million) | $25.8 million |
| Adjustment for Effect of Deferred Taxes | $8.3 million | ($25.8 million) |
| *Recalculated Adjusted EBITDA* | *$44.1 million* | *$21.6 million* |

116.    Assuming that deferred tax assets constituted 99% of the Company's income tax provision for these quarters, Adjusted EBITDA as reported for the quarters ended June 30, 2013, September 29, 2013, and December 29, 2013 would have been dramatically different.  Indeed, including the massive valuation allowance disclosed on February 6, 2014, the Recalculated Adjusted EBITDA for third quarter 2014 would have been negative:

| Quarter Ended | June 30, 2013 | September 29, 2013 | December 29, 2013 |
|---|---|---|---|
| Adjusted EBITDA | $9.2 million | $10.6 million | $12.8 million |
| Income Tax Provision (Benefit) | $2.4 million | $3.2 million | $28.6 million |
| Adjustment for Effect of Deferred Taxes | ($2.4 million) | ($3.2 million) | ($28.6 million) |
| *Recalculated Adjusted EBITDA* | *$6.8 million* | *$7.4 million* | *($15.8 million)* |

### H.     The Truth Is Revealed

117.    Defendants' IPO and Class Period misrepresentations were revealed to be materially false and misleading in two disclosures that each occurred in less than a year after the IPO.

### 1.     The November 7, 2013 Partial Disclosure

118.    On November 7, 2013, less than seven months after the IPO, the truth about Fairway began to emerge.  On that date, the Company issued its results for the second quarter of fiscal 2014, reporting Adjusted EBITDA of $10.6 million, an increase of 14%, which was significantly less than the 20% the Company had projected.  Moreover, the Company reduced its guidance for the fiscal third quarter.  Specifically, Fairway projected 17% year-over-year sales growth and 20-25% adjusted EBITDA growth, figures that were both below consensus estimates and the Company's prior guidance.

119.    The November 7, 2013 disclosure also revealed – for the first time and in direct contrast to Defendants' prior representations – that the Company's fiscal third quarter 2013 results that were included in the IPO offering documents were actually *boosted* by the impact of Hurricane Sandy.  Indeed, Fairway disclosed that "frenetic shopping" before and after Hurricane Sandy had actually led to the highest sales in the Company's existence.  As Santoro explained:

> Because all of our stores opened the day after the storm, except for Brooklyn, what we saw last year as a business was a very, very, very powerful one-up to the storm comparable to a Christmas period, literally. Our store at 74th Street achieved its highest single day volume the day before the storm hit; highest single day volume in the history of the Company at any location.
>
> And in the period after the storm there was extensive restocking, particularly in areas that were affected by power outages. And that was a lot of the areas in which we operate. We also found that because no one else was open, we benefited from those people that would come to our store that might not normally come to our store. Many of them traveled great distances because they all needed food.

40

>So I would say on balance if you really think through Sandy in the context of us, <u>Sandy was probably net-net a positive</u> last year.

120. The Company also disclosed that just seven months after the IPO and just three months after the Company's supposed "best quarter in history," its growth plans were inexplicably off-track.  Rather than opening three stores that year and "three to four annually thereafter," as Defendants had promised in the IPO marketing blitz and in all of its subsequent Class Period disclosures, Fairway would be opening only two stores in fiscal year 2015, and had signed only one lease for the following year.

121. Fairway's disappointing results shocked investors and analysts because they were so sharply at odds with the repeated positive disclosures the Company had been making previously.  In response to these disclosures, Fairway stock dropped from $25.46 per share on November 6, 2013 to close at $19.95 per share on November 7, 2013, or over 21%, wiping out hundreds of millions of dollars in shareholder wealth.

122. Defendants acted quickly to minimize the impact of the November 7, 2013 disclosure by continuing to mislead investors.  For example, Defendant Santoro claimed that sales were up 4.5% over the prior year, describing them as "extremely strong" and "<u>a pretty powerful statement of the underlying health of our business</u>," and reported that "[w]e certainly continue to see good momentum in our business and we are guiding towards positive same store sales comps for the quarter."  Defendants also represented that the Company "ha[d] never been in a better position from a real estate pipeline perspective," that they believed Fairway was "very much on course with regard to all of our major initiatives and growth plans," and that Fairway "remain[ed] on track" with adding new stores and "increas[ing] our margins."

### 2.    The February 6, 2014 Disclosure

123.    It was not until after the close of the market on February 6, 2014 that investors learned the full truth about Fairway.  On that day, Fairway announced its results for the third quarter of fiscal year 2014, reporting an Adjusted EBITDA of $12.8 million – or 3% growth – far below both the analysts' consensus estimates of $15.1 million and the Company's prior guidance of 20%-25% growth.  The Company also reported a 1.7% reduction in its same store sale revenue, a shocking departure from expectations of a 1% improvement.  Moreover, the Company slashed its outlook for the fiscal fourth quarter, anticipating only 10% revenue growth, as opposed to the consensus forecast of 12%, and Adjusted EBITDA more than $3 million below consensus projections of $16.4 million.

124.    Fairway also slashed its earnings outlook for fiscal 2015 to less than half of what it had projected just weeks earlier.  Specifically, Fairway reported projected growth in the "high single digits" compared to expectations of 18% revenue growth and adjusted EBITDA growth of 30%.

125.    In addition, in the Company's Form 10-Q issued after the close of trading on February 6, 2014, Fairway disclosed the stunning news that it would write off its entire deferred tax asset – a total of $26 million – because it was not more likely than not that the Company would experience *any* taxable income for at least the following five years.  This disclosure resulted in a net loss of $0.74 per share — more than $0.70 worse than what analysts had expected.

126.    Finally, the Company announced that Defendant Ruetsch had unexpectedly resigned after fifteen years with Fairway and two years as CEO, and that Bill Sanford, a partner of Defendant Sterling, and Fairway's President since April 2012, was assuming the role of interim CEO immediately.  Ruetsch's resignation was a complete surprise, and, coming less than one year

following the IPO and without a replacement or a CEO succession plan in place, caused investors great concern.

127.    On February 7, 2014, Fairway's stock price fell 29%, from a close of $11.43 on February 6, 2014, to a close of $8.12 on February 7, 2014, on the heaviest trading volume in the Company's history.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

128.    Defendants Fairway, Sterling, Santoro, Ruetsch, and Arditte each acted with scienter with respect to the materially false and misleading statements and omissions discussed herein, in that they had actual knowledge that the statements were false or misleading, or acted with reckless disregard for the truth or falsity of those statements.  In addition to the allegations set forth above, the scienter of these Defendants is established by the following facts.

129.    First, Individual Defendants Santoro, Ruetsch, and Arditte were responsible for the growth targets and guidance set forth in the IPO Documents.  Indeed, pursuant to the Management Agreement between Sterling and Fairway, Sterling was paid significant fees in return for its direct involvement with (i) developing and implementing corporate strategy; (ii) budgeting future corporate investments; (iii) developing acquisition and divestiture strategies; and (iv) debt and equity financing.  Moreover, the direct role played by Defendants Santoro Ruetsch and Arditte was confirmed by numerous former employees.  For instance, CW 6, an Assistant General Manager at Fairway from September 2001 through September 2013, reported that Defendant Ruetsch was in charge of the Company's financial forecasts.  Moreover, according to CW 1, Arditte, as the Company's CFO, was responsible for Fairway's "long-range [financial] plan" or "five-year plan," which served as the basis for the IPO Documents' targets and guidance.

130.    CW 1 further stated that Arditte assembled the long-range plan with input from Santoro and Ruetsch.  Although Ruetsch would have reviewed the plan, Santoro "was the boss"

and had the final say.  Although Arditte "drove the numbers," "they were based on the desires of Sterling and what they want to see. . . . Charles is a great salesman with a lot of passion; the IPO financials were based off his desires."  As CW 1 stated, "Charles ran Fairway; at the end of the day it was Charles."

131.    Further, according to CW 1, there was no objective basis for those targets and guidance, and Arditte and Santoro simply "came up" with the number of stores and growth rate that they wanted, deciding to "ramp this up, ramp it down."   In other words, the Individual Defendants decided on a target number of stores and then sought to determine "how do we get to that."  According to CW 1, concerning the first year of the Company's five-year plan – which became the Company's budget for that year – "[w]e thought it was a great stretch; we didn't see how they were going to make it," and "I don't believe anyone thought they were going to get there," particularly because "[w]e struggled every quarter prior to the IPO."

132.    CW 1 further stated that, rather than being based on verifiable metrics and past performance, with regard to the Company's earnings projections in the IPO Documents, the IPO Documents had "pie in the sky targets," and the Individual Defendants' mentality was, "[h]ere is the earnings I need to justify a price, a valuation."  Likewise, CW 4 stated that "it [w]as a given that Sterling was trying to make the numbers look good for the IPO," and, as such, Defendants were "doing short term things to make the IPO look good" and "painting over a problem."  CW 8 confirmed that management was "in over their heads, selling their hopes and not their business plan."  And CW 1 further stated that the Company wanted to open three to four stores annually, but had no actual plan in place to do so.

133.    In addition, with regard to projected earnings, CW 1 stated that the Company's Internal Audit Manager played little to no role and, because Fairway was a small company, things

were "done by the seat of your pants."  Indeed, CW 7, former Director of Internal Audit at Fairway from 2011 until March 2012, stated that Fairway "definitely didn't have" an internal audit department when he joined the Company, and that he is not sure Fairway has a "true internal audit department" today.

134.    Second, the sudden and precipitous "resignation" of Defendant Ruetsch raises an additional inference of scienter.  The circumstances of Ruetsch's resignation are suspicious under any standard.  As of February 2014, Ruetsch had been employed with the Company for approximately fifteen years and had received a number of promotions, including holding the "key personnel" position of CEO from April 2012 when the Company was privately held until his abrupt and unexplained resignation from the public company on February 6, 2014.  He had received (and was continuing to receive) hundreds of thousands of dollars in stock and other compensation from Fairway.  In his position as CEO, Ruetsch was the regular face of the Company on public conference calls and spoke repeatedly to analysts and investors regarding all aspects of Fairway's operations.  For each quarter during the Class Period, Ruetsch took the lead on conference calls addressing Fairway's operations, performance and projections, and he signed each of the Company's Forms 10-Q and Form 10-K filed with the SEC during the Class Period, including the attached Sarbanes-Oxley certifications.

135.    Moreover, Ruetsch's exit was extremely sudden and entirely unexplained.  He "step[ped] down" on February 5, and was immediately replaced with interim CEO Bill Sanford. For a senior key executive to depart in such haste – without so much as the customary two weeks' notice that would be expected of even a much lower level employee with less responsibility – is highly peculiar.  Moreover, Ruetsch's exit came just one day before the Company disclosed that the growth promised in connection with the IPO, less than one year earlier, would not be reached

within the foreseeable future – an event that Ruetsch would be heavily involved with (both in preparing and signing the Form 10-Q and Sarbanes-Oxley certifications and speaking extensively to investors on the earnings conference call), as he was for other quarters throughout the Class Period.  For the long-serving CEO to abruptly leave the Company on the eve of this quarterly filing raises an inference that he was involved or had knowledge of the misstatements that were revealed to the public the next day.  The suspicious nature of Ruetsch's resignation is further confirmed by the fact that, according to his Separation Agreement, Ruetsch forfeited more than $4.3 million worth of unvested stock and options by resigning when he did.

136.    Third, as described in more detail above, the financial motive for the Sterling and Individual Defendants was enormous.  The IPO managed to temporarily salvage what otherwise would have been a disastrous investment for Sterling, and allowed Sterling to extract an astonishing $95 million from the IPO proceeds (on top of at least $20 million in management fees paid earlier).  Moreover, Defendant Santoro was an investor in Sterling and therefore, as beneficial owners, profited from (or avoided losses because of) Fairway's IPO, both through large payments of dividends and management fees, as well as from the sale of stock at inflated prices.

137.    Former Fairway employees confirm that management was aware that the Company's earnings were well below forecasted figures.  CW 8 described a meeting held in early 2014 that every manager from every Fairway location attended, as well as management including each of the Individual Defendants.  According to CW 8, attendees were told, "Hey guys, we got to change a few things" to turn the Company's performance around, and it seemed that upper management was fearful about keeping their jobs.

138.    In addition to the funds received by Sterling, Defendant Santoro directly profited from Sterling's windfall.  According to a Form 4 filed on April 24, 2014, Santoro, as co-founder

and a managing partner of Sterling with shared voting and investment power over Sterling's funds, is a beneficial owner of each of the Sterling Funds that collectively sold 1,898,909 shares in the IPO for a profit of nearly $23 million.  In addition, the Form 4 makes clear that Santoro was awarded nearly 500,000 shares in the IPO, valued at approximately $6.5 million.

139.    Defendant Ruetsch also sold 23,077 shares of Fairway stock in the IPO, reaping $279,000 – nearly half his annual salary – along with an IPO-related bonus of $738,198, bringing his total cash generated by the IPO to well over $1 million.  Ruetsch's $738,198 IPO bonus was paid directly from the IPO proceeds.

140.    <u>Finally</u>, a post-Class Period letter sent from the SEC to Fairway contributes to a strong inference of scienter.  Fairway's announcement on February 6, 2014 that it would see *no* profits through at least January 1, 2019 attracted immediate regulatory attention in light of the Company's Class Period representations that it had a $26 million deferred tax asset and had improving Adjusted EBITDA.  On March 13, 2014, the SEC Division of Corporate Finance sent Defendant Arditte a comment letter concerning statements included in the Company's Class Period public filings, and directed that Fairway respond to the letter and/or amend its filings within ten business days (the "SEC Letter").  The SEC Letter focused extensively on the Company's measurement of Adjusted EBITDA and calculation of Fairway's valuation allowance and deferred tax assets as of December 31, 2012 and December 31, 2013, as reported in the IPO Documents and the February 6, 2014 Form 10-Q.

141.    Among other items, the SEC asked a series of questions about Fairway's determination that its accounting for deferred tax assets was appropriate.  Given that Fairway "incurred net losses since 2009 and . . . likely needed to generate significantly greater revenue in

future periods to achieve profitability . . . as of March 31, 2013," the SEC demanded the following

information:

- what estimates the Company "actually make[s] with respect to [its] deferred tax assets and liabilities";

- the positive and negative evidence considered by the Company in determining its initial $39 million partial valuation allowance on the deferred income tax assets as of December 31, 2012;

- how Fairway determined for the IPO Documents that no additional valuation allowance was required for the remaining $26.5 million of deferred tax assets at March 31, 2013;

- what "new evidence" arose between  March 31, 2013 and February 6, 2014 pertaining to Fairway's projected operating performance, pre-opening costs, equity compensation charges and initial public offering costs that caused the Company to determine that none of the deferred tax assets would be used within the next five years; and

- the steps taken by the Company to determine that its non-GAAP measure of Adjusted EBITDA "provide[s] useful information to investors regarding [Fairway's] financial condition and results of operations and additional purposes, if any, for which you use such non-GAAP measures."

## VII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

142.    In addition to the materially false and misleading statements and omissions set forth

above, Defendants made the following materially false and misleading statements and omissions

during the Class Period.

### A.    The April 17, 2013 IPO Offering Materials

143.    On April 17, 2013, Fairway and certain selling insiders sold 15,697,500 shares of

common stock at a price of $13.00 per share.  The IPO was conducted pursuant to numerous SEC

filings, including a Registration Statement (No. 333-184063) that was filed with the SEC on April

16, 2013 (as amended) and an IPO prospectus dated April 16, 2013.  Defendants Santoro, Ruetsch

and Arditte signed the IPO Registration Statement.  In addition, Defendants Santoro, Ruetsch and

Arditte marketed the IPO to institutional investors through a "roadshow" that included presentations regarding Fairway's historical performance, growth plans, and business strategy (the "Roadshow Documents").

144. **New Store Growth.** In the Roadshow Documents, Defendants represented that "Fairway is in the Early Innings of Growth," and projected a 20% "top-line growth story" from its projected new stores. The Roadshow Documents also stated that Fairway presented a "[h]ighly scalable store format yielding industry leading productivity," a "10+ year runway of store growth in existing and new markets," that the "Northeast region represents ~90+ store opportunity in a ~$70 billion food retail market," and that the Company would open approximately 300 stores nationally, including "3 stores in FY 2015" and "3-4 stores annually thereafter." The Company further represented that its balance sheet was "well positioned to support growth."

145. The IPO prospectus touted Fairway's "[p]roven ability to replicate [its] store model," which it presented as a basis to rely on the Company's future growth plans, that the Company had "scalable infrastructure," and that it had been "significantly investing in corporate infrastructure to support our growth."

146. The IPO prospectus also stated that Fairway's growth strategy was to "grow our store base in the Greater New York City metropolitan area at a rate of three to four stores annually," and that "[w]e believe, based on . . . demographics, we have the opportunity to more than triple the number of stores" in the Company's "existing marketing region," open up to 90 stores in the Northeast market (between New England and the District of Columbia), and "more than 300 additional stores (including stores in the Northeast)" in total. Defendants represented that "[w]e expect the new stores we open to be the primary driver of our sales, operating profit and market share gains."

49

147.    These statements regarding future store growth and expansion were materially false

and misleading because, as discussed above (and as ensuing events confirmed), the Company was

not in a position to support such aggressive expansion plans.  As Defendants knew, the Company

lacked the necessary infrastructure and capital to execute these growth plans.  Contrary to

Defendants' representations, there was no evidence that Fairway's store format was "highly

scalable," or that Fairway had any "proven ability to replicate [its] store model" such that new

stores were viable.

148.    **Same Store Sales Growth.**  The IPO prospectus stated:

> [w]e temporarily closed all of our stores as a result of Hurricane
> Sandy, which struck the Greater New York City metropolitan area
> on October 29, 2012. While all but one of our stores were able to
> reopen within a day or two following the storm, we experienced
> business disruptions due to inventory delays as a result of
> transportation issues, loss of electricity at certain of our locations
> and the inability of some of our employees to travel to work due to
> transportation issues. In addition, our Red Hook store suffered
> substantial damage, including the loss of all inventory and a
> substantial portion of its equipment, and it was not reopened until
> March 1, 2013. . . . [T]here can be no assurance that our sales or
> gross profit at the store will return to prior levels.

149.    The IPO prospectus also stated that Fairway "track[ed] sales on a daily basis" and

"expect[ed] to report . . . comparable store sales growth of between 2.0% and 2.3% for the fourth

quarter of fiscal 2013."  Similarly, the Roadshow Documents stated that Fairway had experienced

"positive SSS [same store sales] growth in most recent period."

150.    These statements were materially false and misleading because, as set forth above

(and subsequently admitted by the Company), the Company failed to disclose until the end of the

Class Period that Hurricane Sandy had a "net positive" impact on Fairway's third quarter 2012

financial results – indeed, Hurricane Sandy resulted in record sales for the Company.  Defendants

knew that, as discussed herein, Hurricane Sandy had a positive impact on the Company's earnings, based on (among other things) regular sales reports that were generated for each store.

151.    According to CW 1, weekly sales reports were generated automatically from each store's registers, and would go the Company's management, who would pass that information along to Fairway's upper management.  CW 2 reported that daily sales reports were generated for each store each night through a system called the "Stock Ledger."  According to CW 2, information on daily sales was automatically updated and everyone in senior management, including CEO Defendant Ruetsch and CFO Defendant Arditte had access to that system and its reports.  CW 2 reported that the Stock Ledger system was internally developed and took information from each point-of-sale terminal, and combined that information with costs and margins to generate daily totals.  Further, CW 2 reported that senior management, including Defendants Ruetsch and Arditte, held weekly meetings where they would discuss that week's Stock Ledger results.  But Defendants did not disclose to investors that those sales reports evidenced that Hurricane Sandy had a positive, not a negative, effect on the Company's earnings.

152.    **Deferred Tax Assets and Adjusted EBIDTA**.  The IPO prospectus stated that Fairway had deferred tax assets of approximately $26 million.  The IPO prospectus also stated that the deferred tax asset was calculated using "financial forecasts based on the historical performance of the business, targeted number of new store openings and measurement of the year in which taxable income from existing stores exceeds the future costs and losses incurred from new store openings."

153.    The Company also included its deferred tax assets in its calculation of Adjusted EBITDA.  Specifically, the Company either added in the amount of each quarter's income tax

provision, or subtracted the amount of each quarter's income tax benefit, in calculating its Adjusted EBITDA.

154.    The IPO prospectus also stated that "Adjusted EBITDA is a useful performance measure and is used by us to facilitate a comparison of our operating performance on a consistent basis from period-to-period and to provide for a more complete understanding of factors and trends affecting our business."  The IPO prospectus emphasized Adjusted EBITDA, stating that "We have increased our . . . Adjusted EBITDA from $23.9 million in fiscal 2010 to $35.8 million in fiscal 2012, or 49.8%, while significantly investing in corporate infrastructure to support our growth, including our new store expansions."

155.    These statements were materially false and misleading because, as set forth above (and confirmed by subsequent events), there was no objective basis to record the deferred tax asset given the Company's historical performance and results.  Defendants knew that public investors would understand the Company's reported DTA and Adjusted EBITDA to represent that there was an objective, reasonable basis to conclude that the Company would experience significant future growth.  There was no such basis, and the Adjusted EBITDA results were artificially inflated by the amounts set forth above in paragraphs 108-109 because they included the improperly recorded deferred tax assets.

### B.    Fourth Quarter And Fiscal Year 2013 (Ended March 31, 2013)

156.    On June 6, 2013, Fairway issued and filed with the SEC a Form 8-K and press release, as well as its Annual Report on Form 10-K (the "2013 10-K"), announcing the Company's financial results for the fourth quarter 2013 and fiscal year 2013 (ended March 31, 2013).  The 2013 10-K was signed by Defendants Ruetsch, Arditte, and Santoro, among others.

157.    The 2013 10-K stated that:

For the next several years beginning in fiscal 2015, we intend to grow our store base in the Greater New York City metropolitan area at a rate of three to four stores annually. Over time, we also plan to expand Fairway's presence into new, high-density metropolitan markets. . . . [W]e believe, based on these demographics, we have the opportunity to more than triple the number of stores in our existing marketing region of the Greater New York City metropolitan area, the Northeast market (from New England to the District of Columbia) can support up to 90 stores and the U.S. market can support more than 300 additional stores (including stores in the Northeast) operating under our current format.

158.    The 2013 10-K also touted Fairway's "[p]roven ability to replicate [its] store model" by "leverag[ing] our well-developed corporate infrastructure, including our dedicated store opening team and flexible supply chain, to open in desirable locations using a disciplined approach to new store site selection." The 2013 10-K also boasted that its store format was scalable, noting: "We benefit from economies of scale and expect to enhance our operating efficiency as we expand our store footprint, further reinforcing our competitive position and ability to grow our sales profitably."

159.    In a press release filed with the SEC on June 6, 2013 on a Form 8-K, Defendant Santoro stated that "Fairway's Board of Directors, management and employees are excited about our growth outlook and the opportunities ahead," that "[w]e believe that our . . . highly scalable infrastructure" provided "long-term growth opportunities," and that Fairway "expect[ed] to open an additional 3 to 4 stores in each of the next few fiscal years."

160.    These statements regarding future store growth and expansion were materially false and misleading because, as Defendants knew and as discussed above (and as ensuing events confirmed), the Company was not in a position to support such aggressive expansion plans. The Company lacked the necessary infrastructure and capital to execute these growth plans. Contrary to Defendants' representations, there was no evidence that Fairway's store format was "highly

scalable," or that Fairway had any "proven ability to replicate [its] store model" such that new stores were viable.

161.    The 2013 10-K also stated:

> [W]e temporarily closed all of our stores as a result of Hurricane Sandy, which struck the Greater New York City metropolitan area on October 29, 2012. While all but one of our stores were able to reopen within a day or two following the storm, we experienced business disruptions due to inventory delays as a result of transportation issues, loss of electricity at certain of our locations and the inability of some of our employees to travel to work due to transportation issues. In addition, our Red Hook store suffered substantial damage, including the loss of all inventory and a substantial portion of its equipment, and it was not reopened until March 1, 2013.

162.    These statements were materially false and misleading because, as set forth above (and subsequently admitted by the Company), the Company failed to disclose until the end of the Class Period that Hurricane Sandy had a "net positive" impact on Fairway's third quarter 2012 financial results – indeed, Hurricane Sandy resulted in record sales for the Company.  Defendants knew that, as discussed herein, Hurricane Sandy had a positive impact on the Company's earnings, based on (among other things) regular sales reports that were generated for each store.

163.    According to CW 1, weekly sales reports were generated automatically from each store's registers, and would go the Company's management, who would pass that information along to Fairway's upper management.  CW 2 reported that daily sales reports were generated for each store each night through a system called the "Stock Ledger."  According to CW 2, information on daily sales was automatically updated and everyone in senior management, including CEO Defendant Ruetsch and CFO Defendant Arditte had access to that system and its reports.  CW 2 reported that the Stock Ledger system was internally developed and took information from each point-of-sale terminal, and combined that information with costs and margins to generate daily totals.  Further, CW 2 reported that senior management, including Defendants Ruetsch and Arditte,

held weekly meetings where they would discuss that week's Stock Ledger results.  But Defendants did not disclose to investors that those sales reports evidenced that Hurricane Sandy had a positive, not a negative, effect on the Company's earnings.

164.  The 2013 10-K also reported that Fairway had a deferred tax asset of approximately $28.3 million (reflecting additional net operating losses accrued since the IPO), and stated that the Company believed "we will generate future taxable income sufficient to utilize all prior years' net operating losses."

165.  The 2013 10-K further stated that Adjusted EBITDA was "an important measure of our operating performance" because it offers a "more complete understanding of factors and trends affecting our business than GAAP measures can provide alone."  The 2013 10-K reported annual Adjusted EBITDA of more than $47.3 million.

166.  These statements were materially false and misleading because, as set forth above (and confirmed by subsequent events), there was no objective basis to record the deferred tax asset given the Company's historical performance and results.  Defendants knew that public investors would understand the Company's reported DTA and Adjusted EBITDA to represent that there was an objective, reasonable basis to conclude that the Company would experience significant future growth.  There was no such basis, and the Adjusted EBITDA results were artificially inflated by the amounts set forth in the charts above at paragraph 109 because they included the improperly recorded deferred tax assets.

167.  During the June 6, 2013 conference call in connection with the Company's earnings announcements that day, Defendant Santoro stated that the Company had an "extremely large runway for near-term growth representing potentially multiple times our current size," and that "[w]e believe we can successfully operate at least 90 stores in this Northeast corridor alone."

Defendant Ruetsch added that "the story about Fairway is adding new locations.  Charles indicated that our real estate pipeline is very strong, we're very confident, actually more confident after the road show as the Company became financially branded."  Defendant Santoro later added that "[w]e have the capacity in the context of our infrastructure to open more stores than this plan provides for.  We have the capacity within our balance sheet and our cash flow to fully fund the stores that we're guiding you towards, and we have significant liquidity on our balance sheet that will allow us to take on additional sites over the coming three years with a heavy focus on the New York metro area."

168.    On that same call, Defendant Arditte stated that "it should be true on an annual basis [that] sales contribution from new store openings grows faster than our [General and Administrative] expense."  In addition, Defendant Santoro stated that the Company was "very much on track and specifically on track with regards to our business performance, our real estate pipeline and important margin enhancement initiatives."

169.    These statements regarding future store growth and expansion were materially false and misleading because, as Defendants knew and as discussed above (and as ensuing events confirmed), the Company was not in a position to support such aggressive expansion plans.  The Company lacked the necessary infrastructure and capital to execute these growth plans.  Contrary to Defendants' representations, there was no evidence that Fairway's store format was highly scalable, that Fairway "ha[d] the capacity in the context of [its] infrastructure to open more stores than [its growth] plan provide[d] for," or had "the capacity within our balance sheet and our cash flow to fully fund the stores that we're guiding you towards."  Further, the Company had no legitimate basis to estimate that the costs associated with the rapid expansion and opening of new stores would result in net profits for the Company.  Indeed, the opening of eight stores in the prior

three years had resulted in well over $124 million of net operating losses, and over $200 million in Company debt.

170.    Further, Defendants made additional misrepresentations concerning Fairway's Adjusted EBITDA.  Defendant Santoro stated that Fairway "achieved very strong adjusted EBITDA results of $13.5 million for the fourth quarter, a 24% increase over the prior year," and attributed that performance to "new store contributions, strong gross margins and the continued leveraging of our Central Services."  Defendant Arditte also told analysts that, with regard to Adjusted EBITDA, "we're targeting an increase of 200 basis points to the 9% level by March of 2016," based in part on "the production center, our expanded Private Label initiatives and continued work with our vendor base."  Defendant Santoro went on to represent that the Company had a "smorgasbord" of opportunities that would enable the Company to "substantially exceed 200 basis points," and that the Company was "very much . . . on track."  However, at no point did Defendants explain that the Company's Adjusted EBITDA would have been materially worse – and a significant decrease from the prior year Adjusted EBITDA – without the inclusion of the deferred tax assets credited against the Company's losses.

171.    These statements regarding Adjusted EBITDA were materially false and misleading because, as set forth above (and confirmed by subsequent events), there was no objective basis to record the deferred tax asset given the Company's historical performance and results.  Defendants knew that public investors would understand the Company's reported DTA and Adjusted EBITDA to represent that there was an objective, reasonable basis to conclude that the Company would experience significant future growth.  There was no such basis, and the Adjusted EBITDA results were artificially inflated by the amounts set forth in the charts above at paragraph 109 because they included the improperly recorded deferred tax assets.

### C.     First Quarter 2014 (Ended June 30, 2013)

172.     On August 8, 2013, prior to the market's opening, Fairway issued a Form 8-K and press release with the SEC, as well as its Quarterly Report on Form 10-Q (the "August 2013 10-Q"), announcing the Company's financial results for the first quarter 2014 (ended June 30, 2013). The August 2013 10-Q was signed by Defendants Ruetsch and Arditte, among others.   The Company also held a conference call led by all three Individual Defendants to discuss those results with analysts.

173.     In the August 2013 10-Q, Fairway reported that its net sales for first quarter 2014 were $186.8 million, exceeding net sales in first quarter 2013 by more than $32 million, and slightly lower than projections due to the delayed opening of the Company's new Chelsea store – previously scheduled to open during first quarter 2014, but pushed back to open in the following quarter.  The Company attributed just under 7% of its net sales growth – just a little over $2 million – to its existing stores, with the remaining growth attributed to new sales from the three new stores that had opened in the prior fiscal year.

174.     The Company misrepresented its ability to open three to four new stores each year moving forward.  Specifically, the August 2013 10-Q stated that:

> We intend to continue our strong growth by expanding our store base in our existing and new markets, capitalizing on consumer trends and improving our operating margins. . . . For the next several years beginning in fiscal 2015, we intend to grow our store base in the Greater New York City metropolitan area at a rate of three to four stores annually.   Over time, we also plan to expand Fairway's presence into new, high-density metropolitan markets.   Based on demographic research . . . we believe, based on these demographics, we have the opportunity to more than triple the number of stores in our existing marketing region of the Greater New York City metropolitan area, the Northeast market . . . can support up to 90 stores and the U.S. market can support more than 300 additional stores (including stores in the Northeast) operating under our current format.

175.    In a press release also filed on August 8, 2013 with the SEC on a Form 8-K, Defendant Santoro similarly stated that "Fairway remains <u>on track</u> with our long-term strategy designed to expand our store count and increase our margins.  <u>We remain confident in our ability to execute these plans</u>."

176.    These statements regarding future store growth and expansion were materially false and misleading because, as Defendants knew and as discussed above (and as ensuing events confirmed), the Company was not in a position to support such aggressive expansion plans.  The Company lacked the necessary infrastructure and capital to execute these growth plans.  Contrary to Defendants' representations, there was no evidence that Fairway was "on track" with its expansion plans, and that it would be able to open three to four stores annually such that the Company would triple its stores in the Greater New York City area, and open 90 stores in the Northeast and 300 stores across the country.

177.    In the August 2013 10-Q, the Company again misled investors regarding the effects of Hurricane Sandy on the Company's earnings, falsely skewing baseline earnings expectations.  Specifically, the Company stated:

> Hurricane Sandy struck the Greater New York City Metropolitan area on October 29, 2012.  While all but one of our stores were able to reopen within a day or two following the storm, we <u>experienced business disruptions for a variety of storm-related reasons including power outages and transportation issues.</u>  Our Red Hook, Brooklyn, NY store sustained substantial damage from the hurricane and was closed until it reopened on March 1, 2013.

178.    These statements were materially false and misleading because, as set forth above (and subsequently admitted by the Company), the Company failed to disclose until the end of the Class Period that Hurricane Sandy had a "net positive" impact on Fairway's third quarter 2012 financial results – indeed, Hurricane Sandy resulted in record sales for the Company.  Defendants

knew that, as discussed herein, Hurricane Sandy was a "net positive" for the Company's earnings, based on (among other things) regular sales reports that were generated for each store.

179.    According to CW 1, weekly sales reports were generated automatically from each store's registers, and would go the Company's management, who would pass that information along to Fairway's upper management.  CW 2 reported that daily sales reports were generated for each store each night through a system called the "Stock Ledger."  According to CW 2, information on daily sales was automatically updated and everyone in senior management, including CEO Defendant Ruetsch and CFO Defendant Arditte had access to that system and its reports.  CW 2 reported that the Stock Ledger system was internally developed and took information from each point-of-sale terminal, and combined that information with costs and margins to generate daily totals.  Further, CW 2 reported that senior management, including Defendants Ruetsch and Arditte, held weekly meetings where they would discuss that week's Stock Ledger results.  But Defendants did not disclose to investors that those sales reports evidenced that Hurricane Sandy had a positive, not a negative, effect on the Company's earnings.

180.    Finally, in the August 2013 10-Q, the Company continued to include its deferred tax assets in its calculation of Adjusted EBITDA, thereby representing that the Company would generate tens of millions of dollars of taxable income over the ensuing five years.

181.    These statements regarding Adjusted EBITDA were materially false and misleading because, as set forth above (and confirmed by subsequent events), there was no objective basis to record the deferred tax asset given the Company's historical performance and results.  Defendants knew that public investors would understand the Company's reported DTA and Adjusted EBITDA to represent that there was an objective, reasonable basis to conclude that the Company would experience significant future growth.  There was no such basis, and the

Adjusted EBITDA results were artificially inflated by the amounts set forth in the charts above at paragraph 110 because they included the improperly recorded deferred tax assets.

182.    During the August 8, 2013 conference call in connection with the Company's earnings announcement that day, Santoro reaffirmed that the Company would "have the capacity to support approximately 30 stores in the greater New York metropolitan area."

183.    These statements regarding future store growth and expansion were materially false and misleading because, as Defendants knew and as discussed above (and as ensuing events confirmed), the Company was not in a position to support such aggressive expansion plans.  The Company lacked the necessary infrastructure and capital to execute these growth plans.  Contrary to Defendants' representations, there was no evidence that Fairway had "the capacity to support approximately 30 stores in the greater New York metropolitan area."

184.    During the conference call, Defendants continued to project strong performance in the coming quarters.  Defendant Santoro stated that:

> We are also pleased to announce that our adjusted EBITDA for the quarter was $12.7 million and ahead of our expectations.  This performance was driven by strong EBITDA contribution from new stores, gross margin improvement and the continued leveraging of our central services.

185.    Defendant Ruetsch also touted the Company's performance and projections.  He stated, "we also focus very heavily on our adjusted EBITDA margins as a percent of sales.  And, on an annual basis, we've given guidance before that we do expect there is very significant, very meaningful upside for us over the coming two to three years."  And at the call's conclusion, Ruetsch stated that "we have also said just on the issue of margin now jumping to adjusted EBITDA margins that we do believe over the next three years on a run rate basis we will drive 200 basis points to our EBITDA margins as a percentage of sales.  That's on an adjusted basis, within

the next three years we continue to believe that is very doable.  We see a variety of ways to get there. . . . [W]e're giving you a hedged and realistic perspective of what it is we're trying to do."

186.    These statements regarding Adjusted EBITDA were materially false and misleading.  Defendants knew that public investors would understand the Company's reported DTA and Adjusted EBITDA to represent that there was an objective, reasonable basis to conclude that the Company would experience significant future growth.  There was no such basis, however, and as set forth above (and confirmed by subsequent events), the Adjusted EBITDA results were artificially inflated by the amounts set forth in the charts above at paragraph 110 because they included the improperly recorded deferred tax assets.

**D.    Second Quarter 2014 (Ended September 29, 2013)**

187.    On November 7, 2013, prior to the market's opening, Fairway issued a Form 8-K and press release with the SEC, as well as its Quarterly Report on Form 10-Q (the "November 2013 10-Q"), announcing the Company's financial results for the second quarter 2014 (ended September 29, 2013).  The November 2013 10-Q was signed by Defendants Ruetsch and Arditte, among others.  The Company also held a conference call led by the Individual Defendants to discuss those results with analysts.

188.    In the November 2013 10-Q, Fairway reported that its net sales for second quarter 2014 were $183.2 million, exceeding net sales in first quarter 2013 by approximately $23 million. The Company attributed 6% of that growth to its existing stores – approximately $1.3 million – with the remaining 94% attributable to the sales contribution from the three new stores that had opened since August 2012.

189.    The Company continued to represent that it would open three to four new stores each year moving forward.  Specifically, the November 2013 10-Q stated that:

We intend to continue our strong growth by expanding our store base in our existing and new markets, capitalizing on consumer trends and improving our operating margins. . . . For the next several years beginning in fiscal 2015, we intend to grow our store base in the Greater New York City metropolitan area at a rate of <u>three to four stores annually</u>.  Over time, we also plan to expand Fairway's presence into new, high-density metropolitan markets. Based on demographic research . . . we believe, based on these demographics, <u>we have the opportunity to more than triple the number of stores in our existing marketing region of the greater New York City metropolitan area, the Northeast market (from New England to the District of Columbia) can support up to 90 stores and the U.S. market can support more than 300 additional stores (including stores in the Northeast) operating under our current format</u>.

190.    In a press release filed on November 7, 2013 with the SEC on a Form 8-K, Defendant Santoro stated that "our business continued to perform well in the quarter," and that "[w]e also continue to be very excited about Fairway's growth prospects from both the newly opened and announced locations as well as a number of other locations at various stages of development."

191.    These statements regarding future store growth and expansion were materially false and misleading because, as Defendants knew and as discussed above (and as ensuing events confirmed), the Company was not in a position to support such aggressive expansion plans.  The Company lacked the necessary infrastructure and capital to execute these growth plans.  Contrary to Defendants' representations, there was no evidence that Fairway would be able to open three to four stores annually such that the Company would triple its stores in the Greater New York City area, and open 90 stores in the Northeast and 300 stores across the country.

192.    In the November 2013 10-Q, the Company also continued to include its substantial deferred tax assets in its calculation of Adjusted EBITDA, thereby representing that the Company would generate tens of millions of dollars of taxable income over the ensuing five years.

193.    These statements regarding Adjusted EBITDA were materially false and misleading.  Defendants knew that public investors would understand the Company's reported DTA and Adjusted EBITDA to represent that there was an objective, reasonable basis to conclude that the Company would experience significant future growth.  There was no such basis, and as set forth above (and confirmed by subsequent events), the Adjusted EBITDA results were artificially inflated by the amounts set forth in the charts above at paragraph 110 because they included the improperly recorded deferred tax assets.

194.    During the November 7, 2013 conference call in connection with the Company's earnings announcements that day, Santoro re-affirmed that "we have never been in a better position from a real estate pipeline perspective and we feel very good about our new store opening guidance for 2014 and 2015."  He further represented that "[W]e believe Fairway is very much on course with regard to all of our major initiatives and growth plans including our new store development and rollout."

195.    These statements regarding future store growth and expansion were materially false and misleading because, as Defendants knew and as discussed above (and as ensuing events confirmed), the Company was not in a position to support its aggressive expansion plans.  The Company lacked the necessary infrastructure and capital to execute these growth plans.  Contrary to Defendants' representations, there was no evidence that Fairway would be able to open three to four stores annually such that the Company would triple its stores in the Greater New York City area, and open 90 stores in the Northeast and 300 stores across the country and, thus, the Company was not "very much on course with regard to all of the major initiatives and growth plans including [its] new store development and rollout."

196.     Santoro further sought to reassure investors by representing Defendants'
expectation that the Company's same store sales growth in the third quarter of fiscal 2014 (ending
on December 31, 2013) would be "solidly positive."  Santoro bolstered this statement by reporting
that the Company had experienced <u>4.5% positive same store sales growth</u> for the first three weeks
of October – what Santoro called "<u>a pretty powerful statement of the underlying health of our</u>
<u>business</u>," and that the Company predicted that same store sales for the third quarter would increase
by 1% and up to 4.5%.

197.     These statements were materially false and misleading because, as set forth above
(and subsequently admitted by the Company), the Company failed to disclose until the end of the
Class Period that Hurricane Sandy had a "net positive" impact on Fairway's third quarter 2012
financial results – indeed, Hurricane Sandy resulted in record sales for the Company.  Defendants
knew that, as discussed herein, Hurricane Sandy had a positive impact on the Company's earnings,
based on (among other things) regular sales reports that were generated for each store.

198.     Thus, the Company's targeted third quarter 2014 same store sales of 1% to 4.5%
had no basis and were unattainable.

199.     Santoro also touted the Company's performance and EBITDA projections, stating
that "[w]e . . . currently expect our third-quarter revenues will likely increase some 25% from last
year's actual results, and increase some 17% from last year's pro forma results, including lost sales
at Brooklyn resulting from Sandy. . . . [W]e reaffirm [that] our guidance . . . for the third quarter
adjusted EBITDA is 20% to 25% growth over last year."

200.     These statements regarding Adjusted EBITDA were materially false and
misleading.  Defendants knew that public investors would understand the Company's reported
DTA and Adjusted EBITDA to represent that there was an objective, reasonable basis to conclude

that the Company would experience significant future growth.  There was no such basis, and as set forth above (and confirmed by subsequent events), the Adjusted EBITDA results were artificially inflated by the amounts set forth in the charts above at paragraph 110 because they included the improperly recorded deferred tax assets.

## VIII.   THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET AND AFFILIATED UTE

201.   Lead Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

    a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    b.   The omissions and misrepresentations were material;

    c.   The omissions and misrepresentations impacted the price of Fairway common stock;

    d.   The Company's stock traded in an efficient market;

    e.   The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

    f.   Lead Plaintiff and other members of the Class purchased Fairway common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

202.   The market for Fairway common stock was efficient for the following reasons, among others:

    a.   Fairway regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

    b.   Fairway common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

    c.   As a regulated issuer, Fairway filed periodic public reports with the SEC and the NASDAQ;

> d. Fairway's securities were liquid and traded with moderate to heavy volume during the Class Period. The average weekly trading volume during the Class Period was over 1,000,000 shares; and
>
> e. During the Class Period, Fairway was followed by multiple securities analysts who wrote reports about Fairway that were distributed to their clients. Each of these reports was publicly available and entered the public marketplace.

203.   As a result of these and other factors, purchasers of the Company's publicly traded common stock during the Class Period suffered similar injury through their purchase of Fairway's publicly traded common stock at artificially inflated prices, and a presumption of reliance applies.

204.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Lead Plaintiff's fraud claims are grounded in Defendants' material omissions. As this action involves Defendants' failure to disclose material adverse information regarding the true state of the Company's finances, infrastructure, and growth strategy – information that Defendants were obligated to disclose in light of their statements on these topics – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

## IX.   LOSS CAUSATION/ECONOMIC LOSS

205.   Defendants' unlawful conduct alleged herein directly caused the losses incurred by Plaintiff and the Class. The false and misleading statements and omissions set forth above were widely disseminated to the securities markets, investment analysts, and the investing public, misrepresenting (i) Fairway's inability to meet new store growth targets; (ii) the Company's lack of same store sales growth; (iii) the skewed earnings baseline caused by Hurricane Sandy's net-positive impact on earnings; (iv) the Company's objective belief that Fairway would generate sufficient taxable income as a result of its growth plan to utilize $26 million of accrued deferred

tax assets; and (v) the Company's use of Adjusted EBITDA (including accounting for deferred tax assets).  Those materially false and misleading statements and omissions artificially inflated Fairway's stock price.

206.    That artificial inflation was removed when the conditions misstated and omitted by Defendants were revealed to the market through partial disclosures on November 7, 2013 and February 6, 2014.  Investors suffered losses as the price of Fairway's stock declined when those statements were corrected and the risks concealed by Defendants materialized.

207.    On November 7, 2013, before the market opened, Fairway announced that (i) its net sales growth for second quarter 2014 was 14.1% rather than the 15% set forth in the Company's guidance; it would open only two, not three or four, stores in fiscal year 2015; and Hurricane Sandy had had a net-positive effect on earnings in third quarter and fiscal year 2013.  In response to these disclosures, Fairway's stock dropped from a closing price of $25.46 per share on November 6, 2013 to a closing price of $19.95 per share on November 7, 2013 – a 21.6% decline, on the then-heaviest trading volume in the Company's history.

208.    On February 6, 2014, the full truth was disclosed when Fairway announced the disappointing results described in detail above, including announcing revised fiscal year 2015 outlook of less than half of the growth it had projected just weeks earlier; the write-down of its entire $26 million deferred tax asset; reduced Adjusted EBITDA numbers; and the fact that Defendant Ruetsch had unexpectedly resigned after fifteen years with the Company, including two as its CEO.

209.    In response to these disclosures, Fairway's stock declined by nearly 29% in one day – from a closing price of $11.43 per share on February 6, 2014 to a closing price of $8.12 per share on February 7, 2014 on extraordinary volume of 5,510,400 shares, or nearly fifteen times

Fairway's average trading volume during the Class Period, which exceeded the volume of any day since the IPO.

210.    Accordingly, the decline in Fairway's stock price was a direct and proximate result of Defendants' fraudulent conduct being revealed to investors and to the market.  The timing and magnitude of Fairway's stock price decline negates any inference that the economic losses and damages suffered by Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic factors, or even Company-specific facts unrelated to Defendants' fraudulent conduct.

## X.    **THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR**

211.    The PSLRA's safe harbor provisions for forward-looking statements are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

212.    First, many of the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current or historic fact.

213.    Second, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

214.    Third, such false and misleading statements were not accompanied by cautionary language that was meaningful because any such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press release, SEC filings, earnings calls, or other public statements described herein were general, "boilerplate" statements of risk that would affect any food retail company, and misleadingly contained no factual disclosure of any of the specific details

of the endemic problems affecting the Company during the Class Period, or similar important factors that would give investors adequate notice of such risks.

215.    Fourth, to the extent there were any forward-looking statements that were identified as such at the time made, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or, by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of Fairway who actually knew that each such statement was false and/or misleading when made.

## XI.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Fairway and the Individual Defendants

216.    Plaintiff realleges every allegation set forth above as if fully set forth herein.

217.    During the Class Period, Fairway and the Individual Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Fairway common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, these Defendants took the actions set forth herein.

218.    Fairway and the Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's

common stock in an effort to maintain artificially high market prices for Fairway's common stock in violation of Section 10(b) and Rule 10b-5.

219.   Fairway and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged in a continuous course of conduct to conceal the truth about the Company's inability to meet its guidance for earnings and new store openings, as specified herein.  These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

220.   As a direct and proximate result of Fairway's and the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases or acquisitions of Fairway common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against Sterling and the Individual Defendants

221.   Plaintiff realleges every allegation set forth above as if fully set forth herein.

222.   Sterling and the Individual Defendants (the "Section 20(a) Defendants") acted as controlling persons of Fairway within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, stock ownership, contractual arrangements, participation in, awareness of, direct control of and/or supervisory involvement in Fairway's day-to-day operations during the Class Period, the Section 20(a) Defendants had the power to, and did, control and influence the decision-making of the Company and the conduct of Fairway's business, including the content and dissemination of the statements that Plaintiff alleges to be materially false and misleading.  Moreover, the Section 20(a) Defendants had a duty to disseminate accurate and

truthful information regarding Fairway's operations to correct any previously issued statements that had become untrue so that the market price of Fairway common stock would be based upon truthful and accurate information.   In addition, Sterling, through its voting power and the appointment of the majority of the Company's board of directors, was a controlling person within the meaning of Section 20(a).   Indeed, throughout the Class Period the Company registered as a "controlled company" under the corporate governance rules of the NASDAQ due to Sterling's controlling ownership of the Company.

223.   The Individual Defendants and Sterling (through its representatives on the Board) participated in writing or reviewing Fairway's statements, reports, press releases and SEC filings alleged herein to be misleading prior to and/or shortly after they were issued and thus had the ability and opportunity to prevent their issuance or cause them to be corrected, and thereby culpably participated in the fraud alleged herein.

224.   As a direct and proximate cause of Fairway's, the Individual Defendants' and Sterling's wrongful conduct as set forth in this Count, Plaintiff and other members of the Class suffered damages in connection with their purchases of Fairway common stock during the Class Period.

## THE SECURITIES ACT CLAIMS

225.   In this part of the Complaint, separate and apart from the claims set forth above under the Exchange Act, Plaintiff asserts strict liability and negligence claims under Sections 11, 12, and 15 of the Securities Act, on behalf of the Class.   These claims are asserted based on allegedly untrue statements and omissions made in connection with Fairway's IPO.   Plaintiff expressly disclaims any allegations of scienter or fraud for these Securities Act claims, which are pleaded separately in this Complaint from Plaintiff's Exchange Act claims.

226.     This action was brought within one year after the discovery of the untrue statements and omissions (and within one year after such discovery should have been made in the exercise of reasonable diligence) and within three years of the IPO.

227.     On April 17, 2013, Fairway and certain selling insiders sold 15,697,500 shares of common stock at a price of $13.00 per share for total net proceeds of approximately $180 million after deducting expenses related to the IPO.  The IPO was conducted pursuant to numerous SEC filings, including a Registration Statement (No. 333-184063) that was filed with the SEC on April 16, 2013 (as amended) and an IPO prospectus dated April 16, 2013  (collectively, the "Registration Statement").

228.     The shares registered in the IPO were registered on behalf of the Company as well as selling insiders Sterling (Fund I (553,448 shares), SBS I (7,721 shares), Fund II (1,313,482 shares), and SBS II (24,258 shares), along with Defendants Santoro and Selden as managing members of the general partner of each of the Sterling Funds), Defendant Ruetsch (23,077 shares), and other Fairway executives.  Selling insiders' shares were sold for $12.09 each after accounting for underwriting discounts.

229.     The Company did not receive proceeds from the sale of selling insiders' shares in the IPO.

## XII.    THE SECURITIES ACT PARTIES

### A.     Lead Plaintiff

230.     Lead Plaintiff in these Securities Act claims is Plaintiff Jacksonville Police and Fire Pension Fund.  As reflected in the certification already on file with the Court (Dkt. 28-1), Jacksonville P&F purchased shares of Fairway securities traceable to the IPO.

**B.**  **Securities Act Defendants**

    **1.**  **The Company**

231.  Defendant Fairway is a Delaware corporation with its principal executive offices located at 2284 12th Avenue, New York, New York 10027.  Fairway was the issuer of the common stock that was sold pursuant to the IPO.

    **2.**  **Officer Defendants**

232.  Defendant Ruetsch served as Fairway's CEO from February 2012 until his resignation on February 6, 2014.  Ruetsch signed the Company's Registration Statement in connection with the IPO.

233.  Defendant Arditte has served as Executive Vice President and Chief Financial Officer of Fairway since December 2012.  Arditte signed the Company's Registration Statement in connection with the IPO.

234.  Defendant Linda M. Siluk has served as Fairway's Vice President-Finance and Chief Accounting Officer since October 2011.  Siluk signed the Company's Registration Statement in connection with the IPO.

235.  Defendants Ruetsch, Arditte, and Siluk are collectively referred to herein as the "Officer Defendants."

    **3.**  **Director Defendants**

236.  Defendant Santoro has served as Executive Chairman of the Board of Fairway since September 2012, including at the time of the IPO.  Santoro is and has since 1998 been co-founder and a managing partner of Defendant Sterling Investment Partners L.P.  Santoro, along with Defendant Selden, is "deemed to be the beneficial owner of, the shares beneficially owned by the Sterling Funds."  Santoro signed the Company's Registration Statement in connection with the IPO.

237.     Defendant Michael Barr ("Barr") has served as a director of Fairway since January 2007.   He is a principal of Sterling Investment Partners L.P.   Barr signed the Company's Registration Statement in connection with the IPO.

238.     Defendant Howard Glickberg ("Glickberg") has served as a director of Fairway since January 2007 and as the Company's Vice Chairman of Development since January 1, 2012. Glickberg signed the Company's Registration Statement in connection with the IPO.

239.     Defendant Stephen L. Key ("Key") has served as a director of Fairway since August 2012.  He has served as a member of the Senior Executive Advisory Board of Sterling Investment Partners L.P., and was selected for the Fairway Board by Sterling.   Key signed the Company's Registration Statement in connection with the IPO.

240.     Defendant William Selden ("Selden") has served as a director of Fairway since January 2007.  Selden is and has been since 1998 co-founder and a managing partner of Sterling Investment Partners L.P.  Selden, along with Defendant Santoro, is "deemed to be the beneficial owner of, the shares beneficially owned by the Sterling Funds."   Selden signed the Company's Registration Statements in connection with the IPO.

241.     Defendant Farid Suleman ("Suleman") has served as a director of Fairway since August 2012.  He has served as a member of the Senior Executive Advisory Board of Sterling Investment Partners L.P., and was selected for the Fairway Board by Sterling.  Suleman signed the Company's Registration Statement in connection with the IPO.

242.     Collectively, Defendants Santoro, Barr, Glickberg, Key, Selden, and Suleman are referred to herein as the "Director Defendants."

### 4.    Underwriter Defendants

243.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") acted as an underwriter in the IPO.  Credit Suisse is headquartered at 11 Madison Avenue, New York, New York 10010.

244.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") acted as an underwriter in the IPO.  Merrill Lynch is headquartered at 1 Bryant Park, New York, New York 10036.

245.    Defendant Jefferies LLC ("Jefferies") acted as an underwriter in the IPO.  Jefferies is headquartered at 520 Madison Avenue, 10th Floor, New York, New York 10022.

246.    Defendant William Blair & Company, L.L.C. ("William Blair") acted as an underwriter in the IPO.  William Blair is headquartered at 222 West Adams Street, Chicago, Illinois 60606.

247.    Defendant BB&T Capital Markets, a division of BB&T Securities, LLC ("BB&T") acted as an underwriter in the IPO.  BB&T is headquartered at 901 E. Byrd Street, Riverfront Plaza West, Richmond, Virginia 23219.

248.    Defendant Guggenheim Securities, LLC ("Guggenheim") acted as an underwriter in the IPO.  Guggenheim is headquartered at 330 Madison Avenue, New York, New York 10017.

249.    Defendant Oppenheimer & Co. Inc. ("Oppenheimer") acted as an underwriter in the IPO.  Oppenheimer is headquartered at 85 Broad Street, new York, New York 10004.

250.    Defendant Wolfe Trahan Securities ("Wolfe") acted as an underwriter in the IPO.  Wolfe is headquartered at 420 Lexington Avenue, Suite 648, New York, New York 10170.

251.    Defendant Morgan Joseph TriArtisan LLC ("Morgan Joseph") acted as an underwriter in the IPO.  Morgan Joseph is headquartered at 600 Fifth Avenue, 14th Floor, New York, NY 10020.

252.     Defendants Credit Suisse, Merrill Lynch, Jefferies, William Blair, BB&T, Guggenheim, Oppenheimer, Wolfe, and Morgan are referred to as the "Underwriter Defendants."

### 5.     Sterling Defendants

253.     Defendant Sterling Investment Partners L.P. ("Fund I" and, together with Fund II, SBS I, and SBS II discussed below, the "Sterling Funds", and collectively together with the Sterling Funds and Sterling Advisers, "Sterling") is a private equity firm founded in 1991.  On January 24 2007, Sterling acquired an 80.1% stake of Fairway.  In connection with the IPO, Fund I sold 553,448 shares of Class A common stock.  Defendant Sterling's principal place of business is located at 285 Riverside Avenue, Suite 300, Westport, Connecticut 06880.

254.     Defendant Sterling Investment Partners Side-By-Side, L.P. ("SBS I") is an investment fund managed by Sterling.  In connection with the IPO, SBS I sold 7,721 shares of Class A common stock.  Defendant SBS I's principal place of business is located at 285 Riverside Avenue, Suite 300, Westport, Connecticut 06880.

255.     Defendant Sterling Investment Partners II, L.P. ("Fund II") is an investment fund managed by Sterling.  In connection with the IPO, Fund II sold 1,313,482 shares of Class A common stock.  Defendant Fund II's principal place of business is located at 285 Riverside Avenue, Suite 300, Westport, Connecticut 06880.

256.     Defendant Sterling Investment Partners Side-By-Side II, L.P. ("SBS II") is an investment fund managed by Sterling.  In connection with the IPO, SBS II sold 24,258 shares of Class A common stock.  Defendant SBS II's principal place of business is located at 285 Riverside Avenue, Suite 300, Westport, Connecticut 06880.

257.     Defendant Sterling Advisers, an affiliate of Sterling, entered into a management agreement with Fairway in 2010.  Pursuant to the agreement, Sterling Advisers consulted with Fairway's Board of Directors and management on business and financial matters, including

Fairway's corporate strategy and the IPO.  Sterling, Fairway and Sterling Advisers share several key executives:  Securities Act Defendant Barr is a Principal of Sterling Advisers, and Defendant Santoro and Securities Act Defendant Selden are Managing Members of Sterling Advisers. Pursuant to the management agreement with Fairway, the Company paid Sterling Advisers over $20 million in monitoring and management fees between 2010 and the April 17, 2013 IPO. Moreover, Sterling Advisers received $9.2 million, paid directly from the IPO proceeds, as a fee to terminate the management agreement – netting nearly $30 million in an approximately four-year span.

258.    After the IPO, Sterling held approximately 72.5% of the voting power of Fairway's outstanding capital stock through its ownership of super-voting Class B common stock, and approximately 77.1% of the voting power of Fairway's outstanding common stock through its ownership of Class A common stock and Class B common stock.

259.    Pursuant to a stockholder agreement (the "Stockholder Agreement"), Sterling may designate four directors to Fairway's board of directors, including its Chairman.  At the time of the IPO, Sterling named five of six directors to Fairway's Board, including Defendants Santoro, Barr, Selden, Key, and Suleman.

260.    Both before and after the IPO, by virtue of Sterling's supermajority voting power, the five Sterling-affiliated directors on Fairway's Board, the Stockholder Agreement, and the Management Agreement, Sterling has controlled the Company.

## XIII.    BACKGROUND TO THE SECURITIES ACT CLAIMS

261.    As described below, in the IPO Registration Statement (including the IPO prospectus), the Securities Act Defendants made untrue statements and omitted material facts regarding the Company's guidance concerning new store growth and Fairway's earnings.

262.    There were three general categories of misstatements and omissions, concerning (1) new store growth; (2) same store sales growth; and (3) deferred tax assets and Adjusted EBITDA.  For example, in the IPO prospectus, Defendants touted the Company's "proven ability to replicate [its] store model," reiterated the plan to open three to four stores annually, and established that these new stores "will be the primary driver of our sales, operating profit and market share gains."

263.    Similarly, concerning same store sales trends (for stores that had been opened more than one year), the IPO prospectus stated that the Company "track[ed] sales on a daily basis" and that it then "expect[ed] to report . . . comparable store sales growth of between 2.0% and 2.3% for the fourth quarter of fiscal 2013."  Moreover, the IPO prospectus stated that the expected 2.0% to 2.3% increase in same store sales "exclud[ed] the Red Hook store" (which Defendants stated contributed approximately $12.7 million in sales for the same period the prior year).  It further stated that "we were forced to temporarily close our Red Hook, Brooklyn, New York store as a result of damages sustained during Hurricane Sandy, which has impacted our results of operations" and "the closure of this store impacted our results of operations in our third fiscal quarter ended December 30, 2012."

264.    The IPO prospectus also stated that the Company "temporarily closed all of our stores as a result of Hurricane Sandy . . . [w]hile all but one of our stores was able to reopen within a day or two following the storm, we "experienced business disruptions due to inventory delays" and other issues related to the storm.  Similarly, the presentation that Defendants used at the roadshow represented that the "20% top-line growth story" assumed that the Company would realize sales in 2013 from the Red Hook store, which were not realized in 2012 due to Hurricane Sandy.

265.    Defendants knew that investors understood that Hurricane Sandy was a one-time event and that the "business disruptions" and temporary closure of all the Company's stores were not likely to occur again.  Accordingly, it was reasonable for investors to believe that the Company's same stores sales would be higher in subsequent years, all other events being equal, absent the highly unusual disruptions caused by Hurricane Sandy.

266.    The IPO prospectus also reported that Fairway had a deferred tax asset of approximately $26 million, and stated that, through the Company's accounting of its deferred tax assets, management believed that "we will generate future taxable income sufficient to utilize all prior years' net operating losses."

267.    A deferred tax asset is an asset on a Company's balance sheet that may be used in subsequent periods to offset income tax expenses.  Fairway's deferred tax asset was highly significant to potential investors in the IPO because Generally Accepted Accounting Principles ("GAAP") permit a company to record a deferred tax asset only if it believes that it is "more likely than not" that the company will be able to use the deferred tax asset to offset taxable income in future years.  Thus, in order for Fairway to claim a $26 million deferred tax asset, it had to have concluded that it was more likely than not that it would have at least $26 million in taxable income within the five year timespan for which the Company projected future earnings.

268.    The IPO prospectus also stated that "Adjusted EBITDA is a useful performance measure and is used by us to facilitate a comparison of our operating performance on a consistent basis from period-to-period and to provide for a more complete understanding of factors and trends affecting our business."  The IPO prospectus, in fact, emphasized Adjusted EBITDA, stating that "[w]e have increased our . . . Adjusted EBITDA from $23.9 million in fiscal 2010 to $35.8 million

in fiscal 2012, or 49.8%, while significantly investing in corporate infrastructure to support our growth, including our new store expansions."

269.    On April 17, 2013, Fairway priced its IPO at $13 per share.  Fairway's stock price closed at $17.35 on the day of the IPO, climbing 34% in one day, even after being priced above expectations.

270.    Defendants' statements were materially untrue and misleading.  Former employees of Fairway have confirmed that Defendants lacked any objective basis for their representations that Fairway had the capital, infrastructure, or means to successfully open three to four stores every year in the greater New York City metropolitan area, let alone build the Company's store base to 90 in the greater Northeast market and 300 nationwide.  Indeed, Fairway lacked the capital, infrastructure and internal management capacity to support its aggressive growth targets. According to CW 2, the former Assistant Controller at Fairway who worked at the Company from June 2008 through April 2013, at the time of the IPO, Fairway lacked the basic infrastructure needed to facilitate the growth of three to four stores per year.  In fact, CW 2 stated that Fairway's infrastructure – including its IT and warehouse facility for storing and distributing product to the Fairway store – were not fully developed and could not support such growth. CW 2 stated that Fairway had one distribution center in Harlem, and it was not nearly large or efficient enough to support any type of significant store expansion. Among other things, CW 2 explained that the Company's inadequate infrastructure forced it to rely on individual store kitchens to supply multiple stores with certain prepared items, making it impossible for the Company to accurately account for each store's profits and losses.

271.    Fairway not only lacked the current infrastructure to expand, it also lacked the capital required to invest in and improve this infrastructure.  CW 2 stated that "[e]xisting stores

could not generate enough to fund the expansion" and there was no way that the Company had sufficient capital for planned future expansion.  CW 2's account was corroborated by CW 3, an employee in Fairway's corporate accounts payable department from September 2011 through March 2013, who stated that Fairway lacked the infrastructure to support the touted growth of Fairway marketed in the IPO.  For example, CW 3 reported that Fairway was opening new stores but not hiring the personnel in the accounts payable department necessary to handle the influx of new employees.  Moreover, CW 3 reported that Fairway's IT department was not capable of supporting further growth because it could not even sustain the Company's current size, noting that computers were often going down and servers were unable to handle increased capacity.  CW 4, a former Supervisor for several Fairway stores between October 2010 and January 2013, stated that Fairway's corporate infrastructure was an "unbelievable mess" and a "corporate nightmare."

272.    In addition to lacking infrastructure, former high-level employees have reported that Fairway's projections for sales and new store growth lacked an objective basis and were untrue and misleading.  CW 1, whose direct access to the Company's financials and business strategies prior to the IPO gave him a unique insight into the weaknesses facing Fairway, stated that Fairway had highly unrealistic expansion and growth goals.  According to CW 1, prior to the IPO, Fairway set a target that they thought would be attractive to the public – *i.e.*, three to four stores a year and 20%-25% growth – and Fairway's management figured out "how do we get to that" in order to "justify a price, a valuation."  Further, according to CW 1, "the number of stores they said they would open was unrealistic."  CW 1 does not even believe that Fairway even had a plan to execute that much growth because employees within the Company "thought it was a joke to say they could operate 90 stores."

273. Defendants' statements about Fairway's deferred tax assets and Adjusted EBITDA were also materially untrue. Financial Accounting Standards No. 109 ("FAS 109"), as set forth by the Financial Accounting Standards Board, is the GAAP principle governing the use and reporting of deferred tax assets. The principles described in FAS 109 "establish[] financial accounting and reporting standards for the effects of income taxes that result from an enterprise's activities for financial accounting and reporting for income taxes." Crucially, under FAS 109, a company may claim a deferred tax asset on its balance sheet <u>only</u> if it is <u>more likely than not</u> that it will be able to use the deferred tax asset to offset taxable income in future years. For example, a company claiming a $100 million deferred tax asset represents to investors that it is more likely than not that the company will have taxable income of at least $100 million dollars within the time horizon for which the Company can reasonably generate its projections and guidance.

274. Under Paragraph 17(e) of FAS 109, if, based on the weight of available evidence, it is more likely than not that some portion or all of a company's deferred tax assets will not be realized, the company must take a valuation allowance sufficient to reduce the deferred tax asset to the amount that is more likely than not to be realized. Defendants recognized and acknowledged these standards in their own SEC filings during the Class Period.

275. In reality, however (and as revealed at the end of the Class Period), there was no objective basis to conclude that the Company would generate enough income in the next five years to justify maintaining $26 million of deferred tax assets on its books in light of the Company's year-after-year losses. Fairway's reported Adjusted EBITDA was also materially untrue during the Class Period because it was based in large part on the incorrect deferred tax asset.

276. Although the Company did not report the extent to which deferred tax assets contributed to each quarter's income tax provisions in its Class Period Form 10-Qs, it did report

that information in its IPO prospectus and the 2013 10-K, and for certain prior periods.  For the fiscal year ended April 1, 2011, deferred tax assets were responsible for 98.1% of the Company's income tax benefit.  For the thirty-nine weeks ended January 1, 2012 and the fiscal year ended April 1, 2012, deferred tax assets were responsible for 99.99% of the Company's income tax benefit.  For the thirty-nine weeks ended December 30, 2012, deferred tax assets (and the valuation allowance the Company took at the time) were responsible for 99.81% of the Company's income tax provision, and for the fiscal year ended March 31, 2013, deferred tax assets were responsible for 99.96% of the Company's income tax provision.  In other words, through the inclusion of the income tax provision or benefit, the Company's deferred tax assets contributed, essentially dollar-for-dollar, to its reported Adjusted EBITDA.  If the Company had not included its deferred tax asset, Adjusted EBITDA for the nine-month period ended December 30, 2012 would have been approximately $7.4 million, the worst such period presented in the Company's financial statements.

277.    Likewise, Adjusted EBITDA for the fiscal year ended March 31, 2013 would have been approximately $21.6 million, rather than the $47.3 million reported.  In comparison, for fiscal year 2012 (ended April 1, 2012), the Company reported Adjusted EBITDA of $35.8 million. Without an income tax benefit resulting from the Company's deferred tax asset, Adjusted EBITDA for fiscal year 2012 would have been approximately $44.1 million.

278.    On February 6, 2014, when Fairway announced its earnings for third quarter 2014, the Company announced that during that quarter, it had missed all major financial metrics and that its projections for new store growth and same store sales were not achieved.  Specifically, Fairway announced an Adjusted EBITDA of $12.8 million, far below the Company's prior guidance of

20%-25% growth.  The Company also reported a 1.7% reduction in its same store sale revenue, a far cry from expectations of a 1% improvement.

279.    During the conference call held on February 7, 2014, Defendant Arditte answered analysts' questions about the Company's missed guidance by stating that that the "first big thing is the fact that we're talking about two stores and not three stores, and the store not in the mix is an urban store," and that another major factor was "the fact that a number of our new stores, including Chelsea, are ramping in a slower way than perhaps we would have thought a year ago."

280.    In its Form 10-Q issued after the close of trading on February 6, 2014, Fairway also disclosed that the Company would write off its entire deferred tax asset – a total of $29 million – because it was not more likely than not that the Company would experience any taxable income for at least the following five years.  This disclosure resulted in a net loss of $0.74 per share – a loss that was more than $0.70 worse than what analysts had expected.

281.    These announcements were material to investors, and the market reacted negatively as analysts covering Fairway immediately downgraded the stock and reduced price targets.

282.    On February 7, 2014, the first trading day after Defendants' revelations, Fairway's stock price immediately declined, falling 29% in a single trading session, from a close of $11.43 on February 6, 2014, to a close of $8.12 on February 7, 2014.  Trading volume was historic – the largest it had been on any day since the Company went public in April 2013.

## XIV.    THE IPO REGISTRATION STATEMENT CONTAINED UNTRUE STATEMENTS OF FACT AND OMITTED MATERIAL FACTS NECESSARY TO MAKE THE OFFERING MATERIALS NOT MISLEADING

283.    In addition to the statements set forth above, the IPO Registration Statement contained the following untrue statements and omissions of material facts.

284.    The IPO prospectus touted Fairway's "[p]roven ability to replicate [its] store model," which it presented as a basis to rely on the Company's future growth plans, that the

Company had "scalable infrastructure," and that it had been "significantly investing in corporate infrastructure to support our growth."

285.     The IPO prospectus also stated that Fairway's growth strategy was to "grow our store base in the Greater New York City metropolitan area at a rate of three to four stores annually," and that "[w]e believe, based on . . . demographics, we have the opportunity to more than triple the number of stores" in the Company's "existing marketing region," open up to 90 stores in the Northeast market (between New England and the District of Columbia), and "more than 300 additional stores (including stores in the Northeast)" in total.  Defendants represented that "[w]e expect the new stores we open to be the primary driver of our sales, operating profit and market share gains."

286.     These statements regarding future store growth and expansion were materially untrue because, as discussed above (and as ensuing events confirmed), the Company was not in a position to support such aggressive expansion plans, and there was no reasonable basis underlying Defendants' representations that such expansion was possible.  The Company lacked the necessary infrastructure and capital to execute these growth plans.  Contrary to Defendants' representations, there was no evidence that Fairway's store format was "highly scalable," or that Fairway had any "proven ability to replicate [its] store model" such that new stores were viable.

287.     The IPO prospectus stated:

> [w]e temporarily closed all of our stores as a result of Hurricane Sandy, which struck the Greater New York City metropolitan area on October 29, 2012. While all but one of our stores were able to reopen within a day or two following the storm, we experienced business disruptions due to inventory delays as a result of transportation issues, loss of electricity at certain of our locations and the inability of some of our employees to travel to work due to transportation issues. In addition, our Red Hook store suffered substantial damage, including the loss of all inventory and a substantial portion of its equipment, and it was not reopened until

March 1, 2013. . . . [T]here can be no assurance that our sales or gross profit at the store will return to prior levels.

288.    The IPO prospectus also stated that Fairway "track[ed] sales on a daily basis" and "expect[ed] to report . . . comparable store sales growth of between 2.0% and 2.3% for the fourth quarter of fiscal 2013."

289.    These statements were materially false and misleading because, as set forth above (and subsequently admitted by the Company), the Company failed to disclose until the end of the Class Period that Hurricane Sandy had a "net positive" impact on Fairway's third quarter 2012 financial results – indeed, Hurricane Sandy resulted in record sales for the Company.  Defendants knew that, as discussed herein, Hurricane Sandy had a positive impact on the Company's earnings, based on (among other things) regular sales reports that were generated for each store.

290.    According to CW 1, weekly sales reports were generated automatically from each store's registers, and would go the company's management, who would pass that information along to Fairway's upper management.  CW 2 reported that daily sales reports were generated for each store each night through a system called the "Stock Ledger."  According to CW 2, information on daily sales was automatically updated and everyone in senior management, including CEO Defendant Ruetsch and CFO Defendant Arditte had access to that system and its reports.  CW 2 reported that the Stock Ledger system was internally developed and took information from each point-of-sale terminal, and combined that information with costs and margins to generate daily totals.  Further, CW 2 reported that senior management, including Defendants Ruetsch and Arditte, held weekly meetings where they would discuss that week's Stock Ledger results.  But Defendants did not disclose to investors that those sales reports evidenced that Hurricane Sandy had a positive, not a negative, effect on the Company's earnings.

291.    The IPO prospectus further stated that Fairway had deferred tax assets of approximately $26 million.  The IPO prospectus also stated that the deferred tax asset was calculated using "financial forecasts based on the historical performance of the business, targeted number of new store openings and measurement of the year in which taxable income from existing stores exceeds the future costs and losses incurred from new store openings."

292.    The Company also included its deferred tax assets in its calculation of Adjusted EBITDA.  Specifically, the Company either added in the amount of each quarter's income tax provision, or subtracted the amount of each quarter's income tax provision, in calculating its Adjusted EBITDA.

293.    The IPO prospectus also stated that "Adjusted EBITDA is a useful performance measure and is used by us to facilitate a comparison of our operating performance on a consistent basis from period-to-period and to provide for a more complete understanding of factors and trends affecting our business."  The IPO prospectus emphasized Adjusted EBITDA, stating that "We have increased our . . . Adjusted EBITDA from $23.9 million in fiscal 2010 to $35.8 million in fiscal 2012, or 49.8%, while significantly investing in corporate infrastructure to support our growth, including our new store expansions."

294.    These statements were materially false and misleading because, as set forth above (and confirmed by subsequent events), there was no objective basis to record the deferred tax asset given the Company's historical performance and results.  Public investors understood the Company's reported DTA and Adjusted EBITDA to represent that there was an objective, reasonable basis to conclude that the Company would experience significant future growth.  There was no such basis, and the Adjusted EBITDA results were artificially inflated by the amounts set forth in the charts above because they included the improperly recorded deferred tax assets.

## XV.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT III

**Violations of Section 11 of the Securities Act Against Fairway, the Officer Defendants, the Director Defendants, and the Underwriter Defendants**

295.   Plaintiff repeats and realleges each and every allegation above relating to the Securities Act claims as if fully set forth herein.  This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded.  For purposes of asserting this and other claims under the Securities Act, Plaintiff does not allege that Defendants acted with intentional, reckless or otherwise fraudulent intent, except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

296.   This Count is asserted against Fairway, the Officer Defendants, the Director Defendants, and the Underwriter Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired the stock sold in or traceable to the IPO.

297.   The IPO Registration Statement contained untrue statements and omissions of material fact.

298.   In connection with offering the registered securities to the public and the sale of those securities, the Defendants named in this Count, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and a national securities exchange.

299.   As the issuer of the registered securities, Fairway is strictly liable for the untrue statements of material fact and material omissions described herein.

300.     None of the other Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Registration Statement were accurate and complete in all material respects.  Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

301.     Class members did not know, nor in the exercise of reasonable diligence could they have known, that the IPO Registration Statement contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when they purchased or acquired the registered securities.

302.     As a direct and proximate result of the acts and omissions of the Defendants named in this Count in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of Fairway common stock sold through the IPO.

303.     By reason of the foregoing, the Defendants named in this Count are liable for violations of Section 11 of the Securities Act to Plaintiff and the other members of the Class who purchased or otherwise acquired the stock sold in or traceable to the IPO.

## COUNT IV

### For Violations of Section 12(a)(2) of the Securities Act Against Fairway and the Underwriter Defendants

304.     Plaintiff repeats and realleges each and every allegation above relating to the Securities Act claims as if fully set forth herein.  For the purposes of this Count, Plaintiff asserts only strict liability and negligence claims, and expressly excludes from this Count any allegations of fraud or reckless or intentional misconduct, except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

305.     This Count is asserted against Fairway and the Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Fairway securities in or traceable to the IPO.

306.     Fairway and the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the securities issued in the IPO pursuant to the IPO Registration Statement.  The IPO Registration Statement contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth herein.

307.     None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Registration Statement were accurate and complete in all material respects.  Had they exercised reasonable care, these Defendants would have known of the material misstatements and omissions alleged herein.

308.     By means of the IPO Registration Statement, and by using the means and instruments of transportation and communication in interstate commerce and of the mails, the Defendants named in this Count, through a public offering, solicited and sold Fairway common stock to members of the Class.

309.     Members of the Class purchased Fairway common stock by means of the materially misstated IPO Registration Statement.  At the time they purchased shares in the IPO, no member of the Class knew, or by the reasonable exercise of care could have known, of the material misstatements in and omissions from the IPO Registration Statement, which were materially misstated, omitted to state facts necessary to make the statements made not misleading, and concealed or failed to adequately disclose material facts as alleged herein.

310.     By reason of the foregoing, Fairway and the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiff and the other members of the Class who purchased securities sold in or traceable to the IPO.

311.     Accordingly, members of the Class who purchased or otherwise acquired Fairway common stock in or traceable to the IPO have a right to rescind and recover the consideration paid for their securities and hereby elect to rescind and tender their stock to Fairway and the Underwriter Defendants.  Members of the Class who have sold their Fairway common stock issued in the Offering are entitled to rescissory damages.

### COUNT V

**For Violations of Section 15 of the Securities Act Against
the Sterling Defendants, the Officer Defendants, and the Director Defendants**

312.     This Count is asserted against the Sterling Defendants, the Officer Defendants, and the Director Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiff and the other members of the Class who purchased or otherwise acquired Fairway common stock sold in or traceable to the IPO.

313.     At times relevant hereto, the Sterling Defendants, the Officer Defendants, and the Director Defendants were controlling persons of Fairway within the meaning of Section 15 of the Securities Act.  Each of the Officer Defendants and each of the Director Defendants served as an executive officer and/or director of Fairway prior to and at the time of the IPO.  The Sterling Defendants through their voting power and the appointment of Santoro, Barr, Key, Selden, and Suleman, were controlling persons within the meaning of Section 15.  Indeed, throughout the Class Period the Company registered as a "controlled company" under the corporate governance rules of the NASDAQ due to Sterling's controlling ownership of the Company.

314.    The Sterling Defendants, the Officer Defendants, and the Director Defendants at all times relevant hereto participated in the operation and management of Fairway, and conducted and participated, directly and indirectly, in the conduct of Fairway's business affairs.  The Sterling Defendants, the Officer Defendants, and the Director Defendants had a duty to disseminate accurate and truthful information with respect to Fairway's financial condition and operations. Because of their positions of control and authority over Fairway, the Sterling Defendants, the Officer Defendants, and the Director Defendants were able to, and did, control the contents of the IPO Registration Statement, which contained materially untrue financial information.

315.    By reason of the foregoing, the Sterling Defendants, the Officer Defendants, and the Director Defendants are liable under Section 15 of the Securities Act, to the same extent that Fairway is liable under Sections 11 and/or 12(a)(2) of the Securities Act, to Plaintiff and the other members of the Class who purchased securities in or traceable to the IPO.

## XVI.  <u>CLASS ACTION ALLEGATIONS</u>

316.    Plaintiff brings this action on its own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") comprising all persons or entities who purchased or otherwise acquired Fairway common or preferred shares during the period from April 16, 2013 through February 7, 2014 on the open market, inclusive (the "Class Period"), including all persons who purchased or otherwise acquired Fairway shares pursuant or traceable to the registration statements issued in connection with the IPO.  Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of Fairway or any of the Underwriter Defendants (or any other underwriter of the IPO) during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any Defendant has or had a controlling

interest; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

317.    The Class is so numerous that joinder of all Class members is impracticable. Throughout the Class Period, Fairway stock was actively traded on the NASDAQ Stock Market, which is an efficient market.  While the exact number of Class members can be determined only through appropriate discovery, Plaintiff believes that class numbers at least in the thousands. Fairway was followed by securities analysts employed by major brokerage firms who wrote reports that were disseminated to the sales force and to certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

318.    Jacksonville P&F's claims are typical of the claims of other Class members. Jacksonville P&F and all Class members acquired their Fairway shares in or traceable to the IPO or on the open market, and sustained damages as a result of Defendants' conduct complained of herein in violation of the federal securities laws.

319.    Jacksonville P&F will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class action and securities litigation.  Jacksonville P&F has no interests that are contrary to or in conflict with those of the Class members that Jacksonville P&F seeks to represent.

320.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

321.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and

fact common to the Class are:

a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

b) whether documents, press releases and public statements made by Defendants during the Class Period concerning the Company's financial and operational position, including statements concerning the Company's financial results, contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

c) whether the IPO Documents contained material misstatements or omitted to state material information;

d) whether, with regard to claims under the Exchange Act, Defendants named under such claims acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

e) whether the market prices of Fairway shares during the Class Period were artificially inflated due to the material misrepresentations complained of herein; and

f) whether the Class members have sustained damages and, if so, the appropriate measure thereof.

322.    Jacksonville P&F knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

323.    The names and address of record owners of Fairway shares purchased on or traceable to the IPO and during the Class Period are available from records maintained by Fairway or its transfer agent.  Notice may be provided to such record owners via first class mail, using techniques and a form of notice similar to that customarily used in securities class actions.

## XVII.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a) Declaring this action to be a proper class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)  Declaring and determining that Defendants violated the federal securities laws as charged above;

c)  Awarding Plaintiff and the Class compensatory damages;

d)  As to the claims set forth under the Securities Act (§§ 11, 12(a)(2) and/or § 15), awarding rescission or a recessionary measure of damages;

e)  Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

f)  Awarding such other relief as this Court may deem just and proper.

## XVIII. JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated: April 21, 2015

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

/s/ John C. Browne
John C. Browne
Lauren A. Ormsbee
Adam D. Hollander
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

*Lead Counsel for Lead Plaintiff Jacksonville Police and Fire Pension Fund*

KLAUSNER KAUFMAN JENSEN & LEVINSON
Robert D. Klausner
10059 Northwest 1st Court
Plantation, FL 33324
Tel: (954) 916-1202
Fax: (954) 916-1232

*Additional Counsel for Lead Plaintiff Jacksonville Police and Fire Pension Fund*