

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                               :

In re FAIRWAY GROUP HOLDINGS CORP.   :         14 Civ. 0950 (LAK)(AJP)
SECURITIES LITIGATION            :

                               :        **REPORT AND RECOMMENDATION**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Lewis A. Kaplan, United States District Judge:**

          Plaintiff Jacksonville Police and Fire Pension Fund alleges that defendants made material misstatements and omissions in order to make the Fairway Group Holdings Corp. IPO more attractive to investors. (See generally Dkt. No. 83: 2d Am. Compl. ("SAC").) The alleged misstatements and omissions concern three primary issues: (1) Fairway's expansion to new stores ( SAC ¶¶ 53-58, 144-47, 262); (2) Fairway's sales growth at existing store locations including the effect of Hurricane Sandy (SAC ¶¶ 59-64, 148-51, 263); and (3) Fairway's deferred tax asset and adjusted earnings before interest, taxes, depreciation and amortization (SAC ¶¶ 65-67, 152-55, 266-68). Plaintiff brings claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and §§ 11, 12(a)(2) and 15 of the Securities Act of 1933. (SAC ¶¶ 18, 216-25, 295-315)

          Presently before the Court are the defendants' renewed motions to dismiss. (See Dkt. No. 87: Underwriters Notice of Motion; Dkt. No. 88: Fairway & Sterling Notice of Motion; see also Dkt. No 62: Underwriters Br.; Dkt. No. 64: Fairway & Sterling Br.; Dkt. No. 71: Underwriters Reply Br.; Dkt. No. 72: Fairway & Sterling Reply Br.; Dkt. No. 89: Fairway, Sterling & Underwriters Suppl. Br.; Dkt. No. 93: Fairway, Sterling & Underwriters Suppl. Reply Br.) The Underwriter Defendants move to dismiss pursuant to Rules 8(a), 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. (Underwriters Notice of Motion; see also Underwriters Br. at 1; Fairway, Sterling & Underwriters Suppl. Br. at 1.) The Fairway and Sterling Defendants move to dismiss pursuant

2

to Rules 8, 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act ("PSLRA").  (Fairway & Sterling Notice of Motion; see also Fairway & Sterling Br. at 1; Fairway, Sterling & Underwriters Suppl. Br. at 1.)

For the reasons set forth below, the defendants' motions to dismiss (Dkt. Nos. 87 and 88) should be GRANTED.

## FACTS

### The Parties

Lead plaintiff Jacksonville Police and Fire Pension Fund is a public pension plan established for police and firefighters in Jacksonville, Florida.  (Dkt. No. 83: SAC ¶ 23.)  Plaintiff purchased shares of Fairway securities between April 17, 2013 and February 7, 2014 (the "Class Period").  (SAC Intro. & ¶ 23.)  Plaintiff brings this claim on behalf of itself and all others who purchased Fairway common stock during the Class Period.  (SAC Intro.)

Defendant Fairway Group Holdings Corp. is a food retailer in the greater New York City Area.  (SAC ¶ 24.)  Fairway became a publicly traded company through an April 2013 IPO. (Id.)

Defendant Charles W. Santoro was Fairway's Executive Chairman of the Board. (SAC ¶ 25.)  Santoro is a co-founder and managing partner of Sterling Investment Partners and is a member and general partner of the Sterling Funds discussed below.  (Id.)  Defendant Herbert Ruetsch was Fairway's Chief Executive Officer until his resignation on February 6, 2014.  (SAC ¶ 26.)  Defendant Edward C. Arditte was Fairway's Executive Vice President and Chief Financial Officer, and served as a consultant to Fairway in October and November 2012.  (SAC ¶ 27.) According to Fairway's SEC filings, Santoro, Ruetsch and Arditte were "'key personnel'" during the Class Period, and were "'primarily responsible for determining the strategic direction of [Fairway's]

business and for executing [Fairway's] growth strategy.'"  (SAC ¶ 28.)  Fairway, Ruetsch, Arditte and Santoro are defendants to the Exchange Act and Securities Act claims.   (SAC ¶¶ 18, 24-27, 220-25.)

The Sterling Defendants acquired an 80.1 % stake in Fairway on January 24, 2007 for approximately $150 million.  (SAC ¶¶ 29, 253.)  The Sterling Funds collectively sold 1,898,909 shares of Fairway Class A common stock in the IPO for approximately $23 million.  (SAC ¶¶ 29-33, 253-56.)

Defendant Sterling Advisors, a Sterling affiliate, entered into a management agreement with Fairway in 2010.  (SAC ¶¶ 34, 257.)  Sterling Advisors consulted with Fairway's Board of Directors and management on business and financial matters, including Fairway's corporate strategy and the IPO.  (SAC ¶¶ 34, 257.)  Between 2010 and the April 17, 2013 IPO, Fairway paid Sterling Advisors approximately $20 million for these services.  (SAC ¶¶ 34, 257.)  Sterling Advisors also received $9.2 million in the IPO as a fee to terminate the management agreement.  (SAC ¶¶ 34, 257.)  Sterling Advisors and the four Sterling Funds (collectively the "Sterling defendants") are defendants to the Exchange Act and Securities Act claims.  (SAC ¶¶ 18, 29-34, 253-58.)

Defendant Linda M. Siluk has served as Fairway's Vice President-Finance and Chief Accounting Officer since October 2011.  (SAC ¶ 234.)  Defendant Michael Barr is a principal of Sterling Investment Partners and has served as a Fairway director since 2007.  (SAC ¶ 237.)  Defendant Howard Glickberg has served as a Fairway director since January 2007 and as Fairway's Vice Chairman of Development since January 1, 2012.  (SAC ¶ 238.)  Defendant Stephen L. Key has served as a Fairway director since August 2012 and has served as a member of the Senior Executive Advisory Board of Sterling Investment Partners.  (SAC ¶ 239.)  Defendant William

4

Selden is a co-founder and managing partner of Sterling Investment Partners, and has served as a Fairway director since January 2007.  (SAC ¶ 240.)  Defendant Farid Suleman has served as a Fairway director since August 2012 and has served as a member of the Senior Executive Advisory Board of Sterling Investment Partners.  (SAC ¶ 241.)  Siluk, Barr, Glickberg, Key, Selden and Suleman (collectively, the "Director Defendants") are defendants only to the Securities Act claims. (SAC ¶¶ 234, 237-42.)

Defendants Credit Suisse Securities (USA) LLC, Merrill Lynch, Pierce, Fenner & Smith Inc., Jefferies LLC, William Blair & Company L.L.C., BB&T Capital Markets, Guggenheim Securities, LLC, Oppenheimer & Co. Inc., Wolfe Trahan Securities, and Morgan Joseph TriArtisan LLC (collectively, the "Underwriter Defendants") each acted as an underwriter in the Fairway IPO; they are defendants only to the Securities Act claims.  (SAC ¶¶ 18, 243-52.)

**Factual Allegations in the Amended Complaint**

Plaintiff alleges that during the Class Period, defendants made material misstatements and omissions regarding Fairway's growth potential to make Fairway's IPO attractive to investors, because "[d]efendants knew that [was] the only chance that Fairway had to complete an IPO of any size."  (Dkt. No. 83: SAC ¶ 53)  The alleged misstatements and omissions concern three primary issues: (1) Fairway's expansion to new stores; (2) Fairway's sales growth at existing store locations and the effect of Hurricane Sandy; and (3) Fairway's deferred tax asset ("DTA") and adjusted earnings before interest, taxes, depreciation and amortization ("EBITDA").  (SAC ¶¶ 53-67, 261-70.)  Plaintiff's allegations are based upon SEC and other regulatory filings, press releases, and statements by Fairway's directors and officers during conference calls and the IPO roadshow.  (SAC ¶¶ 51-80, 261-77.)  Plaintiff's allegations also are based upon the knowledge of ten confidential witnesses who are former Fairway employees (SAC ¶¶ 40, 64, 85-98), including: manager of

financial planning ("CW 1"); assistant controller ("CW 2"); employee in the accounts payable department ("CW 3"); supervisor of several stores ("CW 4"); store controller ("CW 5"); assistant general manager ("CW 6"); director of internal audit ("CW 7"); general manager of the Woodlawn Park, New Jersey store ("CW 8"); bakery manager for several stores ("CW 9"); and director of training and recruitment ("CW 10"). (SAC ¶¶ 85-97.)

       After purchasing a majority stake in Fairway in 2007, Sterling assumed full operational control and placed its representatives on the Fairway board of directors and in executive positions. (SAC ¶ 4.) In November 2009, Sterling announced plans to take Fairway public. (Id.) Between 2009 and 2012, Sterling positioned Fairway as a growth company, by rapidly expanding Fairway's footprint in New York City and the surrounding area from three to twelve stores. (SAC ¶ 5.) Fairway's expansion was costly, forcing it to take on $260 million in debt. (SAC ¶ 6.) Defendant Santoro predicted that the expansion would be worth the cost, and stated to the Wall Street Journal in July 2011 that he expected Fairway to triple its net sales to more than $1 billion by the end of 2012. (Id.) Fairway's expansion did not prove to be as profitable as Santoro predicted, and in 2012 Fairway generated only $555 million in net sales. (SAC ¶ 7.) In August 2012, Sterling accelerated plans for Fairway's IPO, and filed for a confidential IPO pursuant to the Jumpstart Our Business Startups Act of 2012. (SAC ¶ 8.)

       Defendants conducted an IPO roadshow prior to Fairway's April 17, 2013 IPO. (SAC ¶¶ 9-10.) Defendants told potential investors that Fairway was "'in the early innings of growth'" and would open three stores in the coming year, and three to four stores annually thereafter, ultimately growing to be a national food retailer rivaling Whole Foods and Trader Joes, with ninety stores in the northeast region and three hundred nationwide. (SAC ¶ 10.) Investor concerns about Fairway's historical losses were allayed by Fairway's $26 million DTA, which indicated management's belief

that Fairway would "'more likely than not'" generate at least that much profit over five years.  (SAC ¶ 11.)  Investors further "believe[d] that Fairway's pre-IPO results would have been much stronger without the impact of Hurricane Sandy" in the third quarter of fiscal 2013.  (Id.)

On April 17, 2013, Fairway completed the IPO.  (SAC ¶ 9.)  Fairway sold 15,697,500 shares of common stock at $13 per share.  (Id.)  In the IPO, Sterling received $23 million from stock sales and approximately $63 million in dividend payments.  (Id.)

In earnings calls and quarterly filings in the two fiscal quarters following the IPO, defendants continued to make positive statements about Fairway's growth potential.  (SAC ¶ 12.)  By August 2013, Fairway's stock price had increased to $28 per share.  (Id.)

Plaintiff alleges that defendants made two corrective disclosures that caused Fairway's stock price to plummet.  (SAC ¶¶ 14-17.)  First, in a quarterly earnings call on November 7, 2013, defendants announced disappointing results: (1) Fairway would open only two stores in fiscal 2015, rather than three or four; (2) net sales for the second quarter of fiscal 2014 were only up 14.1%, rather than the 20% set forth in Fairway's guidance; and (3) even given the distortion in sales caused by Hurricane Sandy, the storm was in fact a "'net positive'"for the company.  (SAC ¶ 14.)  Following the earnings call, Fairway's stock price dropped from $25.46 per share to $19.95 per share.  (Id.)

In a quarterly earnings call on February 6, 2014, defendants announced disappointing results for Fairway's expansion and for sales at existing store locations: Fairway's Adjusted EBITDA for the third quarter of fiscal 2014 was $12.8 million, rather than $15.1, far below Fairway's guidance of 20-25% growth.  (SAC ¶ 15.)  Further, Fairway wrote off its entire DTA, indicating that it did not anticipate making any profit before January 1, 2019.  (Id.)  Finally, Fairway announced that CEO Herbert Ruetsch would resign after more than fifteen years with the company and would

be replaced by Fairway President and Sterling partner Bill Sanford.  (Id.)  Following the call, Fairway's stock price fell from $11.43 to $8.12 per share.  (SAC ¶ 16.)

On March 13, 2014, the SEC sent Fairway a comment letter, inquiring after how Fairway determined not to take a valuation allowance against the $26 million DTA prior to the IPO, and raising questions about Fairway's Adjusted EBITDA.  (SAC ¶ 17.)  As of July 17, 2014, Fairway's stock price had fallen further to $6.07 per share.  (Id.)

In brief, plaintiff alleges that defendants accelerated their plans for an IPO to salvage whatever funds they could from what they knew to be a failing investment.  Plaintiff states that within seven months of Fairway's IPO, the company began to fall short on projections that insiders knew all along to be "unrealistic." (SAC ¶ 13.)  According to plaintiff, Fairway's disclosures on November 7, 2013 and February 6, 2014 revealed the truth about Fairway's inability to make good on its growth plans.  (SAC ¶¶ 118-27, 278.)

**Procedural Background**

Plaintiff filed its initial complaint on February 14, 2014 (Dkt. No. 1) and the consolidated amended complaint on July 18, 2014.  (Dkt. Nos. 56 & 59.)  Defendants moved to dismiss on the grounds that plaintiff failed adequately to plead any element of its claims, and lacked standing to pursue a claim under Securities Act § 12(a)(2). (Dkt. Nos. 61-65, 71-73.)  On January 20, 2015, this Court recommended denial of defendants' motions to dismiss, except to dismiss plaintiff's claim under Securities Act § 12(a)(2) and plaintiff's control person claims as to Sterling Advisors.  (Dkt. No. 77.)  In re Fairway Grp. Holdings Corp. Sec. Litig., 14 Civ. 950, 2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) (Peck, M.J.).  On March 25, 2015, following the Supreme Court's decision in Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. 1318 (2015), Judge Kaplan denied the motions to dismiss without prejudice, granted plaintiff leave to file

a second amended complaint, and leave for defendants to renew their motions to dismiss.  (Dkt. No.

82.)  Plaintiff filed the SAC on April 21, 2015 (Dkt. No. 83), and defendants renewed their motions

to dismiss (Dkt. Nos. 87-88, incorporating Dkt. Nos. 61-65, 71-73), including supplemental briefing

addressing the sufficiency of the SAC in light of <u>Omnicare</u> (Dkt. Nos. 89 & 93).

## ANALYSIS

## I.   LEGAL STANDARDS GOVERNING MOTIONS TO DISMISS

### A.   The Standard Pursuant to Fed. R. Civ. P. 12(b)(6)

#### 1.   The Twombly-Iqbal "Plausibility" Standard

In the <u>Twombly</u> and <u>Iqbal</u> decisions in 2007 and 2009, the Supreme Court

significantly clarified the standard for a motion to dismiss, as follows:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and
> plain statement of the claim showing that the pleader is entitled to relief."  As the
> Court held in <u>Twombly</u>, the pleading standard Rule 8 announces does not require
> "detailed factual allegations," but it <u>demands more than an unadorned, the-defendant-</u>
> <u>unlawfully-harmed-me accusation</u>.  A pleading that offers "labels and conclusions"
> or "a formulaic recitation of the elements of a cause of action will not do."  Nor does
> a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual
> enhancement."

> To survive a motion to dismiss, <u>a complaint must contain sufficient factual</u>
> <u>matter, accepted as true, to "state a claim to relief that is plausible on its face."</u>  A
> claim has facial plausibility when the plaintiff pleads factual content that allows the
> court to draw the reasonable inference that the defendant is liable for the misconduct
> alleged.  The plausibility standard is not akin to a "probability requirement," but it
> asks for more than a sheer possibility that a defendant has acted unlawfully.  Where
> a complaint pleads facts that are "merely consistent with" a defendant's liability, it
> "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

> Two working principles underlie our decision in <u>Twombly</u>.  First, the tenet
> that a court must accept as true all of the allegations contained in a complaint is
> inapplicable to legal conclusions.  <u>Threadbare recitals of the elements of a cause of</u>
> <u>action, supported by mere conclusory statements, do not suffice</u>.  Rule 8 marks a
> notable and generous departure from the hyper-technical, code-pleading regime of
> a prior era, but it does not unlock the doors of discovery for a plaintiff armed with
> nothing more than conclusions.  <u>Second, only a complaint that states a plausible</u>

claim for relief survives a motion to dismiss.  Determining whether a complaint
states a plausible claim for relief will . . . be a context-specific task that requires the
reviewing court to draw on its judicial experience and common sense.  But where the
well-pleaded facts do not permit the court to infer more than the mere possibility of
misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader
is entitled to relief."

      In keeping with these principles a court considering a motion to dismiss can
choose to begin by identifying pleadings that, because they are no more than
conclusions, are not entitled to the assumption of truth.  While legal conclusions can
provide the framework of a complaint, they must be supported by factual allegations.
When there are well-pleaded factual allegations, a court should assume their veracity
and then determine whether they plausibly give rise to an entitlement to relief.

Ashcroft v. Iqbal, 556 U.S. 662, 677-79, 129 S. Ct. 1937, 1949-50 (2009) (citations omitted &

emphasis added, quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556-57, 570, 127 S. Ct. 1955,

1965-66, 1974 (2007) (retiring the Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957),

pleading standard that required denying a Rule 12(b)(6) motion to dismiss "unless it appears beyond

doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to

relief")).[1]

      Even after Twombly and Iqbal, the Court's role in deciding a motion to dismiss "is

merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which

might be offered in support thereof."  Bison Capital Corp. v. ATP Oil & Gas Corp., 10 Civ. 0714,

---

[1]    Accord, e.g., Affinity LLC v. GfK Mediamark Research & Intelligence, LLC, 547 F. App'x
54, 55-56 (2d Cir. 2013); Massena v. Bronstein, 545 F. App'x 53, 55 (2d Cir. 2013); Cancel
v. Home Depot, 488 F. App'x 520, 520 (2d Cir. 2012); Spataro v. Glenwood Supply, 479 F.
App'x 403, 404 (2d Cir. 2012); Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir.
2010), cert. denied, 562 U.S. 1168, 131 S. Ct. 901 (2011); Harris v. Mills, 572 F.3d 66, 71-
72 (2d Cir. 2009); Scerba v. Allied Pilots Ass'n, 13 Civ. 3694, 2013 WL 6481583 at *6-7
(S.D.N.Y. Dec. 10, 2013) (Peck, M.J.), aff'd, 589 F. App'x 554 (2d Cir. 2014), cert. denied,
135 S. Ct. 2313 (2015); Florio v. Canty, 954 F. Supp. 2d 227, 229-30 (S.D.N.Y. 2013) (Peck,
M.J.) (citing cases); Mahoney v. Sony Music Entm't, 12 Civ. 5045, 2013 WL 491526 at *4-5
(S.D.N.Y. Feb. 11, 2013) (Peck, M.J.); Toto, Inc. v. Sony Music Entm't, 12 Civ. 1434, 2012
WL 6136365 at *5 (S.D.N.Y. Dec. 11, 2012) (Peck, M.J.), report & rec. adopted, 2013 WL
163826 (S.D.N.Y. Jan. 15, 2013).

2010 WL 2697121 at *5 (S.D.N.Y. June 24, 2010) (Peck, M.J.) (quotations omitted), <u>report & rec.</u>

<u>adopted</u>, 2010 WL 3733927 (S.D.N.Y. Sept. 16, 2010).[2]

### 2.    Consideration of Documents Attached to the Amended Complaint

A Rule 12(b)(6) motion to dismiss challenges only the face of the pleading.  Thus,

in deciding such a motion to dismiss, "the Court must limit its analysis to the four corners of the

complaint."  <u>Vassilatos</u> v. <u>Ceram Tech Int'l, Ltd.</u>, 92 Civ. 4574, 1993 WL 177780 at *5 (S.D.N.Y.

May 19, 1993) (citing <u>Kopec</u> v. <u>Coughlin</u>, 922 F.2d 152, 154-55 (2d Cir. 1991)).[3]  The Court,

however, may consider documents attached to the complaint as an exhibit or incorporated in the

complaint by reference.  <u>E.g.</u>, <u>ATSI Commc'ns, Inc.</u> v. <u>Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir.

2007); <u>Chambers</u> v. <u>Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002) ("Because this standard

has been misinterpreted on occasion, we reiterate here that a plaintiff's <u>reliance</u> on the terms and

effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration

---

[2]    <u>Accord</u>, <u>e.g.</u>, <u>Florio</u> v. <u>Canty</u>, 954 F. Supp. 2d at 230-31; <u>Tasini</u> v. <u>AOL, Inc.</u>, 851 F. Supp. 2d 734, 737 (S.D.N.Y.) ("The Court's function on a motion to dismiss is 'not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient.'"), <u>aff'd</u>, 505 F. App'x 45 (2d Cir. 2012); <u>Saunders</u> v. <u>Coughlin</u>, 92 Civ. 4289, 1994 WL 88108 at *2 (S.D.N.Y. Mar. 15, 1994) (quoting <u>Geisler</u> v. <u>Petrocelli</u>, 616 F.2d 636, 639 (2d Cir. 1980)).

[3]    <u>Accord</u>, <u>e.g.</u>, <u>Grant</u> v. <u>Cnty. of Erie</u>, 542 F. App'x 21, 23 & n.1 (2d Cir. 2013); <u>Faulkner</u> v. <u>Beer</u>, 463 F.3d 130, 134 (2d Cir. 2006); <u>Aniero Concrete Co.</u> v. <u>N.Y.C. Constr. Auth.</u>, 94 Civ. 3506, 2000 WL 863208 at *31 (S.D.N.Y. June 27, 2000); <u>Six W. Retail Acquisition, Inc.</u> v. <u>Sony Theatre Mgmt. Corp.</u>, 97 Civ. 5499, 2000 WL 264295 at *12 (S.D.N.Y. Mar. 9, 2000) ("When reviewing the pleadings on a motion to dismiss pursuant to Rule 12(b)(6), a court looks only to the four corners of the complaint and evaluates the legal viability of the allegations contained therein.").

When additional materials are submitted to the Court for consideration with a 12(b)(6) motion, the Court must either exclude the additional materials and decide the motion based solely upon the complaint, or convert the motion to one for summary judgment under Fed. R. Civ. P. 56.  <u>See</u> Fed. R. Civ. P. 12(b); <u>Friedl</u> v. <u>City of N.Y.</u>, 210 F.3d 79, 83 (2d Cir. 2000); <u>Fonte</u> v. <u>Bd. of Managers of Cont'l Towers Condo.</u>, 848 F.2d 24, 25 (2d Cir. 1988).

11

of the document on a dismissal motion; mere notice or possession is not enough."); <u>Rothman</u> v.

<u>Gregor</u>, 220 F.3d 81, 88 (2d Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a

complaint to include any written instrument attached to it as an exhibit or any statements or

documents incorporated in it by reference . . . .").[4]

      "However, before materials outside the record may become the basis for a dismissal,

several conditions must be met.  For example, even if a document is 'integral' to the complaint, it

must be clear on the record that no dispute exists regarding the authenticity or accuracy of the

document.  It must also be clear that there exist no material disputed issues of fact regarding the

relevance of the document." <u>Faulkner</u> v. <u>Beer</u>, 463 F.3d at 134 (citations omitted).  In this case, the

documents that plaintiff incorporated by reference in the SAC may be considered on the motions

to dismiss, subject to the <u>Faulkner</u> v. <u>Beer</u> proviso.

**B.**     **<u>The Standard Pursuant to Fed. R. Civ. P. 12(b)(1)</u>**

      The "standards for dismissal under [Rule] 12(b)(6) and 12(b)(1) are substantively

identical." <u>Lerner</u> v. <u>Fleet Bank, N.A.</u>, 318 F.3d 113, 128 (2d Cir.) (Sotomayor, C. J.), <u>cert. denied</u>,

540 U.S. 1012, 124 S. Ct. 532 (2003); <u>see also</u>, <u>e.g.</u>, <u>Moore</u> v. <u>PaineWebber, Inc.</u>, 189 F.3d 165, 169

n.3 (2d Cir. 1999); <u>Pearl River Union Free Sch. Dist. v. Duncan</u>, 56 F. Supp. 3d 339, 351 (S.D.N.Y.

---

[4]    <u>See also</u>, <u>e.g.</u>, <u>Yak</u> v. <u>Bank Brussels Lambert</u>, 252 F.3d 127, 130 (2d Cir. 2001) (citing <u>Cortec Indus., Inc.</u> v. <u>Sum Holding L.P.</u>, 949 F.2d 42, 47 (2d Cir. 1991), <u>cert. denied</u>, 503 U.S. 960, 112 S. Ct. 1561 (1992)); <u>Paulemon</u> v. <u>Tobin</u>, 30 F.3d 307, 308-09 (2d Cir. 1994); <u>Brass</u> v. <u>Am. Film Techs., Inc.</u>, 987 F.2d 142, 150 (2d Cir. 1993); <u>Florio</u> v. <u>Canty</u>, 954 F. Supp. 2d 227, 231-32 (S.D.N.Y. 2013) (Peck, M.J.); <u>In re Lehman Bros. Sec. & ERISA Litig.</u>, 903 F. Supp. 2d 152, 168-69 (S.D.N.Y. 2012) (quoting <u>ATSI Commc'ns, Inc.</u> v. <u>Shaar Fund, Ltd.</u>, 493 F.3d at 98); <u>Drum Major Music Entm't Inc.</u> v. <u>Young Money Entm't, LLC</u>, 11 Civ. 1980, 2012 WL 423350 at *2 (S.D.N.Y. Feb. 7, 2012); <u>Maniolos</u> v. <u>United States</u>, 741 F. Supp. 2d 555, 560 (S.D.N.Y. 2010) (Peck, M.J.), <u>aff'd</u>, 469 F. App'x 56 (2d Cir. 2012).

2014); <u>Bishop</u> v. <u>Porter</u>, 02 Civ. 9542, 2003 WL 21032011 at *3 (S.D.N.Y. May 8, 2003); <u>Tennant</u>

v. <u>U.S. Bureau of Prisons</u>, No. 02 CV 00558, 2003 WL 1740605 at *1 (D. Conn. Mar. 29, 2003).<u>5/</u>

    **C.**    **Pleading Requirements for Securities Fraud**

        A complaint alleging securities fraud must satisfy the heightened pleadings

requirements of Federal Rule of Civil Procedure 9(b) by stating with "particularity the circumstances

constituting fraud." Fed. R. Civ. P. 9(b); <u>see</u>, <u>e.g.</u>, <u>Emps.' Ret. Sys. of Gov't of V.I.</u> v. <u>Blanford</u>, No.

14-199, 2015 WL 4491319 at *6 (2d Cir. July 24, 2015); <u>ATSI Commnc'ns, Inc.</u> v. <u>Shaar Fund, Ltd.</u>,

493 F.3d 87, 99 (2d Cir. 2007); <u>Ganino</u> v. <u>Citizens Utils. Co.</u>, 228 F.3d 154, 168 (2d Cir. 2000) ("It

is well-settled in this Circuit that a complaint alleging securities fraud must satisfy the pleading

requirements of Rule 9(b) of the Federal Rules of Civil Procedure."). Federal Rule of Civil

Procedure 9(b) states:

        In alleging fraud or mistake, a party must state with particularity the circumstances
        constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a
        person's mind may be alleged generally.

---

<u>5/</u>    The only substantive difference is "that the party invoking the jurisdiction of the court has
    the burden of proof in a 12(b)(1) motion, in contrast to a 12(b)(6) motion, in which the
    defendant has the burden of proof."  <u>Lerner</u> v. <u>Fleet Bank, N.A.</u>, 318 F.3d at 128 (citing
    <u>Thompson</u> v. <u>Cnty. of Franklin</u>, 15 F.3d 245, 249 (2d Cir. 1994)); <u>see also</u>, <u>e.g.</u>, <u>Langella</u> v.
    <u>Bush</u>, 306 F. Supp. 2d 459, 463 (S.D.N.Y. 2004) ("On a motion to dismiss pursuant to Rule
    12(b)(1), plaintiff carries the burden of establishing that subject matter jurisdiction exists
    over his complaint."); <u>Bishop</u> v. <u>Porter</u>, 2003 WL 21032011 at *3.

        The other difference is that on a motion to dismiss for lack of subject matter
    jurisdiction under Rule 12(b)(1), the Court "may refer to evidence outside the pleadings."
    <u>Makarova</u> v. <u>United States</u>, 201 F.3d 110, 113 (2d Cir. 2000) (citing <u>Kamen</u> v. <u>Am. Tel. &</u>
    <u>Tel. Co.</u>, 791 F.2d 1006, 1011 (2d Cir. 1986)); <u>see also</u>, <u>e.g.</u>, <u>Land</u> v. <u>Dollar</u>, 330 U.S. 731,
    735 n.4, 67 S. Ct. 1009, 1011 n.4 (1947) ("[W]hen a question of the District Court's
    jurisdiction is raised . . . the court may inquire by affidavits or otherwise, into the facts as
    they exist."(citations omitted)); <u>Exchange Nat'l Bank</u> v. <u>Touche Ross & Co.</u>, 544 F.2d 1126,
    1130-31 (2d Cir. 1976); <u>Masters</u> v. <u>Wilhelmina Model Agency, Inc.</u>, 02 Civ. 4911, 2003 WL
    145556 at *1 (S.D.N.Y. Jan. 17, 2003).

Although Rule 9(b) must be read together with Rule 8(a), which requires only a "'short and plain statement' of the claims," Ouaknine v. MacFarlane, 897 F.2d 75, 79 (2d Cir. 1990), the fraud allegations in the complaint must be specific enough to allow the defendant "a reasonable opportunity to answer the complaint," Ross v. A. H. Robins Co., 607 F.2d 545, 557 (2d Cir. 1979), cert. denied, 446 U.S. 946, 100 S. Ct. 2175 (1980).[6]  Furthermore, the complaint must give the defendant "adequate information" to allow the defendant "to frame a response."  Ross v. A. H. Robins Co., 607 F.2d at 557-58.[7]

Because the SAC asserts a claim for securities fraud, Rule 9(b)'s requirements are supplemented by the parallel requirements of the Private Securities Litigation Reform Act ("PSLRA").  See, e.g., Emps.' Ret. Sys. of Gov't of V.I. v. Blanford, 2015 WL 4491319 at *6 ("The PSLRA builds on Rule 9's particularity requirement . . . ."); ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009); Lentell v. Merrill Lynch & Co., 396 F.3d at 168; Rombach v. Chang, 355 F.3d at 172; Novak v. Kasaks, 216 F.3d 300, 306-07 (2d Cir.), cert. denied, 531 U.S. 1012, 121 S. Ct. 567 (2000); Freedman v. Weatherford Int'l Ltd., 12 Civ.

---

[6]    Accord, e.g., Lentell v. Merrill Lynch & Co., 396 F.3d 161, 168 (2d Cir.), cert. denied, 546 U.S. 935, 126 S. Ct. 421 (2005); Rombach v. Chang, 355 F.3d 164, 171 (2d Cir.  2004); LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co., 951 F. Supp. 1071, 1081 (S.D.N.Y. 1996) (Knapp, D.J. & Peck, M.J.); In re Towers Fin. Corp. Noteholders Litig., 93 Civ. 0810, 1995 WL 571888 at *12 (S.D.N.Y. Sept. 20, 1995) (Peck, M.J.), report & rec. adopted, 936 F. Supp. 126 (S.D.N.Y. 1996);  O'Brien v. Nat'l Prop. Analysts Partners, 719 F. Supp. 222, 225 (S.D.N.Y. 1989) ("Rule 9(b) is designed to provide a defendant with fair notice of a plaintiff's claim in order to enable a defendant to prepare a defense, protect defendant's reputation or goodwill from harm, and reduce the number of strike suits.").

[7]    See, e.g., Miller v. Holtzbrinck Publishers, LLC, 08 Civ. 3508, 2009 WL 528620 at *2 (S.D.N.Y. Mar. 3, 2009), aff'd, 377 F. App'x 72 (2d Cir. 2010); Kermanshah v. Kermanshah, 580 F. Supp. 2d 247, 257 (S.D.N.Y. 2008) (Peck, M.J.); Ryan v. Hunton & Williams, No. 99-CV-5938, 2000 WL 1375265 at *6 (E.D.N.Y. Sept. 20, 2000) ("Allegations of fraud . . . must be specific enough to provide a defendant with 'a reasonable opportunity to answer the complaint and . . . adequate information to frame a response.'").

2121, 2013 WL 5299137 at *4 (S.D.N.Y. Sept. 20, 2013) (Kaplan, D.J.); In re AOL, Inc. Repurchase

Offer Litig., 966 F. Supp. 2d 307, 311 (S.D.N.Y. 2013).[8/]   The PSLRA provides:

> (b) Requirements for securities fraud actions
>
> (1) Misleading statements and omissions
>
> In any private action arising under this chapter in which the plaintiff alleges that the defendant –
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

Even before the PSLRA, in order to satisfy the Rule 9(b) pleading requirement for

fraud under § 10(b) and Rule 10b-5, the Second Circuit required that the complaint must:

> (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.

---

[8/]   See also, e.g., In re Parmalat Sec. Litig., 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2005) (Kaplan, D.J.); In re Revlon, Inc. Sec. Litig., 99 Civ. 10192, 2001 WL 293820 at *6 (S.D.N.Y. Mar. 27, 2001) ("A complaint alleging a violation of section 10(b) must satisfy the particularity requirement of Rule 9(b) as well as the pleading requirements of the PSLRA." (citation omitted)); Rich v. Maidstone Fin., Inc., 98 Civ. 2569, 2001 WL 286757 at *4-7 (S.D.N.Y. Mar. 23, 2001); Vogel v. Sands Bros. & Co., 126 F. Supp. 2d 730, 737 (S.D.N.Y. 2001).

Acito v. IMCERA Grp., Inc., 47 F.3d 47, 51 (2d Cir. 1995).[9/]  This requirement continues after passage of the PSLRA.  E.g., Emps.' Ret. Sys. of Gov't of V.I. v. Blanford, 2015 WL 4491319 at *7; ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d at 99; Novak v. Kasaks, 216 F.3d at 306; In re Optionable Sec. Litig., 577 F. Supp. 2d 681, 688 (S.D.N.Y. 2008) (Kaplan, D.J.); In re Parmalat Sec. Litig., 383 F. Supp. 2d at 622.[10/]

        The Second Circuit, both before and after passage of the PSLRA, requires that "a plaintiff alleging fraud in connection with a securities transaction must specifically allege the acts or omissions upon which his claim rests.  It will not do merely to track the language of Rule 10b-5 and rely on such meaningless phrases as 'scheme and conspiracy' or 'plan and scheme and course of conduct to deceive.'"  Ross v. A.H. Robins Co., 607 F.2d at 557; see, e.g., Slayton v. Am. Exp. Co., 604 F.3d 758, 773 (2d Cir. 2010) ("plaintiffs must 'state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter'"); Novak v. Kasaks, 216 F.3d at 306-11 (discussing particularity and scienter requirements); Rich v. Maidstone Fin., Inc., 2001 WL 286757 at *7.[11/]  When the Rule 9(b) and PSLRA "standards are combined with the more

---

[9/]    Accord, e.g., Emps.' Ret. Sys. of Gov't of V.I. v. Blanford, 2015 WL 4491319 at *7; Novak v. Kasaks, 216 F.3d at 306; Shields v. Citytrust Bancorp, 25 F.3d 1124, 1127-28 (2d Cir. 1994); LaSalle Nat'l Bank v. Duff & Phelps, 951 F. Supp. at 1081-82, see also, e.g., In re Towers, 1995 WL 571888 at *13 (& cases cited therein).

[10/]   See also, e.g., Gordon v. Sonar Capital Mgmt. LLC, 11 Civ. 9665, 2014 WL 3900560 at *2 (S.D.N.Y. Aug. 1, 2014); Fishoff v. Coty Inc., 09 Civ. 628, 2009 WL 1585769 at *3 (S.D.N.Y. June 8, 2009); In re Complete Mgmt. Inc. Sec. Litig., 153 F. Supp. 2d 314, 329 (S.D.N.Y. 2001); In re Revlon, Inc. Sec. Litig., 2001 WL 293820 at *6; Rich v. Maidstone Fin., Inc, 2001 WL 286757 at *6; Vogel v. Sands Bros. & Co., 126 F. Supp. 2d at 737.

[11/]   See also, e.g., In re Refco Inc. Sec. Litig., 826 F. Supp. 2d 478, 492 (S.D.N.Y. 2011); In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig., 08 Civ. 11278, 2009 WL 4823923 at *7 (S.D.N.Y. Dec. 14, 2009); Fishoff v. Coty Inc., 2009 WL 1585769 at *3; LaSalle Nat'l Bank v. Duff & Phelps, 951 F. Supp. at 1082; In re Towers, 1995 WL 571888 at *13.

general standards applicable to Rule 12(b)(6) motions to dismiss under Twombly and Iqbal, it is clear that plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed." In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), aff'd, 604 F. App'x 62 (2d Cir. 2015).

Furthermore, a complaint alleging fraud against multiple defendants must state the allegations specifically attributable to each individual defendant. E.g., In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 695 (2d Cir. 2009), cert. denied, 561 U.S. 1038, 130 S. Ct. 3505 (2010); Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993); DiVittorio v. Equidyne Extractive Indus., 822 F.2d 1242, 1247 (2d Cir. 1987); IKB Int'l S.A. v. Bank of Am., 12 Civ. 4036, 2014 WL 1377801 at *5 (S.D.N.Y. Mar. 31, 2014) (Kaplan, D.J.), aff'd, 584 F. App'x 26 (2d Cir. 2014); In re Parmalat Sec. Litig., 479 F. Supp. 2d 332, 340 (S.D.N.Y. 2007) (Kaplan, D.J.) ("[W]here, as here, 'multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his [or her] alleged participation in the fraud.'"); Rich v. Maidstone Fin., Inc., 2001 WL 286757 at *6 ("when fraud is alleged against multiple defendants, a plaintiff must set forth separately the acts complained of by each defendant.  A complaint may not simply clump defendants together in vague allegations to meet the pleading requirements of Rule 9(b)." (quotations, citations, & alterations omitted; collecting cases)).

## II.    LEGAL ELEMENTS OF PLAINTIFF'S CLAIMS

Plaintiff asserts claims under Exchange Act §§ 10(b) and 20(a), and SEC Rule 10b-5, as well Securities Act §§ 11, 12(a)(2) and 15.

Exchange Act § 10(b) and SEC Rule 10b-5 prohibit fraudulent activities in connection with the purchase or sale of securities, whether or not those securities are registered.[12] In order to state a prima facie case of a violation of § 10(b) and Rule 10b-5, a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 131 S. Ct. 1309, 1317-18 (2011); accord, e.g., Carpenters Pension Trust Fund v. Barclays PLC, 750 F.3d 227, 232 (2d Cir. 2014).[13]   The failure to establish any

---

[12]      § 10(b) makes it unlawful:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . .

15 U.S.C. § 78j(b).  Further, Rule 10b-5 makes it unlawful:

> (a)      To employ any device, scheme, or artifice to defraud,
>
> (b)      To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or
>
> (c)      To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

[13]      See, e.g., Emps.' Ret. Sys. of Gov't of V.I. v. Blanford, No. 14-199, 2015 WL 4491319 at *6 (2d Cir. July 24, 2015); Stratte-McClure v. Morgan Stanley, No. 13-0627, 2015 WL 136312 at *5 (2d Cir. Jan. 12, 2015); Acticon AG v. China N.E. Petroleum Holdings Ltd., 692 F. 3d 34, 37 (2d Cir. 2012); ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009); ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 105 (2d Cir. 2007); Ganino v. Citizens Utils. Co., 228 F.3d 154, 160 (2d Cir. 2000); Rothman v. Gregor, 220 F.3d 81, 89 (2d Cir. 2000); Grandon v. Merrill Lynch & Co., 147
(continued...)

element is fatal to a § 10(b)/Rule 10b-5 claim.  See, e.g., Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 190-91, 114 S. Ct. 1439, 1455 (1994); First N.Y. Sec. LLC v. United Rentals Inc., 391 F. App'x 71, 74 (2d Cir. 2010) (unnecessary to address materiality where plaintiff failed to establish scienter); Wilson v. Comtech Telecomm. Corp., 648 F.2d 88, 94 (2d Cir. 1981) ("Because we find that [plaintiff] has failed to demonstrate his reliance on any actions by appellees, we need not reach the other elements of his 10b-5 claim.").[14/]

       "To establish a prima facie case of control person liability" under Exchange Act § 20(a),[15/] "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the

---

[13/]    (...continued)
F.3d 184, 189 (2d Cir. 1998); In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 264 (2d Cir. 1993) (quoting Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 61 (2d Cir. 1985)), cert. denied, 511 U.S. 1017, 114 S. Ct. 1397 (1994); In re China Valves Tech. Sec. Litig., 979 F. Supp. 2d 395, 406 (S.D.N.Y. 2013) (Kaplan, D.J.); In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 285 (S.D.N.Y. 2005) (Kaplan, D.J.).

[14/]    See also, e.g., ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co., 553 F.3d at 199-203 (failure to plead scienter); ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d at 106 (failure to plead loss causation); In re Carter-Wallace, Inc. Secs. Litig., 220 F.3d 36, 39 (2d Cir. 2000) (affirming dismissal of 10b-5 claim on basis that plaintiff failed to adequately allege scienter); Rothman v. Gregor, 220 F.3d at 98 (same); Chill v. General Elec. Co., 101 F.3d 263, 271 (2d Cir. 1997) (same); In re Parmalat Sec. Litig., 570 F. Supp. 2d 521, 526 (S.D.N.Y. 2008) (Kaplan, D.J.); In re Glenayre Tech., Inc. Secs. Litig., 96 Civ. 8252, 1998 WL 915907 at *2 n.4 (S.D.N.Y. Dec. 30, 1998) ("Since the plaintiffs fail to adequately plead scienter, I need not address the other grounds for dismissal articulated by the defendants."), aff'd, 201 F.3d 431 (table), 1999 WL 1212491 (2d Cir. Dec. 16, 1999); The High View Fund, L.P. v. Hall, 27 F. Supp. 2d 420, 426 (S.D.N.Y. 1998); LaSalle Nat'l Bank v. Duff & Phelps, 951 F. Supp. at 1082; In re Towers, 1995 WL 571888 at *13; First Equity Corp. v. Standard & Poor's Corp., 690 F. Supp. 256, 260 (S.D.N.Y. 1988) ("Because I hold that plaintiffs have failed to demonstrate the existence of any genuine issue of fact as to defendant's scienter, I need not address defendant's remaining arguments . . . ."), aff'd, 869 F.2d 175 (2d Cir. 1999).

[15/]    § 20(a) provides:

        Every person who, directly or indirectly, controls any person liable under any
        (continued...)

19

primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  ATSI Commc'ns., Inc. v. Shaar Fund, Ltd., 493 F.3d  87, 108 (2d Cir. 2007); accord, e.g., Emps.' Ret. Sys. of Gov't of V.I. v. Blanford, 2015 WL 4491319 at *6 ("Section 20(a) of the Exchange Act provides that individual executives, as 'controlling person[s]' of a company, are secondarily liable for their company's violations of the Exchange Act.").  The control person claim must be dismissed if a primary violation of another provision of the Act is not adequately alleged.

Securities Act § 11 establishes liability on the part of issuers of registration statements if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. §  77k(a).[16]

---

[15]    (...continued)
provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

[16]    See also, e.g., In re Morgan Stanley Info. Fund. Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010); In re UBS AG Sec. Litig., 07 Civ. 11225, 2012 WL 4471265 at *24 (S.D.N.Y. Sept. 28, 2012), aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173 (2d Cir. 2014).

Although plaintiff "expressly disclaims any allegations of scienter or fraud" in connection with the Securities Act claims (SAC ¶ 225), plaintiff's § 11 claim is substantively identical to plaintiff's Exchange Act fraud claims, and plaintiff provides no alternative theory of liability.  Accordingly, "the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies, requiring that the circumstances of the alleged fraud be set forth in the complaint with particularity."  City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 183 (2d Cir. 2014); see also, e.g., Rombach v. Chang, 355 F.3d 164, 172 (continued...)

The roughly parallel elements of Securities Act § 12(a)(2) impose liability upon "any person" who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading. . . ." 15 U.S.C. § 77l(a)(2); see, e.g., NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 156 (2d Cir. 2012), cert. denied, 133 S. Ct. 1624 (2013); In re Sanofi Sec. Litig., 13 Civ. 8806, 14 Civ. 2211, 2015 WL 365702 at *11 (S.D.N.Y. Jan. 28, 2015).

Securities Act § 15 imposes liability on "[e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under" §§ 11 or 12.  15 U.S.C. § 77o(a).  To establish a claim for control person liability under § 15, plaintiff must allege "'(a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator.'"  In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 637 (S.D.N.Y. 2007) (Lynch, D.J.).[17]

---

[16]    (...continued)
(2d Cir.2004); Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC, 902 F. Supp. 2d 329, 338-39 (S.D.N.Y. 2012) ("Although Plaintiffs claim that they should not be held to the higher [Fed. R. Civ. P. 9(b)] standard for their '33 Act claims because they took the trouble to separate their claims into separate sections, the false and misleading statements and omissions alleged for both sets of claims pertain to the exact same underlying events."), aff'd sub nom. IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783 F.3d 383 (2d Cir. 2015).

[17]    Accord, e.g., Ho v. Duoyuan Global Water, Inc., 887 F. Supp. 2d 547, 578 (S.D.N.Y. 2012); Fait v. Regions Fin. Corp., 712 F. Supp. 2d 117, 125 (S.D.N.Y. 2010) (Kaplan, D.J.), aff'd, 655 F.3d 105 (2d Cir. 2011); In re CIT Grp., Inc. Sec. Litig., 349 F. Supp. 2d 685, 688 (S.D.N.Y. 2004) ("Section 15 simply imposes derivative liability against those who control section 11 or 12 violators."); In re Vivendi Universal, S.A., 381 F. Supp. 2d 158, 187-88 (S.D.N.Y. 2003).

Accordingly, a material misstatement or omission is an element of all of plaintiff's claims.  See, e.g., City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp., 679 F.3d 64, 67-68 (2d Cir. 2012) (claims under Exchange Act §§ 10(b) and 20(a) and Securities Act §§ 11 and 12 "all share a material misstatement or omission element"); In re Sanofi Sec. Litig., 2105 WL 365702 at *10-11.  The Court thus addresses this element of plaintiff's claims first.

### A.    Actionable Misstatement Or Omission

As stated above, the first element of plaintiff's claims is a false or misleading statement or omission of material fact.  "A violation . . . premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made."  In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (emphasis in original), aff'd, 604 F. App'x 62 (2d Cir. 2015).  "A statement believed to be true when made, but later shown to be false, is insufficient."  In re Lululemon Sec. Litig., 14 F. Supp. 3d at 571 ("Put another way, without contemporaneous falsity, there can be no fraud.").  To establish falsity, plaintiffs must do more than assert that a statement was untrue, they must "demonstrate with specificity why and how that is so."  Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004); accord, e.g., In re Lululemon Sec. Litig., 14 F. Supp. 3d at 571.

Subjective statements of opinion or belief, in contrast to objective statements of fact, are actionable "if the 'defendant's opinions were both false and not honestly believed when they were made.'" Kleinman v. Elan Corp., 706 F.3d 145, 153 (2d Cir. 2013) (quoting Fait v. Regions Fin. Corp., 655 F.3d 105, 113 (2d Cir. 2011));  In re Lululemon Sec. Litig., 14 F. Supp. 3d at 571.  The Supreme Court stated in Omnicare that a statement of opinion "explicitly affirms one fact: that the speaker actually holds the stated belief."  Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. 1318, 1326 (2015).  Omnicare further recognized that "some sentences that

begin with opinion words like 'I believe' contain embedded statements of fact." Id. at 1327. Liability for such a statement would follow "not only if the speaker did not hold the belief she professed but also if the supporting fact she supplied were untrue." Id. Accordingly, as the Second Circuit previously has held, allegations that an opinion is both objectively false and subjectively disbelieved at the time it is made are sufficient to establish a material misstatement. See, e.g., Fait v. Regions Fin. Corp., 655 F.3d at 110. After Omnicare, liability also may follow for an opinion that contains an embedded statement of untrue material fact. Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. at 1327.

An "omission is actionable under the securities laws only when the [defendant] is subject to a duty to disclose the omitted facts." In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993), cert. denied, 511 U.S. 1017, 114 S. Ct. 1397 (1994).[18] Federal securities law "do[es] not create an affirmative duty to disclose any and all material information." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 131 S. Ct. 1309, 1322 (2011). "[O]nce a party chooses to speak," however, "it has a 'duty to be both accurate and complete.'" Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co., 753 F. Supp. 2d 166, 180 (S.D.N.Y. 2010) (quoting Caiola v. Citibank, N.A., 295 F.3d 312, 331 (2d Cir. 2002)).[19] An omission is actionable when disclosure is "necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. at 1321 (quoting 17 C.F.R. § 240.10b-5(b)).

---

[18]    Accord, e.g., Kleinman v. Elan Corp., 706 F.3d 145, 153 (2d Cir. 2013); City of Roseville Emps.' Ret. Sys. v. Energy Solutions Inc., 814 F. Supp. 2d 395, 410 (S.D.N.Y. 2011).

[19]    Accord, e.g., Dalberth v. Xerox Corp., 766 F.3d 172, 185 n.2 (2d Cir. 2014); City of Roseville Emps.' Ret. Sys. v. Energy Solutions Inc., 814 F. Supp. 2d at 410.

In some circumstances, an omission may render a statement of opinion misleading. Omnicare recognized that a reasonable investor may understand an opinion to imply facts about the speaker's basis for holding the opinion expressed.  Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. at 1332.  While "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless of whether an investor can ultimately prove the belief wrong," such statements may be actionable "if a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself."  Id. at 1327, 1329.  Thus, to allege that an omission has rendered a statement of opinion misleading, Omnicare clarified:

> The investor must identify particular (and material) facts going to the basis for the issuer's opinion–facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have–whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

Id. at 1332; see also, e.g., In re Bioscrip Sec. Litig., 13 Civ. 6922, 2015 WL 1501620 at *11 (S.D.N.Y. Mar. 31, 2015).

## B.   Materiality

In addition to being false or misleading, an alleged false or misleading statement or omission must be material.  When a plaintiff alleges "'a statement or omission that a reasonable investor would have considered significant in making investment decisions,'" such a misstatement or omission is material.  Litwin v. Blackstone Grp. L.P., 634 F.3d 706, 716-17 (2d Cir.), cert. denied, 132 S. Ct. 242 (2011); see, e.g., Caiola v. City Bank, N.A., 295 F.3d 312, 329 (2d Cir. 2002) ("[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the

omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." (quotations omitted)).[20]

Because materiality is a mixed question of law and fact, a complaint may not be dismissed on the ground that the alleged misstatements or omissions are not material "unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co., 553 F.3d at 197 (quotations omitted).[21]

While materiality is a fact specific inquiry, "expressions of puffery and corporate optimism do not give rise to securities violations" because "'[p]eople in charge of an enterprise are not required to take a gloomy, fearful, defeatist view of the future.'" Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) (quoting Shields v. Citytrust Bancorp, 25 F.3d 1124, 1129-30 (2d Cir. 1994)); see also, e.g., ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co., 553 F.3d at 205-06 (statements that defendant had "'"risk management processes [that] are highly disciplined and designed to preserve the integrity of the risk management process,'" that it "'set the standard' for 'integrity,'" and that it would "'continue to reposition and strengthen [its] franchises with a focus on financial discipline"'" were "too general to cause a reasonable investor to rely upon them" and thus

---

[20]     See also, e.g., Carpenters Pension Trust Fund  v. Barclays PLC, 750 F.3d 227, 235 (2d Cir. 2014); ECA, Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009); Ganino v. Citizens Utils. Co., 228 F.3d 154, 161-62 (2d Cir. 2000); City of Roseville Emps.' Ret. Sys. v. Energysolutions, Inc., 814 F. Supp. 2d 395, 410 (S.D.N.Y. 2011).

[21]     Accord, e.g., Carpenters Pension Trust Fund v. Barclays PLC, 750 F.3d at 235; Ganino v. Citizens Utils. Co., 228 F.3d at 162; City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp., 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012); In re China Valves Tech. Sec. Litig., 11 Civ. 0796, 2012 WL 4039852 at *7 (S.D.N.Y. Sept. 12, 2012) (Kaplan, D.J.); In re Gen. Elec. Co. Sec. Litig., 856 F. Supp. 2d 645, 654 (S.D.N.Y. 2012); In re Sanofi-Aventis Sec. Litig., 774 F. Supp. 2d 549, 561 (S.D.N.Y. 2011).

no more than inactionable puffery); Novak v. Kasaks, 216 F. 3d 300, 309 (2d Cir.) ("as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects"), cert. denied, 531 U.S. 1012, 121 S. Ct. 567 (2000); In re Sanofi-Aventis Sec. Litig., 774 F. Supp. 2d at 566 (whether corporate "optimism was, by hindsight, unwarranted 'do[es] not give rise to securities violations' because '[u]p to a point, companies must be permitted to operate with a hopeful outlook.'").

C.     **Protected Forward Looking Statements**

The PSLRA amended the Exchange Act and the Securities Act to provide a safe harbor for "forward-looking" statements that later prove false.  15 U.S.C. § 77z-2(c); 15 U.S.C. § 78u-5(c).  A forward looking statement is defined as including a statement containing "a projection of revenues, income (including income loss), earnings (including earnings loss) per share," "a statement of the plans and objectives of management for future operations," or "a statement of future economic performance." 15 U.S.C. § 77z-2(i); 15 U.S.C. § 78u-5(i).   "The [PSLRA] safe harbor is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."  Slayton v. Am. Exp. Co., 604 F.3d 758, 766 (2d Cir. 2010); see 15 U.S.C. § 77z-2(c)(i); 15 U.S.C. § 78u-5(c)(i). "'To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information, identifying 'important factors that could cause actual results to differ materially from those in the forward-looking statements.'"  In re Barrick Gold Sec. Litig., 13 Civ. 3851, 2015 WL 1514597 at *6 (S.D.N.Y. Apr. 1, 2015) (quoting Slayton v. Am. Exp. Co., 604 F.3d

at 772.).  Under the second prong, the safe harbor provides protection for immaterial statements as that term is defined above.  (See pages 23-25 above.)  Under the actual knowledge prong, the safe harbor protects forward looking statements unless plaintiff demonstrates "actual knowledge" that a statement was false or misleading by stating ""with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'""  Slayton v. Am. Exp. Co., 604 F.3d at 773.

The Second Circuit's "bespeaks caution" doctrine protects an alleged misrepresentation that "is sufficiently balanced by cautionary language within the same prospectus such that no reasonable investor would be misled about the nature and risk of the offered security."  P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 96 (2d Cir. 2004);[22] see also, e.g., Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004); In re Barrick Gold Sec. Litig., 13 Civ. 3851, 2015 WL 1514597 at *6;  IBEW Local 90 Pension Fund v. Deutsche Bank AG, 11 Civ. 4209, 2013 WL 1223844 at *10 (S.D.N.Y. Mar. 27, 2013) ("Where the cautionary language is adequate, a reasonable investor would not be deemed to consider the statement material.").  The cautionary language relied upon "'must relate directly to that by which the plaintiffs claim to have been misled.'"  P. Stolz Family P'ship L.P. v. Daum, 355 F.3d at 97 (quoting Hunt v. Alliance N. Am. Gov't Income Trust, Inc., 159 F.3d 723, 729 (2d Cir. 1998)).  "The touchstone" of the bespeaks caution inquiry "is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered."  Rombach v. Chang, 355 F.3d at 173.

---

[22]     The PSLRA safe harbor does not apply to statements "made in connection with an initial public offering."  15 U.S.C. § 78u-5(b)(2)(D).

### III.   PLAINTIFF FAILS TO ALLEGE AN ACTIONABLE MISSTATEMENT OR OMISSION

#### A.   Alleged Misstatements Regarding New Store Growth

The SAC identifies allegedly false and misleading statements about Fairway's plans for expansion (new stores) in Fairway's April 17, 2013 IPO offering materials (Dkt. No. 83: SAC ¶¶ 144-47, 284-85), June 6, 2013 Forms 8-K and 10-K (SAC ¶¶ 156-60), August 8, 2013 Forms 8-K and 10-Q (SAC ¶¶ 172-74), November 7, 2013 Forms 8-K and 10-Q (SAC ¶¶ 187-89), and during conference calls and press releases on June 6 (SAC ¶¶ 157, 167-68), August 8 (SAC ¶¶ 175, 182), and November 7, 2013 (SAC ¶¶ 190, 194).  (See page 5 above.)

Several of the identified statements are merely immaterial corporate puffery.  (See, e.g., SAC ¶ 144 (Fairway "'is in the early innings of growth'" and was "'well positioned to support growth'"), ¶ 167 (Fairway had an "'extremely large runway for near-term growth representing potentially multiple times [its] current size'"), ¶ 190 (Fairway's board members "'continue to be very excited about Fairway's growth prospects from both the newly opened and announced locations as well as a number of other locations at various stages of development'")).  "Puffery is defined as a 'company's statements of hope, opinion, or belief about its future performance or general market conditions.'  It is well established that puffery is 'not actionable under the securities laws.'" Shemian v. Research In Motion Ltd., 11 Civ. 4068, 2013 WL 1285779 at *23 (S.D.N.Y. Mar. 29, 2013) (citations omitted; statements such as "'we're laying in the pieces here to sustain really exciting growth'" and "'I feel very, very good about [the] U.S.'" held "non-actionable corporate puffery"), aff'd, 570 F. App'x 32 (2d Cir. 2014); see also, e.g., Scott v. Gen. Motors Co., 605 F. App'x 52, 54 (2d Cir. 2015) (statement that GM "believed" that "improved inventory management" would help strengthen its reputation was "an expression of mere 'corporate optimism' that was too general to

cause a reasonable investor to rely upon it."); Pearlstein v. BlackBerry Ltd., 13 Civ. 7060, 2015 WL

1137519 at *6 (S.D.N.Y. Mar. 13, 2015) (statements such as "'[w]e continue to see compelling long-

term opportunities for Blackberry 10'" were "so optimistic, and so lacking in tangible detail, that

they would be immaterial from a reasonable investor's standpoint.").  Fairway's statements described

in the first sentence of this paragraph are not sufficiently specific for a reasonable investor to have

relied on them "as a guarantee of some concrete fact or outcome."  City of Pontiac Policemen's &

Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 185 (2d Cir. 2014); see also, e.g., Strougo v. Barclays

PLC, 14 Civ. 5797, 2015 WL 1883201 at *7 (S.D.N.Y. Apr. 24, 2015).  Accordingly, they are not

actionable as material misstatements under the securities laws.

### 1.     Protected Forward Looking Statements

The SAC challenges a statement made in Fairway's roadshow documents and IPO

prospectus (and similar statements made on numerous occasions thereafter) that Fairway presented

a

> "[h]ighly scalable store format yielding industry leading productivity," a "10+ year
> runway of store growth in existing and new markets," that the "Northeast region
> represents ~90+ store opportunity in a ~$70 billion food retail market," and that the
> Company would open approximately 300 stores nationally, including "3 stores in FY
> 2015" and "3-4 stores annually thereafter."

(SAC ¶ 144; see also SAC ¶¶ 146 ("The IPO prospectus also stated that Fairway's growth strategy

was to 'grow our store base in the Greater New York City metropolitan area at a rate of three to four

stores annually.'"),157, 159, 174, 182, 189, 194 ("During the November 7, 2013 conference call .

. . Santoro re-affirmed that 'we have never been in a better position from a real estate pipeline

prospective.'"), 285.)   The IPO prospectus represented that Fairway's expansion was possible

because of Fairway's "'[p]roven ability to replicate [its] store model'" and the "'scalable

infrastructure'" Fairway had "'significantly'" invested in.  (SAC ¶ 145; see also SAC ¶¶ 158 (similar

statement made in 2013 10-K), 284.)  Plaintiff asserts that these statements were materially false and misleading because Fairway "was not in a position to support such aggressive expansion plans" and "Defendants knew [] the Company lacked the necessary infrastructure and capital to execute these growth plans." (SAC ¶ 147; see also SAC ¶ 286.)

As an initial matter, accurate statements of historical fact, such as that Fairway had a "'proven ability to replicate [its] store model,'" and had made infrastructure investments "'to support growth'" (SAC ¶¶ 57-58), are not actionable.  See, e.g., In re Sanofi-Aventis Sec. Litig., 774 F. Supp. 2d 549, 569 (S.D.N.Y. 2011).  Fairway did indeed open eight new store locations between March 2009 and the IPO date, thereby replicating its store model.  (See Ex. 3: Fairway 4/16/13 IPO Prospectus at 3.)[23/]  Likewise, Fairway's 2013 Form 10-K indicated an approximate five million dollar increase in general and administrative expenses "attributable to [Fairway's] continued investments in management, information technology systems, infrastructure, compliance and marketing to support continued execution of [Fairway's] growth plans."  (Ex. 2: Fairway 6/6/13 10-K at 59.)  Thus, there is no falsity in such claims.

Further, the forward looking statement are accompanied by meaningful cautionary language set out in the same communication, and thus are protected by the bespeaks caution doctrine and the PSLRA safe harbor.  Each of the filings, press releases and conference calls in which plaintiff identifies false or misleading statements about new store growth included a note or statement such as the following, identifying forward looking statements:

---

[23/]     Unless otherwise indicated, references to "Ex." are to the exhibits to the Allerhand Affidavit, Dkt. No. 65.

<u>Special Note Regarding Forward-Looking Statements</u>

This Annual Report on Form 10-K contains forward-looking statements that are subject to risks and uncertainties.  All statements other than statements of historical fact included in this report are forward-looking statements.  Forward-looking statements give our current expectations and projections relating to our financial condition, results of operations, plans, objectives, future performance and business. . . .  These statements may include words such as "anticipate," estimate," "expect," "project," "forecast," "continue," "plan," "intend," "believe," "may," "will," "should," "can have," "likely," and other words and terms of similar meaning . . . .  For example, all statements we make relating to our estimated and projected store openings, . . . growth rates and financial results, our plans and objectives for future operations, growth or initiatives, strategies . . . are forward-looking statements.  All forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially from those that we expected, including

• our ability to open new stores on a timely basis or at all;
• our ability to achieve sustained sales and profitable operating margins at new stores;
. . .
• ongoing economic uncertainty;
• our ability to maintain or improve our operating margins;
• our history of net losses;
. . .
• our ability to satisfy our ongoing capital needs and unanticipated cash requirements;
. . .
• other factors discussed under "Item 1A—Risk Factors."

(Ex. 2: Fairway 6/6/13 10-K at 3; <u>accord</u>, Ex. 3: Fairway 4/16/13 IPO Prospectus at 45; Ex. 7: Fairway Roadshow Slides at 1; Ex. 18: Fairway 6/6/13 8-K at 2, 8; Ex. 25: Fairway 6/6/13 Earnings Call Tr. at 1; Ex. 9: Fairway 8/8/13 8-K at 2, 5-6; Ex. 29: Fairway 8/8/13 Earnings Call Tr. at 1; Ex. 30: Fairway 8/8/13 10-Q at 3; Ex. 11: Fairway 11/7/13 Earnings Call Tr. at 2; Ex. 19: Fairway 11/7/13 8-K at 2, 7; Ex. 31: Fairway 11/7/13 10-Q at 3-4.)[24/]

---

[24/]   The Court was not given copies of Fairway's June 6, August 8 and November 7, 2013 press releases.  These releases are publicly available on Fairway's website, were filed with the SEC, and are available on the SEC's Edgar database.  <u>See</u> U.S. SEC, Fairway Group Holdings Corp. Filings, http://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK = 000155 5492&owner=exclude&count=40&hidefilings=0.  Because the SAC relies upon
(continued...)

Investors also were provided with specific warning that Fairway's continued expansion to new store locations was conditioned upon numerous factors that could be impacted by circumstances outside of Fairway's control:

### ITEM 1A—RISK FACTORS

*Certain factors may have a material adverse effect on our business, financial condition and results of operations.  You should consider carefully the risks and uncertainties described below, in addition to other information contained in this Annual Report on Form 10-K, including our consolidated financial statements and related notes.  The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties that we are unaware of, or that we currently believe are not material, may also become important factors that adversely affect our business.  If any of the following risks actually occurs, our business, financial condition, results of operations, and future prospects could be materially and adversely affected. In that event, the trading price of our Class A common stock could decline, and you could lose part or all of your investment.*

**Risks Relating to Our Business**

**Our continued growth depends on new store openings and on increasing same store sales, and our failure to achieve these goals could negatively impact our results of operations and financial condition.**

Our growth strategy depends, in large part, on opening new stores in existing and new areas and operating those stores successfully.  Successful implementation of this strategy is dependent on finding suitable locations and negotiating acceptable lease terms for store sites, and we face competition from other retailers for such sites. There can be no assurance that we will continue to grow through new store openings. We may not be able to open new stores timely or within budget or operate them successfully, and there can be no assurance that store opening costs for, net sales of, contribution margin of and average payback period on initial investment for new stores will conform to our operating model for new urban and suburban stores discussed elsewhere in this report.  New stores, particularly those we open outside

---

24/   (...continued)
and quotes these documents, the Court may properly consider them without converting defendants' motion to dismiss into one for summary judgment.  See, e.g., City of Austin Police Ret. Sys. v. Kinross Gold Corp., 957 F. Supp. 2d 277, 302 n.7 (S.D.N.Y. 2013). Each of the press releases at issue contains a section identifying forward looking statements as such.  (Fairway 6/6/13 Press Release at 6; Fairway 8/13/13 Press Release at 4; Fairway 11/7/13 Press Release at 5.)

the Greater New York City metropolitan area, may not achieve sustained sales and operating levels consistent with our mature store base on a timely basis or at all. Lower contribution margins from new stores, along with the impact of related store opening and store management relocation costs, may have an adverse effect on our financial condition and operating results. In addition, if we acquire stores in the future, we may not be able to successfully integrate those stores into our existing store base and those stores may not be as profitable as our existing stores.

Also, we may not be able to successfully hire, train and retain new store employees or integrate those employees into the programs, policies and culture of Fairway. We, or our third party vendors, may not be able to adapt our distribution, management information and other operating systems to adequately supply products to new stores at competitive prices so that we can operate the stores in a successful and profitable manner. We may not have the level of cash flow or financing necessary to support our growth strategy.

Additionally, our opening of new stores will place increased demands on our operational, managerial and administrative resources. These increased demands could cause us to operate our existing business less effectively, which in turn could cause a deterioration in the financial performance of our existing stores. If we experience a decline in performance, we may slow or discontinue store openings, or we may decide to close stores that we are unable to operate in a profitable manner.

Additionally, some of our new stores may be located in areas where we have little experience or a lack of brand recognition. Those markets may have different competitive conditions, market conditions, consumer tastes and discretionary spending patterns than our existing markets, which may cause these new stores to be less successful than stores in our existing markets.

(Ex. 2: Fairway 6/6/13 10-K at 18; accord, Ex. 3: 4/16/13 IPO Prospectus at 18; see also Ex. 3: Fairway 4/16/13 IPO Prospectus at 4-5, 18-46; Ex. 18: Fairway 6/6/13 8-K at 8; Ex. 19: Fairway 11/7/13 8-K at 7; Exs. 11, 25, 29: Fairway Earnings Call Trs. at 2 (identifying forward looking statements and directing listeners to the risk disclosures in Fairway's 2013 10-K).)

"These statements conveyed substantive information about the risk that ultimately materialized. As such, they were meaningful cautionary language, not mere boilerplate." In re Sanofi Sec. Litig., 13 Civ. 8806, 2015 WL 365702 at *21 (S.D.N.Y. Jan. 28, 2015); see also, e.g., In re Barrick Gold Sec. Litig., No. 13 Civ. 3851, 2015 WL 1514597 at *8 (S.D.N.Y. Apr. 1, 2015);

City of Austin Police Ret. Sys. v. Kinross Gold Corp., 957 F. Supp. 2d at 303 ("For similar reasons, Kinross's statements during its February 17, 2011 conference call are protected as forward-looking. At the beginning of the call, Kinross's moderator stated that the speakers would 'be making forward-looking statements during the presentation,' and directed the call participants to the cautionary language in Kinross's February 16, 2011 news release for a discussion of the relevant risks, uncertainties, and assumptions.").

## 2.     Statements Of Opinion

Further, as expressions of defendants' expectations for future growth, the challenged statements are statements of opinion.  See, e.g., In re Sanofi Sec. Litig, 13 Civ. 8806, 2015 WL 365702 at *15 (S.D.N.Y. Jan 28, 2015) (expressions of "expectations for the future" are opinions); City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp., Inc., 10 Civ. 2835, 2011 WL 4357368 at *19 n.54 (S.D.N.Y. Sept. 19, 2011) (growth projections are statements of opinion).  Accordingly, to adequately plead a misstatement "plaintiff must allege that defendant's opinions were both false and not honestly believed when they were made." Fait v. Regions Fin. Corp., 655 F.3d 105, 113 (2d Cir. 2011); see also cases cited at pages 21-23 above.

As stated above, several of the alleged misstatements concerning new store growth were not objectively false.  Additionally, plaintiff offers no particularized, non-conclusory factual allegations to show that defendants did not believe their statements when they made them– e.g., that defendants did not plan to open new stores at the stated rate, believe their infrastructure investments to be "significant," understand their store model to be replicable, or expect that the local market could support ninety Fairway stores and the national market three hundred.  On the contrary, defendants' actions indicate that they expected Fairway would "'be a very strong investment'" as they stated prior to the IPO.  (SAC ¶ 41.)  For example, defendants have maintained  a large percentage

of ownership in Fairway, five individual defendants increased their Fairway stock holdings following the IPO (Ex. 4 at 17, 19, 23, 27, 28, 30) and defendants Arditte and Santoro purchased stock in the IPO (Ex. 4 at 15, 23: Arditte & Santoro SEC Forms 4).

To demonstrate that defendants "knew or should have known" that their statements were false when made, plaintiff collects statements from former Fairway employees, who opine that Fairway's operating conditions leading up to and after the IPO made the stated projections impossible. (See SAC ¶¶ 83-98.)[25/] For example, CW1, Fairway's former manager of financial planning, stated that Fairway "suffered from clear infrastructure inefficiencies that constrained its ability to expand." (SAC ¶ 86.) CW 1 viewed portions of Fairway's five-year growth plan prior to the IPO, and stated that he "never saw increases in administrative expense to cover new infrastructure costs." (SAC ¶ 89.) CW 1 believed Fairway's financial forecasts were not driven "by objective performance figures, but by Defendant Santoro and the rest of Sterling's management who created bold projections in order to create interest in the Company." (SAC ¶ 93.) CW 1 alleged that "Fairway set a [growth] target that they thought would be attractive to the public . . . and they figured out 'how do we get to that' in order to 'justify a price, a valuation.'" (SAC ¶ 94.) CW 1 further "did 'not believe anyone thought they were going to get [to the targets]' because the corporate financial divisions, including his, 'struggled every quarter prior to the IPO.'" (SAC ¶ 96.) CW 1 stated that he "[s]aw 'no evidence' that the plan even attempted to account for growth outside the

---

[25/] "[T]he PSLRA does not require confidential sources to be named in the complaint. A complaint may rely on information from confidential witnesses if 'they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" Emps.' Ret. Sys. of Gov't of V.I. v. Blanford, No. 14-199, 2015 WL 4491319 at *7 (2d Cir. July 24, 2015) (quoting Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000)).

New York City area." ( SAC ¶ 96.)   Additionally, CW1 reported that "employees within the

Company 'thought it was a joke to say [Fairway] could operate 90 stores.'" (SAC ¶ 97.)[26]

Plaintiff relies on City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.,

875 F. Supp. 2d 359 (S.D.N.Y. 2012), to assert that the CW allegations are sufficient to establish

falsity.  (Dkt. No. 91: Plaintiff Suppl. Opp. Br. at 28.)  In that case,  confidential witnesses alleged

that individual defendants personally reviewed bids and regularly revised them downward, a practice

omitted from their public statements; the CWs further provided information regarding defendants'

participation in weekly telephone calls, discussing the "red" status of programs later omitted from

defendants' public statements about "red" programs; and three confidential witnesses alleged that

---

[26]   Other confidential witnesses offer similar reports.  For example, CW2, Fairway's former
assistant controller, stated that "'[e]xisting stores could not generate enough to fund the
expansion'" and there was "no way the Company had sufficient capital for planned future
expansion." (SAC ¶ 86.)  CW2 further believed projected new store growth was "'too
aggressive, based on the staffing and systems [Fairway] had.'" (SAC ¶ 89.)  CW3, a former
employee in Fairway's accounts payable department, concurred "that Fairway lacked the
infrastructure to support the touted growth Fairway marketed in the IPO."  (SAC ¶ 86.)
CW9, a former bakery manager for multiple Fairway locations, regularly received and
reviewed financial data for the Fairway bakery and observed declines in production,
offerings to customers, and outside purchases following the IPO. (SAC ¶ 88.)  "For those
reasons, CW 9 'never saw' that Fairway would be able to open three to four stores annually."
(SAC ¶ 88.)  CW 4, a former supervisor for several Fairway stores, "stated that Fairway's
corporate infrastructure was an 'unbelievable mess' and a 'corporate nightmare.'" (SAC ¶ 90.)
CW 4 further observed that "in the lead up to the IPO, Sterling 'made life difficult for
management and workers' in order to inflate numbers for the IPO.  For example, payroll was
cut in existing stores where it should not have been so that the 'bean counters' could
'manipulat[e] stores in a very harsh way in order to make the numbers look right.'" (SAC ¶
90.)  CW 4 believed "these practices were 'chaotic' and were instituted for the purpose of
'mak[ing] the numbers look good for the IPO' while 'painting over [the] problem' of high
debt and poor performance." (SAC ¶ 90.)  Further, the SAC alleged that "former high-level
employees have reported that 'Fairway's projections for sales and new store growth were
without a legitimate basis and were devised as a means to to drum up investment.'" (SAC
¶ 92.)

they shared their concerns about the company's financial goals with a defendant executive.  Id., 875

F. Supp. at 363, 369-70.

      In contrast to City of Pontiac, none of the CWs presented by plaintiff allege that they

communicated their concerns to defendants, or that defendants communicated like concerns to

Fairway's employees. Compare City of Pontiac Gen. Emps' Ret. Sys. v. Lockheed Martin Corp., 875

F. Supp. 2d at 370 ("[T]he Complaint alleges that in March 2009, [defendant] approached CW2 and

pressured CW2 to represent that the IS & GS area for which CW2 was responsible had a $2.5 billion

backlog for 2009.  CW2 allegedly told [defendant] and others with whom she worked that $2.5

billion in backlog was not reasonable.").  Accordingly, City of Pontiac is inapposite.

      Likewise, CW allegations about "widespread" undisclosed deficiencies generally

known to the defendants were held insufficiently specific to establish falsity in In re Lululemon Sec.

Litig., a decision recently affirmed by the Second Circuit.  In re Lululemon Sec. Litig., 14 F. Supp.

3d 553, 579-81 (S.D.N.Y. 2014), aff'd, 604 F. App'x 62 (2d Cir. 2015).  In that case, the court stated

that "none of the CWs is alleged to be the 'maker' of any of the alleged misstatements, and it is the

facts known to, and the intent of, the maker of the statements which is ultimately relevant when the

Court considers the falsity of statements of belief or opinion."  In re Lululemon Sec. Litig., 14 F.

Supp. 3d at 580.  The Court referred to City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.,

for the proposition that "allegations that defendants 'should have' been aware of facts contradicting

their opinions 'alone would not suffice to state a securities fraud claim after Fait'" v. Regions Fin.

Corp. 655 F.3d 105 (2d Cir. 2011).  In re Lululemon Sec. Litig., 14 F. Supp. 3d at 579.  The Second

Circuit concluded "for substantially the same reasons provided by the District Court" that the

plaintiff in Lululemon "failed adequately to plead that any of the statements attributed to the

defendants were materially misleading at the time that they were made." In re Lululemon Sec. Litig., 604 F. App'x at 63.

In this case, none of the CWs is alleged to be the maker of any of the alleged misstatements.  Nor do any of the CWs allege that they communicated their concerns about Fairway's projected growth to any of the defendants.  Allegations that defendants attended weekly meetings at which Fairway's stock ledger results were discussed (SAC ¶¶ 64, 290) are insufficiently specific to explain how it is that defendants' stated opinions were subjectively false when made, as plaintiff has not provided details about the timing of the meetings in relation to defendants' statements, or how discussions at those meetings were contradictory to defendants' public statements.  Even accepting all the CW allegations as true, they do not "substitute for well-pleaded allegations of contemporaneous falsity–that the makers of the statements . . . knew their statements were false or misleading at the time they were made." In re Lululemon Sec. Litig., 14 F. Supp. 3d at 580 (emphasis in original).

### 3.      Statements Of Opinion Made Misleading By Omission

Plaintiff asserts that because Fairway's "strong infrastructure and other characteristics that purportedly gave it the ability to grow substantially by opening new stores at a rapid clip" were core selling points in the IPO, defendants should be held liable for their failure to disclose the "numerous facts that contradicted their statements."  (Dkt. No. 91: Plaintiff Suppl. Opp. Br. at 20-21.)  Plaintiff argues that while defendants were free to "express their opinions . . . that Fairway was well positioned for growth, . . . they were required at the same time to inform investors of the material facts that Fairway would have to substantially upgrade its infrastructure and capital base, and further refine its growth plans, if the advertised growth had any actual chance to be achieved." (Plaintiff Suppl. Opp. Br. at 22.)

In order to establish that a statement of opinion was misleading on the basis of an omitted fact, plaintiff must (1) "identif[y] one or more facts left out of [the] registration statement"; (2) demonstrate that "the omitted fact would have been material to a reasonable investor"; (3) show that the omission rendered the opinion misleading to a reasonable investor; and (4) consider the "statement's context," taking into account whatever disclaimers the company did provide, as well as any "hedges, disclaimers, or qualifications." Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. 1318, 1333 (2015); accord, e.g., Medina v. Tremor Video, Inc., 13 Civ. 8364, 2015 WL 3540809 at *2 (S.D.N.Y. June 5, 2015).

The contradictory facts identified by plaintiff as omitted from defendants' public statements are the numerous CW remarks about Fairway's generally poor infrastructure and lack of investment in improvement.  (See pages 34-35 & n.26 above.)  Setting aside that plaintiff has not established that defendants knew of the various CW concerns, "[a]n opinion statement . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. at 1329.  Further, because none of the CWs is alleged to have participated in creating Fairway's growth plan or even to have seen it in its entirety (see, e.g., SAC ¶ 89 (CW 1 "observed portions of Defendants' five-year growth plan"), ¶ 94 ("CW 8 reported that Fairway management kept the Company's financial forecasting 'very close to the vest.'")), they were not in a position to remark on its feasability.  The opinions of staff who were not involved in creating growth projections are not "the sort of information that a speaker implicitly represents as forming a basis for their opinion . . . ." In re BioScrip, Inc. Sec. Litig., 13 Civ. 6922, 2015 WL 1501620 at *19 (S.D.N.Y. Mar. 31, 2015).  Thus, even assuming that the omitted CW statements were "facts" left out of Fairway's public statements, plaintiff has not alleged how those facts would have been material to a reasonable investor.  See,

e.g., Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. at 1332 ("The [plaintiff] must identify particular (and material) facts going to the basis for the issuer's opinion-facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have-whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.").

Further, defendants  identified numerous risks to growth in Fairway's public filings (see pages 29-32 above & 45, 48 below), and disclosed that their projections were based on demographic research conducted by the Buxton Company, "a customer analytics research firm." (Ex. 3: Fairway 4/16/13 IPO Prospectus at 63, 94; see also Ex. 7: Fairway Roadshow Slides at 12 "note.")  See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. at 1332 ("to avoid exposure for omissions . . . , an issuer need only divulge an opinion's basis, or else make clear the real tentativeness of its belief.")   Thus, in context, the "excluded facts" do not show that defendants "lacked the basis for making th[eir] statements that a reasonable investor would expect." Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. at 1333.

### 4.   Statements Of Embedded Fact

Finally, plaintiff asserts that the identified misstatements contained false "statements of embedded fact"and thus are actionable under Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. 1318 (2015).  (Dkt. No. 91: Plaintiff Suppl. Opp. Br. at 17-24.)  In Omnicare, the Supreme Court provided the following as an example of a statement of opinion containing an embedded fact: "'I believe our TVs have the highest resolution available because we use a patented technology to which our competitors do not have access.'"  Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. at 1327.  The Supreme Court identified as an embedded fact the company's use of patented technology.  Id.  The Supreme Court

stated that liability for such a statement would follow "not only if the speaker did not hold the belief she professed but also if the supporting fact she supplied were untrue." Id.  The Supreme Court further stated that the following--"'I believe' (or 'I think') 'the TVs we manufacture have the highest resolution available on the market.'"– is a statement that expresses only "a view, not a certainty," for which liability would follow only if the speaker "knew that her company's TVs only placed second." Id. at 1326.

After Omnicare, the Middle District of Pennsylvania addressed opinion statements alleged to contain embedded facts. See SE PA Transp. Auth. v. Orrstown Fin. Servs., Inc., No. 12-CV-00993, 2015 WL 3833849 (M.D. Pa. June 22, 2015).  In that case, the court considered the following statement: "'We view sound credit practices and stringent underwriting standards as an integral component of our continued success.  In September 2009, we created the position of Chief Credit Officer to enhance our processes and controls, as well as clearly delineate independence between sales and credit.'" Id. at *19.  Plaintiff argued that within the bank's opinion was a statement of embedded fact that it employed "'sound credit practices and stringent underwriting standards.'" Id.  The court held that such statements were "too vague to be capable of verification, and are therefore accurately characterized as puffery, or a positive portrayal so vague as to be immaterial to a reasonable investor." Id.  The court next assessed the statement "'we believe that this disciplined approach to lending results in peer-leading asset quality metrics even in a difficult environment.'" Id. at *22.  Plaintiff argued that the embedded fact within this opinion statement was that the bank's "'disciplined approach to lending results in peer-leading asset quality metrics.'" Id. Again, the court found that to constitute more than puffery, statements "must be in some way determinate or verifiable." Id.

Plaintiff's brief highlights seven statements alleged to contain embedded facts. (Plaintiff Suppl. Opp. Br. at 18-19.)   While plaintiff correctly asserts that the use of the word "believe" cannot transform a statement of fact into a statement of opinion (Plaintiff Suppl. Opp. Br. at 18), the alleged embedded facts are not determinate or verifiable. By way of example, plaintiff highlights the following statement from Fairway's prospectus: "'[W]e intend to improve our operating margins by the following key initiatives: <u>Leverage our well-developed and scalable infrastructure</u>.'" (Plaintiff Suppl. Opp. Br. at 18.)  A statement describing an asset as well-developed and scalable is not determinate or verifiable in the same way as a statement asserting the use of patented technology.

Additionally, plaintiff does not adequately allege that the embedded facts actually were false.  An optimistic description of Fairway's corporate infrastructure as well developed and scalable certainly is inconsistent with CW 4's assertion that the infrastructure was an "'unbelievable mess'" and a "'corporate nightmare.'" (<u>See</u> page 35 n.26 above.)  In light of Fairway's successful expansion from three stores to twelves stores between 2009 and 2012 (SAC ¶ 5), however, it is not an actionably false misrepresentation.  <u>See</u>, <u>e.g.</u>, <u>Pearlstein</u> v. <u>Blackberry Ltd.</u>, 13 Civ. 7060, 2015 WL 1137519 at *6 (S.D.N.Y. Mar. 13, 2015) ("It is simply implausible to argue that discounting [Blackberry] Z10 prices is incompatible with an optimistic belief that the smartphones 'have been well-received.'").

By way of further example, plaintiff's brief highlights the following statement: "'[W]e are also on track to commence operations at our new production center later this year.  We believe that facility will have the capacity to support approximately 30 stores in the greater New York Metropolitan area.'"  (Plaintiff Suppl. Opp. Br. at 19.)  This statement was made by Charles Santoro on August 8, 2013.  (Ex. 29: Fairway 8/8/13 Earnings Call Tr. at 3.)  "If something is 'on track' it

is reasonable to assume that it could go 'off track'.  Thus, the challenged statements are vague expressions of opinion which are not sufficiently concrete or specific to impose a duty to update." Elliott Assocs., L.P. v. Covance, Inc., 00 Civ. 4115, 2000 WL 1752848 at *10 (S.D.N.Y. Nov. 28, 2000).  Plaintiff does not explain how the alleged embedded fact that the facility was "on track" as of August 2013 was false.  Instead, plaintiff points to Arditte's statement on February 6, 2014  that a "'major focus for fiscal 2015 will be to bring the production center online.'" (Plaintiff Suppl. Opp. Br. at 20; Dkt. No. 92: Brown Aff. Ex. B: Fairway 2/6/14 Earnings Call Tr. at 7.)  As further evidence, plaintiff points to a May 26, 2015 statement by Fairway CEO Jack Murphy that the production center would be "'fully going'" in the next few months.  (Plaintiff Suppl. Opp. Br. at 20; see also Brown Aff. Ex. C: Fairway 5/26/15 Earnings Call Tr. at 7.)  It is insufficient to argue in hindsight that defendant's statement ultimately was false; plaintiff must allege that the statement was false at the time it was made.  See, e.g., Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir.) (fraud by hindsight is not actionable, "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."), cert. denied., 531 U.S. 1012, 121 S. Ct. 567 (2000).

The additional statements highlighted by plaintiff as containing false statements of embedded fact (see Plaintiff Suppl. Opp. Br. at 18-19) suffer from the same deficiencies.  The alleged embedded facts are too vague to be factual, and defendant's statements are not alleged to have been false when made.  Accordingly, plaintiff has not adequately alleged that defendants made actionably false statements of embedded fact regarding Fairway's capacity for new store growth.

**B.      Alleged Misstatements And Omissions Regarding Sales Growth At Existing Fairway Store Locations**

The SAC identifies allegedly false and misleading statements about sales at Fairway's existing store locations based on the impact of Hurricane Sandy, in the IPO prospectus (Dkt. No. 83: SAC ¶¶ 60-62, 148-49, 287-88), roadshow presentation (SAC ¶¶ 62, 149), 2013 10-K (SAC ¶ 161), August 2013 10-Q (SAC ¶¶ 173, 177), November 7, 2013 Form 8-K (SAC ¶ 187), and during a November 7, 2013 earnings call (SAC ¶ 196-97).

**1.      Material Omission Regarding Hurricane Sandy**

The Fairway IPO Prospectus and June 6, 2013 Fairway 10-K included a statement about disruptions to Fairway's business following Hurricane Sandy, as follows:

> [W]e temporarily closed all of our stores as a result of Hurricane Sandy, which struck the Greater New York City metropolitan area on October 29, 2012. While all but one of our stores were able to reopen within a day or two following the storm, we experienced business disruptions due to inventory delays as a result of transportation issues, loss of electricity at certain of our locations and the inability of some of our employees to travel to work due to transportation issues. In addition, our Red Hook store suffered substantial damage, including the loss of all inventory and a substantial portion of its equipment, and it was not reopened until March 1, 2013. . . . [T]here can be no assurance that our sales or gross profit at the store will return to prior levels.

(Ex. 3: Fairway 4/16/13 IPO Prospectus at 33; accord Ex. 2: Fairway 6/6/13 10-K at 31; see also Ex. 7: Fairway Roadshow Slides at 24 "note"; Ex. 30: Fairway 8/8/2013 10-Q at 18.)  Plaintiff alleges that while characterizing Hurricane Sandy as disruptive, defendants misleadingly omitted to state until November 7, 2013 that Hurricane Sandy led to the "'highest single day volume in the history of the Company at any location'" and "'was probably net-net a positive'" for 2012. (SAC ¶ 119.)

"A duty to disclose arises whenever secret information renders prior public statements materially misleading. . . ."  In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993), cert. denied, 511 U.S. 1017, 114 S. Ct. 1397 (1994); see also, e.g., Kleinman v. Elan Corp.,

706 F.3d 145, 152-53 (2d Cir. 2013) ("Disclosure of an item of information is not required . . .

simply because it may be relevant or of interest to a reasonable investor." (quotation & citation

omitted)).  As an initial matter, defendants disclosed in Fairway's prospectus that net sales increased

to $167 million in the quarter ending December 30, 2012 (i.e., the quarter during which Hurricane

Sandy occurred) (Ex. 3: Fairway 4/16/13 IPO Prospectus at 79), and "'[t]here can be no omission

where the allegedly omitted facts are disclosed.'"  SRM Global Fund L.P.  v. Countrywide Fin.

Corp., 09 Civ. 5064, 2010 WL 2473595 at *8 (S.D.N.Y. June 17, 2010), aff'd, 448 F. App'x 116 (2d

Cir. 2011).

              Plaintiff argues, however, that "it was reasonable for investors to believe that

[Fairway's] same store sales would be higher in subsequent years, all other events being equal,

absent the highly unusual disruptions caused by Hurricane Sandy."  (SAC ¶ 63.)  The statement

about Hurricane Sandy excerpted above is included in the "Risk Factors" section of Fairway's IPO

prospectus and June 6, 2013 10-K, as an example under the subheading "Severe weather, natural

disasters and adverse climate changes may materially adversely affect our financial condition and

results of operations."  (Ex. 3: Fairway 4/16/13 IPO Prospectus at 33; Ex. 2: Fairway 6/6/13 10-K

at 31.)  That subheading does not discuss same stores sales growth, except to warn that sales at the

Red Hook location may not return to prior levels. (Id.)  In Fairway's August 2013 10-Q, the "Effect

of Hurricane Sandy" is listed under the heading "Factors Affecting Our Operating Results."  (Ex.

30: Fairway 8/8/13 10-Q at 18.)  That subheading discusses store closures and damage, as well as

insurance claims and premiums.  In context, it is not clear how a reasonable investor would read

these statements as implying that future sales at existing locations would be greater than they were

in 2012, or how they are rendered materially misleading by omission of the fact that sales spiked

before and after the hurricane.

Plaintiff argues that "[o]nce defendants addressed the effects of Hurricane Sandy on the Company's earnings, . . . Defendants 'ha[d] a duty to be both accurate and complete.'" (Dkt. No. 68: Plaintiff Opp. Br. at 32.)   Plaintiff identifies two statements that addressed the effect of Hurricane Sandy on Fairway's earnings.  The first appears in the "Recent Developments" section of the IPO prospectus and states: "based on information available to date, we expect to report . . . comparable store sales growth of between 2.0% and 2.3% for the fourth quarter of fiscal 2013, compared to (8.1%) for the fourth quarter of fiscal 2012, excluding the Red Hook store in both periods."   (Ex. 3: Fairway 4/16/13 IPO Prospectus at 5; see SAC ¶¶ 149, 288.) Plaintiff does not explain how the omission of a single day's high sales volume, or a week's worth of frenetic shopping, renders that statement misleading.

Further, as a projection of future sales, this is a forward looking statement.  The prospectus included the following warning:

> We do not consider same store sales, which controls for the effects of new store openings, to be as meaningful a measure for us as it may be for other retailers because as a destination food retailer in a concentrated market area we have in the past experienced, and in the future expect to experience, sales transfer from our existing stores to our newly opened stores that are in closer proximity to some of our customers.

(Ex. 3: Fairway 4/16/13 IPO Prospectus at 67.)  The prospectus then details eleven specific factors effecting Fairway's same store sales, and additionally discusses factors generally effecting consumer purchases of "high-quality perishables and specialty food products." (Id.)  In light of the total mix of information available, which included disclosures that net sales increased during the quarter including Hurricane Sandy and same store sales decreased (id. at 6, 13, 79), and the meaningful cautionary language provided, including that there was no assurance that sales or profits at the Red Hook store would return to prior levels (id. at 33), as well as warnings about Fairway's business and

the grocery business generally, the omission of a brief increase in sales during the fourth quarter of fiscal 2012 was not material.  The prospectus provided specific, tailored warnings that bespoke caution above Fairway's capacity to attain its projections.

Plaintiff next identifies as misleading by omission a statement in Fairway's roadshow slides that "represented that the '20% top line growth story' assumed that the Company would realize sales in 2013 from the Red Hook store, which were not realized in 2012 due to Hurricane Sandy." (SAC ¶ 62.)  Plaintiff does not, however, assert that Fairway did not realize greater sales at the Red Hook stores in 2013 than it did in 2012, or explain how the omission of a week's worth of "'frenetic shopping'" at Fairway's other stores (SAC ¶ 119), was material in relation to Fairway's complete absence of sales at the Red Hook store in the final two months of 2012.

## 2.    Additional Challenged Statements

Plaintiff challenges two additional statements as misleading.

First, plaintiff challenges a statement in Fairway's roadshow presentation that the "Company had experienced 'positive SSS [same store sales] growth in most recent period.'" (SAC ¶¶ 60, 149.)  Plaintiff does not assert how this statement is false or misleading, and accordingly has not adequately pled a misstatement.

Next, plaintiff challenges a remark from the November 7, 2013 earnings call, arguing that defendant "Santoro bolstered" his prediction of "'solidly positive'" fourth quarter results "by reporting that the company had experienced 4.5% positive same store sales growth for the first three weeks of October – What Santoro called 'a pretty powerful statement of the underlying health of our business,' and that the Company predicted that same stores sales for the third quarter would increase by 1% and up to 4.5%.'" (SAC ¶ 196.)  Descriptions such as "solidly positive" and "pretty powerful" are immaterial corporate puffery.  (See cases cited at pages 24-25, 27-28 above.)  Further, plaintiff

does not allege that Fairway did not experience 4.5% positive same store sales growth for the first three weeks of October.  Rather, plaintiff asserts that because "Hurricane Sandy had a 'net positive' impact on Fairway's third quarter 2012 financial results," the "[c]ompany's targeted third quarter 2014 same store sales of 1% to 4.5% had no basis and were unattainable." (SAC ¶¶ 197- 98.) Plaintiff does not allege how this is so.  Nor does the Court understand how omitting to disclose that Hurricane Sandy had a "net positive" impact on sales renders this projection unattainable and thus misleadingly stated.

In conclusion, none of the alleged misstatements or omissions same about store sales or Hurricane Sandy are actionable.

### C.    Alleged Misstatements Regarding Fairway's DTA and EBITDA

The SAC identifies allegedly false and misleading statements about Fairway's DTA and Adjusted EBITDA in the IPO prospectus (SAC ¶¶ 152-54, 291-93), Fairway's 2013 10-K (SAC ¶¶ 164-65), August 2013 10-Q (SAC ¶ 180), November 2013 10-Q (SAC ¶ 192), and during earnings calls on June 6, August 8 and November 7, 2013 (SAC ¶¶ 170, 184-85, 199).

### 1.    Alleged Misstatement Regarding Fairway's DTA

Plaintiff alleges that Fairway's IPO prospectus "stated that Fairway had deferred tax assets of approximately $26 million" (SAC ¶¶ 152, 291), and that Fairway's 2013 10-K represented that the company believed it would generate future taxable income to utilize the DTA (SAC ¶ 164). Plaintiff argues that this metric was important to investors because under the relevant accounting principle, FAS 109, it "indicated that the Company expected to be able to make sufficient profits over the next five years to utilize its entire deferred tax asset."  (SAC ¶¶ 99, 101.)  Plaintiff asserts that Fairway's reporting of its DTA and Adjusted EBITDA was "materially false and lacked any reasonable, objective basis."  (SAC ¶ 100.)  Plaintiff asserts that defendants knew "there was no

48

objective basis to conclude that the Company would generate enough income in the next five years to justify maintaining $26 million of deferred tax assets on its books in light of the Company's year-after-year losses."  (SAC ¶ 105.)

Defendants assert that statements estimating the fair market value of assets, such as a DTA, "reflects management's judgment and opinion," not "matters of objective fact."  (Dkt. No. 64: Fairway & Sterling Br. at 22-24; Dkt. No. 72: Fairway & Sterling Reply Br. at 9-10.)  Plaintiff does not argue that defendants misstated the amount of the DTA; rather plaintiff claims that Fairway knew it would not have the income within five years to use the DTA.  Thus, this is a forward looking statement issue.  Fairway's Form 10-K and IPO Prospectus clearly warned that Fairway might not have sufficient profit to use the DTA, stating under "Risk Factors" that:

> We reported a net loss of $18.6 million in fiscal 2011, $11.9 million in fiscal 2012 and $62.9 million in fiscal 2013, and we expect to incur net losses through at least fiscal 2014. . . .  While we believe that we will generate future taxable income sufficient to utilize all prior years' net operating losses, we cannot assure you that we will not continue to incur net losses or if and when we will report net income.

(Ex. 2: Fairway 6/6/13 10-K at 21; <u>accord</u> Ex. 3: Fairway 4/16/13 IPO Prospectus at 21.)  Thus, Fairway disclosed the very risk that plaintiff claims was the misstatement – that because of Fairway's historical losses there was no assurance that Fairway would have the income to be able to use the DTA.  This Court agrees that "statements about the realization of a DTA are statements of opinion, not of fact."  <u>In re MF Global Holdings Ltd. Sec. Litig.</u>, 982 F. Supp. 2d 277, 312 (S.D.N.Y. 2013).  Accordingly, defendants' statements about Fairway's DTA are actionable only if they were "both false and not honestly believed when they were made."  <u>Fait</u> v. <u>Regions Fin. Corp.</u>, 655 F.3d 105,113 (2d Cir. 2011).[27/]  As noted, this statement was not false.

---

[27/]   Statements of opinion also are actionable when "stated as guarantees."  <u>Fait</u> v. <u>Regions Fin.</u>
(continued...)

Plaintiff argues that defendants knowingly violated GAAP, and that objectively, in light of negative factors such as "'cumulative losses in recent years[,] [l]osses expected in early future years [and] unsettled circumstances that, if unfavorably resolved, would adversely affect future operations and profit levels," Fairway should have taken a complete valuation allowance against the DTA prior to the IPO.  (Dkt. No. 68: Plaintiff Opp. Br. at 33; see also SAC ¶ 105.) Plaintiff, however, has not presented sufficient evidence alleging subjective falsity.  Plaintiff relies on confidential witness statements that Fairway's financial forecasts were driven by defendant Santoro's desires and defendants Arditte's "'pie in the sky targets'" (SAC ¶ 94) to assert that defendants knew they would not have sufficient taxable income to utilize the DTA (Dkt. No. 91: Plaintiff Suppl. Opp. Br. at 25).  Plaintiff acknowledges, however, that no CW played a role in Fairway's financial forecasting, and that the process "was tightly confined to the inner circle of Individual and Sterling Defendants." (SAC ¶ 108; see page 38 above.)  Plaintiff presents additional testimony from CW 1 that "there was no reasonable basis to believe that the Company could generate $26 million in profits" (SAC ¶ 107), and that at a board meeting after the IPO Arditte presented a five year plan with "no specific details on how to achieve what was in the plan, only projected results" (SAC ¶ 109). These statements do not allow the Court to determine what defendants knew, and when they knew it.  See cases cited at page 21 above; see also Omnicare, Inc. v. Laborers District Council Constr. Indus. Pension Fund, 135 S. Ct. 1318, 1333 (2015) ("Funds' conclusory allegation that Omnicare lacked 'reasonable grounds for the belief'" insufficient to identify a materially misleading omission.).  Accordingly, plaintiff has pleaded no facts from which

---

27/   (...continued)
Corp., 655 F.3d at 110 n.3.  Plaintiff does not argue that Fairway's statements about realizing its DTA constituted guarantees.

50

the Court could conclude that defendants did not subjectively believe they would have sufficient income to justify utilization of the DTA over the next five years.

### 2.    Alleged Misstatements Regarding Adjusted EBITDA

Plaintiff additionally asserts that "the numbers the Company reported for its Adjusted EBITDA . . . were materially false" and "misleading," because the Adjusted EBITDA figures were artificially inflated by the company's reported DTA. (SAC ¶¶ 100, 110-16, 153-55, 170-71, 180-81, 292; Dkt. No. 68: Plaintiff Opp. Br. at 17.) Plaintiff acknowledges that Fairway's prospectus and 2013 10-K "report[ed] the extent to which deferred tax assets contributed to each quarter's income tax provisions." (SAC ¶ 113.) Plaintiff's EBITDA claim is really a restatement of its DTA claim, which the Court has rejected. Defendants' statements in those documents regarding adjusted EBITDA were not misstated or made misleading by omitted fact.

Plaintiff additionally asserts that defendants made further statements regarding EBITDA growth during quarterly earnings calls (SAC ¶¶ 170, 184-85, 199.) Plaintiff argues that defendants' "statements regarding Adjusted EBITDA were materially false and misleading because . . . there was no objective basis to record the deferred tax asset given the Company's historical performance and results." (SAC ¶ 181.) Projected EBITDA and growth margins are forward looking statements within the meaning of the PSLRA. As plaintiffs do not allege sufficiently "that any defendant who made these forward-looking statements about [Adjusted] EBITDA [and growth] margin knew that they were false or misleading, those statements are protected by the PSLRA's safe harbor provision." Prime Mover Capital Partners L.P. v. Elixir Gaming Tech., Inc., 898 F. Supp. 2d 673, 689 (S.D.N.Y. 2012) (Kaplan, D.J.), aff'd, 548 F. App'x 16 (2d Cir. 2013)

\* \* \* \*

Accordingly, the SAC fails to adequately plead that defendants made an actionable false or misleading statement or omission of material fact, as is required for liability under Exchange Act § 10(b) and Rule 10b-5, and Securities Act §§ 11 and 12(a)(2).  Because plaintiff has failed adequately to plead the first element of its claims, the Court need not address the sufficiency of the remaining elements.  Defendants' motions to dismiss plaintiff's claims under Exchange Act §10(b) and Securities Act §§ 11 and 12(a)(2) should be GRANTED.  Plaintiff's claims under Exchange Act § 20(a), and Securities Act § 15 each require a primary underlying violation, which the Court does not find.  Accordingly, defendants' motion to dismiss those claims also should be GRANTED.

## IV.    PLAINTIFF ADDITIONALLY LACKS STANDING UNDER § 12(a)(2)

Defendants argue that plaintiff does not have standing under § 12(a)(2).  (Dkt. No. 62: Underwriters Br. at 12-14; Dkt. No. 64: Fairway & Sterling Br. at 34 n.23; Dkt. No. 71: Underwriters Reply Br. at 5; Dkt. No. 72: Fairway & Sterling Reply Br. at 15.)  The Supreme Court has defined a prospectus as "a document that describes a public offering of securities." Gustafson v. Alloyd Co., 513 U.S. 561, 584, 115 S. Ct. 1061, 1073 (1995).  Following that decision, the Second Circuit has determined that "a Section 12(a)(2) action cannot be maintained by a plaintiff who acquires securities through a private transaction, whether primary or secondary," because a "private offering is not effected 'by means of a prospectus.'"  Yung v. Lee, 432 F.3d 142, 149 (2d Cir. 2005).[28]  The SAC merely alleges that plaintiff "purchased shares of Fairway securities during the

---

[28]    See also Caiafa v. Sea Containers Ltd., 331 F. App'x 14, 16 (2d Cir. 2009) (plaintiffs did not have standing under § 12(a)(2) as they "failed to alleged that they purchased the securities at issue in an initial public offering"); Johnson v. Sequans Commc'ns S.A., 11 Civ. 6341, 2013 WL 214297 at *16 (S.D.N.Y. Jan. 17, 2013) (the Second Circuit "generally requires plaintiffs to plead that the securities at issue were purchased in the initial public offering"); In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 625 (S.D.N.Y. 2007) (Lynch, D.J.) ("Even where the defendants' marketing efforts in connection with the private transaction relied
(continued...)

Class Period." (Dkt. No. 83: SAC ¶ 23.)[29/]  As defendants correctly point out (Underwriters Br. at 13), plaintiff purchased Fairway stock on December 20, 2013 and January 4, 2014 (Dkt. No. 28: Silk Aff. Ex. A at 4).  Plaintiff does not allege that it purchased stock in the April 2013 initial public offering.  Indeed, in both plaintiff's response to the defendants' original motion to dismiss and in response to defendants' post-<u>Omnicare</u> motion to dismiss, plaintiff does not try to defend this claim.  Further, plaintiff did not file an objection to the portion of the prior Report & Recommendation dismissing this claim, nor was it mentioned in plaintiff's opposition to defendants' objections.  (Dkt. No. 81.)  In essence, plaintiff has abandoned this claim.  Accordingly, defendants' motion to dismiss plaintiff's Exchange Act §12(a)(2) claim should be <u>GRANTED</u>.

## <u>CONCLUSION</u>

For the reasons set forth above, defendants' motions to dismiss (Dkt. Nos. 87 & 88) should be <u>GRANTED</u>.

## <u>FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION</u>

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  <u>See also</u> Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan, 500 Pearl Street, Room 2240, and to my chambers, 500 Pearl Street, Room 1370.

---

[28/]     (...continued)
heavily upon the same prospectus used in a public offering, there was no liability because defendants were not obligated to distribute the prospectus in connection with that transaction.").

[29/]     Despite the prior Report & Recommendation pointing out the deficiency in the amended complaint (Dkt. No. 59), plaintiff did not amend ¶ 23 in the SAC.

53

Any requests for an extension of time for filing objections must be directed to Judge Kaplan (with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Ingram v. Herrick, 475 F. App'x 793, 793 (2d Cir. 2012); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:        New York, New York
              August 19, 2015

                              Respectfully submitted,


                              _____
                              **Andrew J. Peck**
                              United States Magistrate Judge


Copies ECF to:  All Counsel
                Judge Lewis A. Kaplan